UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge McMahon

———————————————— x

J. ROBERT ARBUTHNOT, Individually and
on Behalf of All Others Similarly Situated,

                 Plaintiff,

vs.

AEROPOSTALE, INC., THOMAS P.
JOHNSON and MARC D. MILLER,

                 Defendants.

———————————————— x

Civil Action No. 11 CIV 7132

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

RECEIVED
OCT 11 2011
U.S.D.C. S.D.N.Y.
CASHIERS



Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Aeropostale, Inc. ("Aeropostale" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the common stock of Aeropostale between February 3, 2011 and August 3, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff J. Robert Arbuthnot, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Aeropostale during the Class Period and has been damaged thereby.

7.     Defendant Aeropostale operates as a mall-based specialty retailer of casual apparel and accessories. It designs, markets, and sells merchandise principally targeting 14 to 17 year-old young women and men.

8.     Defendant Thomas P. Johnson ("Johnson") was, at all relevant times, Chief Executive Officer of Aeropostale.

9.     Defendant Marc D. Miller ("Miller") was, at all relevant times, Chief Financial Officer and Senior Vice President of Aeropostale.

10.     The defendants referenced above in ¶¶8-9 are referred to herein as the "Individual Defendants."

11.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Aeropostale, were privy to confidential and proprietary information concerning Aeropostale, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Aeropostale, as discussed in detail below.   Because of their positions with Aeropostale, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual

- 2 -

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Aeropostale's business.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Aeropostale's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Aeropostale common stock would be

based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Aeropostale common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Aeropostale's business, operations and management and the intrinsic value of Aeropostale common stock; (ii) allowed certain Company insiders, including Defendants Johnson and Miller, to collectively sell 143,401 shares of their personally-held Aeropostale common stock for gross proceeds in excess of $3.5 million; and (iii) caused plaintiff and members of the Class to purchase Aeropostale common stock at artificially inflated prices.

CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased the common stock of Aeropostale during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Aeropostale stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by

Aeropostale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public misrepresented material facts about the business, operations and management of Aeropostale;

(c)     whether the price of Aeropostale common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

22.     Defendant Aeropostale describes itself as a "mall-based, specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women and men through its Aeropostale® stores and 7 to 12 year-old kids through its P.S. from Aeropostale® stores."

23.     The Class Period begins on February 3, 2011.  On that date, Aeropostale issued a press release announcing its January 2011 sales results and guidance for the fourth quarter of 2010. For January 2011, net sales increased 7% to $120.4 million, compared to $112.5 million for the same period the previous year.  For the quarter, total net sales increased 5% to $838.9 million.  As a result, the Company "raised its fourth quarter earnings guidance to a range of $0.96 to $0.97 per share, versus its previously issued guidance of $0.94 to $0.96 per share."

24.     On March 10, 2011, Aeropostale issued a press release announcing its financial results for the fourth quarter and fiscal year of 2010, the period ended January 29, 2011.  For the quarter, the Company reported diluted net earnings of $0.95 per diluted share and net sales of $839.3 million.  Defendant Johnson, commenting on the results, stated, in pertinent part, as follows:

> In 2010 the Aeropostale brand continued to build momentum and popularity, we opened our flagship Times Square store, and we continued the roll-out of our children's concept 'P.S. from Aeropostale.' While we are proud of our many accomplishments, our performance in the back-half was below our expectations. The teen retail environment was highly promotional and we believe that we did not execute to our full potential. Moving into 2011, we recognize our opportunities and are more determined than ever to show the power of the Aeropostale brand.

With regard to the Company's outlook for the first quarter and full year 2011, Defendants stated, in pertinent part, as follows:

> For the first quarter of fiscal 2011, the Company expects earnings in the range of $0.35 to $0.38 per share, compared to earnings of $0.48 per share last year. For the full year, the Company expects net earnings in the range of $2.20 to $2.40 per diluted share.

> Mr. Johnson, continued, "Our outlook for the first quarter reflects the impact from clearing through holiday inventories, and our outlook for the full year reflects

- 6 -

industry wide inflationary pressures. As we look forward into 2011, we recognize that the entire sector faces near term challenges. We are, however, focused on leveraging our flexible promotional business model to navigate through the current environment and delivering on our initiatives to position ourselves for future growth."

25.     Following the press release, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations. With regard to the Company's outlook for 2011, Defendant Johnson stated, in pertinent part, as follows:

> Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give the customers what they want. At the same time, Aeropostale, along with the rest of the industry, is facing inflationary pressures. We are working diligently to mitigate the cost increases by leveraging our vendor relationships, raising ticket prices strategically, offering our customers creative promotions and being more conservative with our initial buys.

> However, there is still uncertainty surrounding the macroeconomic environment and the consumers' response to higher prices. Accordingly, we will manage the business carefully and focus on delivering key initiatives that will enable us to maximize our sales and profitability. For the rest of 2011, our key initiatives continue to be focused in three primary areas -- executing our product initiatives, enhancing our processes and technology, and concentrating on future growth drivers.

With regard to the Company's inventory, Defendant Miller stated, in pertinent part, as follows:

> JANET KLOPPENBURG, ANALYST, JJK RESEARCH: A couple of questions. If you could please talk about the inventory situation -- it feels really high -- and what the expectations are for inventory levels at the end of the first quarter. And also, given the gross margin pressure that it sounds like you are under, I'm wondering if there were any savings opportunities on the occupancy or store operating expense line or elsewhere that might help to offset that.

> MARC MILLER: On inventory levels, as we said, coming over Q4 our inventories per retail square foot were up 9%. We have been aggressively marking down through February and early March. And as result, as I updated in the opening remarks, we are currently sitting at a 4% increase in retail per square foot, and it's even lower than that on an absolute units basis.

> So we feel like we are appropriately attacking the inventory problem. Our goal, as always, is to end the quarter as cleanly as possible from an inventory standpoint.

With regard to the Company's women's fashion division, Defendant Johnson stated, in pertinent part, as follows:

EVREN KOPELMAN, ANALYST, WELLS FARGO SECURITIES: Can you talk a little bit more about the girls business? Do you think it's more of a major fashion shift if your customer is changing, she is getting older? Maybe more than a product issue, is it a brand issue? Can you talk a little bit more about maybe what -- from that perspective what's going on with the girls business?

TOM JOHNSON: Sure. We don't believe at all it's brand issue. We think that we just need to be very focused on our core customer and deliver what she wants. We have done it in the past, we have been very good at it and we will continue to do that.

But no, we do not think that there's a brand issue at all. If anything, our graphic business is stronger than ever, both in the girls and the guys business. Just as a point of reference, last year we sold 200 million units, 50 million graphic T-shirts. So we think that the brand is just as strong as ever.

26.     The statements referenced above in ¶¶23-25 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

        (a)     that Aeropostale was experiencing declining demand for its women's fashion division, which makes up 70% of the Company's sales;

        (b)     that Aeropostale was enduring pressure on its profit margins as a result of increasing inventory and higher discounts on its clothing; and

        (c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

27.     On May 5, 2011, Aeropostale issued a press release announcing its preliminary first quarter financial results. For the quarter, the Company reported net sales of $469.2 million and expected earnings of approximately $0.20 per diluted share – well below the Company's previously issued guidance. Defendant Johnson, commenting on the results, stated, in pertinent part, as follows:

Clearly we are not satisfied with our sales and margin performance for the first quarter. We were more promotional than anticipated on our spring assortment and clearance merchandise. Additionally, our core customers continue to be pressured by challenging macroeconomic conditions while, at the same time, the teen retail sector remains intensely promotional. As we move forward through the year, our entire management team is keenly focused on our key initiatives: regaining the balance and

clarity of our merchandise assortment, managing our cost structure, and leveraging our strong financial position. We remain very confident in our business model, in the ability and determination of our organization, and in the strength and positioning of our brand.

28.     In reaction to the announcement, the price of Aeropostale stock fell $4.20 per share, or 16.5%, to close at $21.29 per share, on heavy trading volume.  However, Defendants continued to conceal the true scope of the problems at the Company.

29.     On May 19, 2011, Aeropostale issued a press release announcing its first quarter financial results and second quarter financial guidance.  For the quarter, the Company reported diluted net earnings per share of $0.20 per share, net income of $16.4 million and net sales of $469.2 million.  With regard to the Company's outlook for the second quarter, Defendants stated, in pertinent part, as follows:

> For the second quarter of fiscal 2011, the Company expects earnings in the range of $0.11 to $0.16 per share. Based on current business trends and uncertainty surrounding the retail environment in the back-half of the year, the Company is not reiterating or providing an update to its previously issued full year guidance at this time. Moving forward, the Company expects to provide quarterly guidance.

> Thomas P. Johnson, Chief Executive Officer, commented, "Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories to position ourselves appropriately for the important back to school selling season. While we are disappointed with our current performance, we are confident that our entire organization is focused on the right initiatives to regain market share. Our goals for the remainder of the year remain very clear - regain balance and clarity in our merchandise assortments, mitigate industry wide cost increases, and manage our cost structure conservatively and carefully."

30.     Following the Company's first quarter press release, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations.  Defendant Johnson, commenting on the Company's "disappointing" first quarter performance, stated, in pertinent part, as follows:

> The first quarter was clearly very disappointing. While our February started off well, we experienced a significant deceleration in the business as we moved through March and April. Sales were affected more severely than we originally anticipated

during the Easter shift, and we did not experience the recovery that we had expected during the month of April.

We believe our performance was primarily impacted by the merchandising missteps we discussed on our last conference call. Based upon the merchandising strategies that were initiated back in the back half of last year, we did not deliver a balanced and compelling women's assortment for the first half of this year. Additionally, the retail environment remains highly competitive and promotional and our core customer continues to be pressured by difficult macroeconomic conditions.

As a result of these factors, we were significantly more promotional than anticipated on our spring assortment and clearance merchandise. By division, our men's business was up 2% comp, while our women's business was down 10% comp. During the quarter, our men's business continued to perform very well across multiple key classifications while our women's assortment underperformed. We experienced particular weakness in our women's knit tops business where we did not deliver a cohesive assortment in terms of silhouette, color and fashion.

We were encouraged, however, with our girls' positive response to certain newness in details, color and prints. We experienced strong sellthroughs in expanded classifications such as dresses and skirts.

Moving into the remainder of the year, our number one priority is to regain the balance and clarity in our assortment. We have made significant changes to the assortments starting in the back half of 2011. We are committed to returning to our fun, bright and optimistic product offering.

Additionally, we will deliver the right fashion and color palette, one that is understandable to our customer and fits her lifestyle. The girl's wardrobe is now broader than ever and we have the opportunity to offer her expanded classifications and more fashion.

31.    With regard to the Company's inventory situation, Michael Cunningham

("Cunningham"), Aerepostale's President, stated, in pertinent part, as follows:

KIMBERLY GREENBERGER, ANALYST, MORGAN STANLEY SMITH BARNEY: My question is on inventory. I'm wondering if you can talk about the 16% increase here. How did that come out relative to your initial expectation? And as you look at the end of second quarter, I would assume that you will see some cost inflation in the end of second quarter inventory levels.

So what do you think we should look for in terms of end of inventory -- sorry, end of second quarter inventory on a cost basis versus a unit basis? I think you said you were buying units down. If you could just help us understand that, that would be great.

MICHAEL CUNNINGHAM: Sure I can. Let me tackle the second half. We said we bought the units down in the second half. The cost impressions we've said were going to be up probably 35% in the beginning in the beginning of the second half. So at that rate, basically should be kind of flattish total cost inventory.

With regard to where we ended first quarter, I think first quarter was up 6% per square foot, which was not too unreasonable. However, given as Marc indicated some of the current business trends, especially with the reception of the spring product that Tom talked about, we are backing up in our inventory so we are being very aggressive with the markdown. And our goal is to basically take this quarter and liquidate as much as we can with the spring product to drive through and be flattish last year with any carryover inventory and open up back-to-school with fresh product.

32.     With regard to inventory and demand for the Company's products, Defendant

Johnson and Cunningham stated, in pertinent part, as follows:

JANET KLOPPENBURG, ANALYST, JJK RESEARCH: Just a couple of follow-ons there. So I'm glad you understand what the problem is, Tom, and I'm just wondering if the remedies to that were -- if you had enough time to infuse the remedies to the problem with the tops into the back-to-school season? Or do you think that because of your lead times we should be more hopeful about some sort of improvement in that important category in the fourth quarter?

And also, Michael, if you could be a little bit more specific about inventories. I assume you are planning them down significantly in the back half, but I didn't hear that. So if you could give us a little more embellishment that would help. Thanks.

TOM JOHNSON: Sure, Janet. The first part clearly we are building and yes you are correct. We will be more right in the fourth quarter than we are in the third quarter, but we are certainly more right in the third quarter than we were in the first quarter. So we are making incremental change and we understand that change and we will be building towards that. Mike?

MICHAEL CUNNINGHAM: And, Janet, this is Michael. Yes we are -- and I believe we talked about this on the last quarter call, but we are planning our units down in the mid- to high single digits for Q3 and in the high single to low double digits down in units for Q4. Obviously unit cost will be up.

And with regards to the question that Kim asked, again, we bought units flat for Q2 but the cost of increase will be about 3%. So there will be a slight increase in inventory if we end clean as we anticipate.

33.     In reaction to these announcements, on May 20, 2011, the price of Aeropostale stock

fell $3.04 per share, or 14.25%, to close at $18.30 per share, on extremely heavy trading volume.

- 11 -

34.     Then, on August 4, 2011, Aeropostale issued a press release providing a business update for the second quarter of 2011.  For the quarter, the Company reported net sales of $468.2 million, a decrease of 5% from the second quarter of 2010, and expected net earnings to be in the range of $0.02 to $0.03 per share.  Defendant Johnson, commenting on the second quarter results, stated, in pertinent part, as follows:

> We are very disappointed with our second quarter financial results that were clearly unacceptable. As a result of a lack of balance in our merchandise assortments, as well as continued promotional and macroeconomic challenges, we significantly increased the depth and breadth of our promotions and markdowns.  Our top priority is to deliver a merchandise assortment that resonates with the teen customer and captures market share from our competitors. Additionally, based on current business conditions that are likely to continue for the remainder of the year, we are planning our inventories conservatively and focusing aggressively on cost controls. As we look to 2012 and beyond, we have great confidence in the strength of the Aeropostale and PS brands, in our ability to develop balanced merchandise assortments for our customer, and in our capability to deliver improved financial performance and growth.

35.     In reaction to the Company's announcement, on August 4, 2011, the price of Aeropostale stock fell $3.99 per share, or 24%, to close at $12.53 per share, on extremely heavy trading volume.

36.     On August 18, 2011, the Company held a conference call with analysts and investors to discuss Aeropostale's second quarter 2011 financial results.  Again, Defendant Johnson described the quarter as "disappointing" due to weak trends in June and July.  In that regard, Defendant Johnson stated, in pertinent part, as follows:

> We are clearly disappointed with our second-quarter results. Since we last spoke to you in May, our trends in June and July weakened, and we experienced sharply lower consumer demand. In response, we increased both the depth and breadth of our promotions and our markdowns in order to move through our spring and summer merchandise. This action resulted in significantly lower than expected sales and gross margins for the second quarter.
>
> Same-store sales for the quarter declined 14%, and our GAAP earnings for the quarter were $0.04 per diluted share. While these financial results are unexceptionable, we believe we are making progress with our merchandise

initiatives. On our last conference call, we discussed our organization's top priority --
regaining the balance and clarity of our merchandise assortment and winning back
market share.

We outlined two specific areas of improvement in our women's business, color and
fashion. Since that call, as many of you have commented, we have returned our color
palette to represent the fun, bright and optimistic spirit that our customer wants.

We have also started to integrate more fashion into our assortment, and this initiative
remains our greatest opportunity. While the overall business in women's was weak
for the quarter, we did experience bright spots when we offered the girl newness and
fashion that was both understandable and consistent with the heritage of the
Aeropostale brand.

Moving forward, our entire product development team is working diligently to strike
the appropriate balance between fashion and core basics. We will leverage our
flexible operating model and speed to market, becoming even more responsive to
emerging trends. Additionally we will continue to fund new and innovative ways to
connect with our customer, amplifying our fashion message and create excitement in
our stores.

This initiative of pursuing more fashion is a subtle modification to our formula, but
can have meaningful impact to our brand projection and performance. To be clear,
we remain committed to our brand positioning. Aeropostale will always be a fun,
inclusive and parent-friendly brand offering our team customer the best mix of
fashion and basics at compelling prices.

With regard to the Company's outlook for the third quarter and full year 2011, Defendant Miller

stated, in pertinent part, as follows:

I will now discuss our guidance outlook. With third quarter, we expect earnings per
share in the range of $0.09 to $0.15 per diluted share. This guidance assumes a share
count of 82 million and a tax rate of 40.5%. We expect the effective tax rate to
normalize as we move through the second half of the year. While our trends have
improved slightly since the second quarter, we believe it is prudent to take a cautious
view of the third quarter and the remainder of the year as uncertainty surrounding the
macroeconomic and competitive environment remains, and we continue to work
through our merchandising initiatives.

With regard to the Company's high level of inventory, Cunningham stated, in pertinent part, as

follows:

DOROTHY LAKNER, ANALYST, CARIS & COMPANY: I wanted to ask about
inventory. It seems a little high, obviously, relative to where your sales are, even if

- 13 -

trends have improved. So I am just wondering in terms of the carryover there and where we should expect that to be at the end of 3Q or what you are aiming at?

MICHAEL CUNNINGHAM, PRESIDENT, AEROPOSTALE, INC.: Clearly we are not satisfied with our level of inventory at the end of the second quarter. It is clearly well above our sales trend. And I think as you look at our guidance for Q3, it reflects our plans and our goals to liquidate the inventory, the carryover inventory to again try to get clean and have a fresh inventory for the holiday season.

37.     The market for Aeropostale common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Aeropostale common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Aeropostale common stock relying upon the integrity of the market price of Aeropostale common stock and market information relating to Aeropostale, and has been damaged thereby.

38.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Aeropostale common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Aeropostale's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Aeropostale and its business, prospects and operations, thus causing the Company's

common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

40.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Aeropostale, their control over, and/or receipt and/or modification of Aeropostale's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Aeropostale, participated in the fraudulent scheme alleged herein.

41.     Defendants were further motivated to engage in this course of conduct in order to enable certain Company insiders, including Defendants Johnson and Miller, to collectively sell 143,401 shares of their personally-held Aeropostale common stock for gross proceeds in excess of $3.5 million.  The insider shares sold during the Class Period are set forth more fully in the following chart:

| Insider | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Ross Citta | Chief Accounting Officer | 03/25/11 | 1,522 | $24.23 | $36,878 |
| | | 05/25/11 | 2,753 | $18.29 | $50,352 |
| | | | 4,275 | | $87,230 |
| | | | | | |
| Julian Geiger | Director | 02/08/11 | 30,000 | $25.33 | $759,900 |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Thomas Johnson | Chief Executive Officer | 02/14/11 | 8,080 | $25.81 | $208,545 |
| | | | | | |
| Mindy Meads | President and Chief Merchandising Officer | 02/14/11 | 9,042 | $25.81 | $233,374 |
| | | 02/16/11 | 10,000 | $26.57 | $265,700 |
| | | 03/25/11 | 10,935 | $24.23 | $264,955 |
| | | 03/28/11 | 32,024 | $23.90 | $765,374 |
| | | 03/30/11 | 16,875 | $24.67 | $416,306 |
| | | | 78,876 | | $1,945,709 |
| | | | | | |
| Marc Miller | Chief Financial Officer | 03/25/11 | 2,541 | $24.23 | $61,568 |
| | | 03/28/11 | 2,527 | $23.90 | $60,395 |
| | | | 5,068 | | $121,964 |
| | | | | | |
| Mary Pile | Executive Vice President | 03/25/11 | 3,173 | $24.23 | $76,882 |
| | | 03/28/11 | 3,157 | $23.90 | $75,452 |
| | | | 6,330 | | $152,334 |
| | | | | | |
| Barbara Pindar | Senior Vice President, Planning and Allocation | 03/25/11 | 2,862 | $24.23 | $69,346 |
| | | 03/28/11 | 2,826 | $23.90 | $67,541 |
| | | | 5,688 | | $136,888 |
| | | | | | |
| Edward Slezak | Senior Vice President, General Counsel and Secretary | 03/25/11 | 2,557 | $24.23 | $61,956 |
| | | 03/28/11 | 2,527 | $23.90 | $60,395 |
| | | | 5,084 | | $122,351 |
| | | | | | |
| | | Total: | 143,401 | | $3,534,921 |

**Loss Causation/Economic Loss**

42.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aeropostale common stock and operated as a fraud or deceit on Class Period purchasers of Aeropostale common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Aeropostale common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Aeropostale common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

43.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Aeropostale's business and prospects. Defendants' false and misleading statements had the intended effect and caused Aeropostale common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $26.64 per share on February 18, 2011.

44.     As a direct result of defendants' disclosures on May 5, 2011, May 19, 2011 and August 4, 2011, the price of Aeropostale common stock fell precipitously, falling from its closing price of $25.49 per share on May 4, 2011 to $12.53 per share on August 4, 2011 – a loss of $12.96 per share, or over 50%. These drops removed the inflation from the price of Aeropostale common stock, causing real economic loss to investors who had purchased Aeropostale common stock during the Class Period.

45.     The over 50% decline was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Aeropostale common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Aeropostale common stock and the subsequent significant decline in the value of Aeropostale common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## Applicability of Presumption of Reliance:
## Fraud on the Market Doctrine

46.     At all relevant times, the market for Aeropostale common stock was an efficient market for the following reasons, among others:

- 17 -

(a)     Aeropostale common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Aeropostale filed periodic public reports with the SEC and the NYSE;

(c)     Aeropostale regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Aeropostale was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Aeropostale common stock promptly digested current information regarding Aeropostale from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Aeropostale common stock during the Class Period suffered similar injury through their purchase of Aeropostale common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the

statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aeropostale who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

49.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.      During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51.      Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

52.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aeropostale common stock.  Plaintiff and the Class would not have purchased Aeropostale common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

53.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Aeropostale common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of Aeropostale within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Aeropostale, and their ownership of Aeropostale stock, the Individual Defendants had the power and authority to cause Aeropostale to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 11, 2011

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.

_____
MARIO ALBA JR.

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
MARSHALL DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, Colorado 80203
Telephone:  303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the complaint and authorized its filing.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| ARO | | *See attached* | |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| ARO | | *None* | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7th_ day of _October_, 2011 in ___Belleville___, ___KS___.

(Signature) X _____

(Print Name) _J. Robert Arbuthnot_

2

EXHIBIT A

Arbuthnot ARO Purchases:

| Date | Shares | Price / Share | Cost |
|---|---|---|---|
| 5/10/2011 | 200 | $21.2284 | $4,245.68 |
| 5/10/2011 | 200 | $21.00 | $4,200.00 |
| 5/13/2011 | 400 | $21.4284 | $8,571.36 |
| 5/20/2011 | 400 | $18.3899 | $7,355.96 |
| 5/20/2011 | 600 | $18.26 | $10,956.00 |
| 6/1/2011 | 200 | $18.66 | $3,732.00 |
| 6/2/2011 | 200 | $18.15 | $3,630.00 |
| 6/7/2011 | 300 | $17.8084 | $5,342.52 |
| 6/15/2011 | 200 | $17.38 | $3,476.00 |