# COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(THK) |
| Plaintiff, | ) ) ) | CLASS ACTION |
| vs. | ) ) ) | AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) ) | JURY TRIAL DEMANDED |

U S DISTRICT COURT SDNY

2012 FEB 10  P 4 05

RECEIVED

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ..................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................. 7

III.  PARTIES ................................................................................................................ 7

IV.  CONFIDENTIAL WITNESSES ........................................................................... 8

V.  SUBSTANTIVE ALLEGATIONS ...................................................................... 10

    A.  BACKGROUND ......................................................................................... 10

        1.  Aeropostale: An Overview ............................................................. 10

        2.  Aeropostale's Business Model ....................................................... 10

        3.  The Company's Product Categories and Seasons ......................... 11

        4.  Aeropostale's Fiscal Calendar ...................................................... 12

    B.  Aeropostale's Core Operations ................................................................. 12

    C.  Aeropostale's Comprehensive Information Management System ....................... 13

    D.  Weekly Executive Committee Meetings, Daily Reports, and Unit-Q
        Meetings ..................................................................................................... 14

        1.  Weekly Executive Committee Meetings ................................... 14

        2.  Daily Flash Reports and the "Bible" ........................................... 15

        3.  Weekly Unit-Q Reports and Monthly Unit-Q Meetings ........... 16

    E.  Aeropostale Moves Away from It's Core Offering in the Back Half of
        2010 ............................................................................................................ 17

    F.  Defendants Know That the Company Has Already Over-Ordered
        Inventory Under Meads' New Designs for Spring and Summer 2011 .................. 19

    G.  Sales of the New Styles Continue to Sell Poorly Through 4Q2010 Leading
        to Increased Inventory Backlog .................................................................. 20

    H.  Defendants Condition the Market to Believe 2010 Inventory Overhang
        Would Not Linger into 2011 ....................................................................... 20

    I.  The Inventory Problems Worsened Throughout the First Half of 2011 and
        Defendants Knew the Severity of the Developing Crisis ............................ 21

J.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS MADE DURING THE CLASS PERIOD ................................... 24

        1.      March 10, 2011 Press Release ..................................................... 24

        2.      March 10, 2011 Earnings Conference Call ................................ 26

        3.      May 5, 2011 Business Update ..................................................... 30

        4.      May 19, 2011 Press Release ....................................................... 32

        5.      May 19, 2011 Earnings Conference Call ................................... 33

K.      THE TRUTH IS FULLY REVEALED ................................................... 35

        1.      August 4, 2011 Business Update ................................................ 35

        2.      August 18, 2011 Press Release ................................................... 37

        3.      August 18, 2011 Earnings Conference Call .............................. 38

VI.     PLAINTIFF'S INDUSTRY EXPERT ALLAN ZWERNER ........................... 40

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................. 42

VIII.   LOSS CAUSATION AND ECONOMIC LOSS ............................................ 44

IX.     CLASS ACTION ALLEGATIONS ............................................................ 46

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE
        *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE
        FRAUD ON THE MARKET DOCTRINE ..................................................... 48

XI.     NO STATUTORY SAFE HARBOR ......................................................... 51

XII.    CONTROL PERSON ALLEGATIONS ...................................................... 52

COUNT I Claim for Violations of Section 10(b) Of The Exchange Act and Rule 10b-5(b)
        Promulgated Thereunder Against All Defendants ........................................ 54

COUNT II Claim for Violation of Section 20(a) of the Exchange Act Against the
        Individual Defendants .............................................................................. 58

XIII.   PRAYER FOR RELIEF ........................................................................ 59

XIV.    JURY DEMAND ................................................................................. 60

ii

Lead Plaintiff, The City of Providence ("Providence" or "Plaintiff"), by its undersigned attorneys, hereby brings this Amended Complaint ("Complaint") against Aeropostale, Inc. ("Aeropostale" or the "Company"), Thomas P. Johnson and Marc D. Miller ("Defendants").  The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Aeropostale and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, *etc.*) and will be described in the masculine in all cases in order to protect their identities); review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by Aeropostale, regulatory filings and reports, securities analysts' reports and research data, investor conference transcripts, Company advisories, press releases and other public statements issued by the Company, media reports about the Company and consultations with experts, including consultation with Allan Zwerner, an expert on the retail and wholesale industry with over 40 years of experience.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

## I.      NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of itself and as a class action on behalf of all persons and entities who purchased the common stock of Aeropostale between March 11, 2011 and August 18, 2011 inclusive (the "Class Period") and who were damaged thereby.

2.      Aeropostale is a specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women through its Aeropostale stores and 7 to 12 year-old

children through its P.S. from Aeropostale ("P.S.") stores.  Its apparel offerings include graphic

t-shirts, tops, bottoms, sweaters, jeans, outerwear and accessories.  Much of the merchandise

features Aeropostale brand logos.  As of January 29, 2011, Aeropostale operated 965 stores, and

employed 4,160 full-time and 13,668 part-time employees.

3.      Aeropostale's business is highly seasonal, highlighted by back-to-school demand

during the third quarter and fourth quarter holiday shopping.  Sales during the first and second

quarters are traditionally less robust.

4.      Aeropostale's primary focus is on merchandise designed for young women.  For

at least the past three years, approximately 70% of the Company's revenue was generated from

the Company's Women's fashion line.

5.      Aeropostale's success, or lack thereof, depends almost entirely on the Company's

ability to match the merchandise it offers with the styles young women want.  When Aeropostale

correctly anticipates both the style and the likely level of demand for that style, the Company

does well.  When the Company selects the wrong style or overestimates demand for its clothing

and accessories, it performs less well.

6.      During the first half of 2010, a traditionally slow period, Aeropostale's sales were

relatively strong.  Aeropostale did a good job anticipating customer demand for a strong product

line.  In fact, the Company reported record profits for those seasonally slow quarters.

7.      A turn for the worse took place in the second half of 2010.  The change coincided

with the strategic decision made by the Company's former Co-CEO and Chief Merchandising

Officer, Mindy Meads, to change the Women's clothing line design to one that (she hoped)

appealed to a more mature audience.  This change in design philosophy was implemented for the

2010 back-to-school and holiday seasons and was carried through the ordering of the 2011 spring

and summer lines.  The strategy backfired, with back-to-school and holiday sales in 2010 falling far short of plan.  Ms. Meads ultimately lost her job with the Company as a result thereof.

8.      Back-to-school and holiday clothing that did not sell, even at a discount, clogged the Company's stores' shelves long after the 2010 holiday season.

9.      The arrival of the spring 2011 line also designed by Meads for a more mature audience exacerbated the Company's inventory problems.  Unfortunately for Aeropostale, orders were placed for this misguided spring line (and summer line) months earlier.  The Company was faced with the prospect of having to try to sell off the fall, winter and spring lines during the first quarter of 2011, at drastically reduced prices.

10.     Aeropostale maintains sophisticated software systems which allow the Company to track orders, inventory, store-wide sales, and margins on a real time basis.  So when a particular clothing line is not selling well, or when inventory is backing up, Defendants know it immediately and institute promotions to move that inventory.  Indeed, according to former employees of the Company, Defendants knew by the start of the Class Period that the Company had a severe inventory carryover problem and that the Company's traditional efforts to sell through the inventory back log were unavailing.

11.     The sophisticated software systems allowed the Company not only to track the performance, sale, inventory levels and margins on its merchandise, but they allowed Defendants to forecast revenue and earnings with remarkable precision because merchandise that sold well during the first part of a quarter could be expected to sell well throughout the quarter, while slow moving inventory would be discounted in a predictable, quantifiable manner.  It became the Company's practice, a few weeks into a quarter, to provide analysts with revenue and earnings guidance for the balance of the quarter.

12.     In 2010, for example, four weeks into the fourth quarter, the Company provided earnings per share guidance of $0.94-$0.96, and subsequently reported actual earnings per share of $0.95.  In the third quarter 2010, the Company provided guidance three weeks into the quarter of $0.61-$0.63, and reported actual third quarter earnings of $0.63.  Defendants offered second quarter 2010 guidance of $0.45-$0.48 per share a few weeks into the quarter, and reported actual earnings per share of $0.46.  In other words, a few weeks into a given quarter, Defendants have the wherewithal and technology to know what to expect in the balance of the quarter, absent an unexpected and unknown change in circumstances. The market came to expect these predictable results.

13.     In keeping with this custom and practice, and with real time access to the Company's actual performance during the first half of the first quarter, on March 10, 2011, Defendants guided analysts to expect first quarter 2011 earnings of $0.35-$0.38 per share—a robust expectation only slightly below the Company's very successful first quarter 2010 actual results.  When Defendants provided this guidance, they knew that the Company still had significant carry over fall and winter line inventory clogging its shelves and in some instances, off-site storage spaces that had to be rented to house the stale fall and winter clothing lines, a spring line that was not selling well in February, a coming summer line ordered by Meads in the same style as the failed 2010 back-to-school and holiday lines, and no ability to generate anywhere near the level of revenue or generate the kind of margins needed to meet that guidance. These factors made the strong guidance knowingly false and misleading when made.  Defendants compounded their misleading guidance with false non-forward looking statements indicating that the Company had successfully addressed the inventory overhang from 2010 and was confident in its spring and summer 2011 styles.  In reality, as Allan Zwerner, an expert in the retail and

wholesale industry opined, by six weeks into the first quarter, Defendants had no reasonable basis to offer this guidance.  In consideration of the real-time data Defendants had in front of them and the absence of any unexpected or unknown circumstances, the guidance "miss" of $0.15-$0.18 is too great to believe otherwise.

14.     Moreover, Defendants' after-the-fact explanation for the earnings miss, that sales were strong in February but took an unexpected turn for the worse in March, is contradicted by numerous former employees of the Company, who maintain that February sales were, in reality, dismal.

15.     By April, 2011, the Company was in full panic mode, with plans already in place to offer unprecedented promotions already utilized on a trial basis which, they knew, when implemented chain-wide, would decimate the Company's margins and earnings.

16.     The second quarter guidance provided on May 10, 2011, also lacked any reasonable basis, as did Defendants' non-forward looking statements that the Company's inventory issues could be remedied in the second quarter.  At the time the Company provided second quarter guidance, Defendants knew that the spring line and early sales of the summer 2011 line were unpopular – as they knew would be the case - and would never generate the level of revenue or earnings to meet its $0.11-$0.16 guidance.  Again, Mr. Zwerner concluded that a guidance miss of $0.15 to $0.20 per share on a forecast given two to three weeks into the quarter, combined with the known deterioration in revenue and need to discount almost everything on the Company's shelves, and the absence of any unexpected or unknown change in circumstances, meant that Defendants had no reasonable basis to believe that this guidance was attainable when made.

17.     Without any unexpected or unknown developments to account for the earnings misses during the first and second quarters, and with full knowledge of the unprecedented inventory backlog, slow sales, and spring and summer lines that its core audience rejected, there was no reasonable justification for providing the misleading guidance.

18.     Throughout the Class Period, rather than disclose the true, serious nature of the problems facing the Company, Defendants systematically and fraudulently misled the investing public regarding the true state of the Company's financial condition and ability to correct the mistakes from fall and winter 2010, withholding known facts indicating that (1) Defendants over-ordered merchandise that they knew, prior to and during the Class Period, was unpopular with its core female customer base, (2) the unpopular styles had been ordered through the summer 2011 line, (3) the Company was having trouble off-loading this merchandise, even with normal promotional markdowns, (4) the Company was forced to rent extra space at malls to store its inventory overflow, (5) as the inventory crisis deepened, the Company was forced to take significant and unprecedented markdowns, including selling three shirts for the price of one, and (6) all of this would and did have a predictable adverse effect on the Company's margins and ultimately on its earnings per share during the Class Period.

19.     Partial disclosures by the Company on May 5, 2011 and May 19, 2011 concerning the Company's performance for the 1Q2011, and further corrective disclosures on August 4, 2011 and August 18, 2011 concerning the Company's performance for 2Q2011, led to Aeropostale's stock price plummeting from $23.05 at the close of business on March 11, 2011, the beginning of the Class Period, to $10.71 at the end of the Class Period—more than a 53% decline.

20.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other Class members have suffered significant losses.

## II.     JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because Aeropostale's principal place of business is located in this District and the acts charged herein, including the dissemination of materially false and misleading information, occurred in this District.

24.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

25.     Court-appointed Lead Plaintiff, Providence, purchased Aeropostale common stock during the Class Period, as indicated in its Certification attached hereto as Exhibit A, and was damaged thereby.

26.     Defendant Aeropostale is a Delaware corporation with its principal executive offices located at 112 West 34th Street, New York, NY 10120.  Aeropostale is a primarily mall-based, specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old

young women and men through its Aeropostale stores and 7 to 12 year-old children through its

P.S. from Aeropostale stores.  The Company is a vertical retailer, controlling it own proprietary

brands that it designs, sources, markets and sells in its own store environment.  Aeropostale

products can only be purchased in Aeropostale stores and online at www.aeropostale.com.

*Approximately 70% of the Company's annual net sales have been attributable to Women's*

*fashion for the past three years.*  Aeropostale trades on the NYSE under the symbol "ARO."

27.     Defendant Thomas P. Johnson ("Johnson") served as Aeropostale's Chief

Executive Officer ("CEO") since December 2010 after serving as the Company's Co-Chief

Executive Officer (along with Mindy Meads) from February 2010 to December 2010.  Prior to

serving as Co-CEO, Defendant Johnson served as Executive Vice President and Chief Operating

Officer of the Company from March 2004 to February 2010.  Defendant Johnson has also served

as a member of the Company's Board of Directors ("Board") since August 2008.

28.     Defendant Marc D. Miller ("Miller") served as Aeropostale's Chief Financial

Officer ("CFO") since December 2010.  Prior to that, Defendant Miller was the Senior Vice

President of Strategic Planning, Business Development and E-Commerce from April 2007 to

December 2010.

29.     The defendants referenced above in ¶¶27-28 are referred to herein as the

"Individual Defendants."  Aeropostale and the Individual Defendants are collectively referred to

as "Defendants."

**IV.     CONFIDENTIAL WITNESSES**

30.     Plaintiff's counsel's investigation included interviews of former employees of

Aeropostale and other persons with knowledge of the matters alleged herein.  The following

CWs were knowledgeable about the allegations contained herein and provided information in

confidence to Plaintiff:

- CW1 was the former Visual Manager of Corporate Initiatives at Aeropostale. He was employed by the Company from June 2008 through July 2011. In his capacity as the Director of Visual Merchandising CW1 was knowledgeable about the inventory issues confronting the Company before and during the Class Period and routinely discussed the inventory overhang with Defendants.

- CW2 was a Director of Planning and Allocation at the Company from November 2008 through September 2011. For the majority of his tenure, he reported to Barbara Pindar, the Senior Vice President of Planning and Allocation who, along with the Individual Defendants, was a member of the Executive Team. In May 2011, CW2 began reporting to Gina Reis who was the Vice President of Merchandise Planning. According to CW2, Reis reported to Pindar. CW2 focused on Aeropostale's P.S. brand from November 2008 through May 2011. CW2 was then transferred to the "Aero brand" focusing mainly on men's wear from May 2011 through September 2011. At Aeropostale, CW2 was in charge of preparing financials for his group and was responsible for presenting products to the Executive Committee and finalizing buys.

- CW3 was an Associate Merchant in the Merchandising Department at Aeropostale from January 2010 through August 2011, responsible for ordering clothing in the long-sleeve Women's knit line. He reported directly to Caroline Pettinger, Senior Merchant.

- CW4 was an Assistant Designer at the Company from May 2008 through December 2011. During 2011, CW4 was in the Women's woven department and reported to Women's Woven Director Tamara Reynolds. CW4 was responsible for all aspects of line development in the Women's woven outerwear category.

- CW5 was an Associate Merchant at Aeropostale from July 2007 through September 2011. He reported to Christine Munnelly, Vice President of Merchandising. CW5 was responsible for overseeing Women's sweaters and dresses.

- CW6 was a Senior Planner for e-Commerce. He primarily focused on the Company's P.S. brand. He was employed by the Company from July 2010 through July 2011 and reported to Wendy Finerty. CW6 was responsible for managing the P.S. line on the Company's website.

- CW7 was a Freelance Merchandise Assistant in Aeropostale's Merchandising Department from May 2010 through January 2011. He reported to the Head of Women's Accessories.

- CW8 was a Senior Programmer/Analyst at Aeropostale from October 2010 through August 2011. He reported to Georgia Day, Project Leader and Chris

Liu, Vice President of Application Development.  CW8 was responsible for the upgrade and coding of Aeropostale's internal systems.

- CW9 was a Merchandiser at Aeropostale from 2007 through April 2011.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   BACKGROUND

#### 1.   Aeropostale: An Overview

31.    The Aeropostale brand was established by R.H. Macy & Co. ("Macy's") in the early 1980's, as a department store, private label initiative targeting men in their twenties. Macy's subsequently opened the first mall-based Aeropostale specialty store in 1987. Aeropostale was originally incorporated as MSS-Delaware, Inc. in September 1995, and, in February 2000, the Company changed its name to Aeropostale, Inc.  In May 2002, Aeropostale management took the Company public through an initial public offering.  As of January 29, 2011, Aeropostale operated 965 stores, and employed 4,160 full-time and 13,668 part-time employees.[1]

32.    During the Class Period, Aeropostale was a clothing and accessories retailer.  Its "Aeropostale" stores sell clothing targeting 14 to 17 year-old young women and men while its "P.S. from Aeropostale" stores sell clothing targeting 7 to 12 year-old children.[2]

#### 2.   Aeropostale's Business Model

33.    The Company's business model is premised on providing its customer with a selection of fashion at value prices in a teen-focused store environment.  Aeropostale's stores feature visual merchandising, colorful signage and popular music.  Aeropostale's strategy is to update merchandise presentation in its floor displays numerous times throughout the year.  Its

---

[1] *See* SEC Form 10-K filed on March 28, 2011 ("2010 Form 10-K") at 3, 9.
[2] *Id.* at 3.

apparel offering includes graphic t-shirts, tops, bottoms, sweaters, jeans, outerwear and accessories. Much of the merchandise features the brand's logos.[3]

34.     Aeropostale is a vertical retailer—the Company designs, produces, and sells its own products, without using middlemen or wholesalers. The Company sources its merchandise from vendors with production factories located in Asia and Central America.[4]

### 3.     The Company's Product Categories and Seasons

35.     Employees of Aeropostale's merchandising and design department report directly to Defendant Johnson. Employees of the planning department report directly to the Company's President, Michael Cunningham ("Cunningham"). The departments, with Johnson's and Cunningham's oversight, determine the quantities of units needed for each of the Company's product categories.[5] Aeropostale's product categories are broken down by men and women in the Aeropostale line and children in the P.S. line. The Company orders its products by season, breaking up its offerings into spring, summer, back-to-school and holiday.

36.     According to CW2, Aeropostale orders the vast majority of its merchandise from its vendors approximately nine months before the merchandise is slated to hit the stores. By December 1, 2010, 2010 back-to-school and holiday merchandise were already on the shelves and the spring and summer 2011 lines had already been ordered.[6] CW2 confirmed that prior to Meads' departure in early December 2010, the Company had "bought" almost its entire product "through fall" of 2011 based upon Meads' design choices. CW2 added that at least 90% of the merchandise that would fill Aeropostale's shelves through the summer 2011 had been ordered by Meads.

---

[3] *Id.*

[4] *Id.* at 7.

[5] *Id.*

[6] *See* 3Q2010 Earnings Conference Call held on December 1, 2010 at 6.

### 4.    Aeropostale's Fiscal Calendar

37.    The Company's fiscal year and fourth quarter end on the last Saturday in January. As relevant for the Class Period, the Company's fourth quarter and fiscal year 2010 ended on January 29, 2011 ("4Q2010"),[7] the first quarter of 2011 ended on April 30, 2011 ("1Q2011")[8] and the second quarter of 2011 ended on July 30, 2011 ("2Q2011").[9]

### B.    Aeropostale's Core Operations

38.    Aeropostale's Women's fashion division was the admitted core of the Company's business.  For the past three years, revenues derived from Aeropostale's Women's fashion division consistently represented approximately ***70% of the Company's annual net sales***.  The Women's division was so critical to the Company's success that Defendants closely monitored all aspects of this line, including daily review of sales and inventory levels.

39.    The Company frequently noted the contribution of its Women's fashion division to overall sales in numerous public filings.  For example:

- In the Company's 4Q2010 Earnings Conference Call on March 10, 2011, Defendant Johnson noted that the women's and men's mix has historically been a 70-30 split, respectively. *Id.* at 12.

- In the Company's 2010 Form 10-K the Company stated that "[w]omen's" represented 69%, 70%, and 71% of the Company's sales for the fiscal years ended January 29, 2011, January 30, 2010, and January 31, 2009, respectively.

- In the Company's 2009 Form 10-K the Company twice noted that Women's fashion represented 70%, 71%, and 72% of sales for fiscal years 2009, 2008, and 2007, respectively.

40.    Aeropostale's quarterly reports covering quarters ended prior to and during the Class Period further touted the significance of the Company's Women's fashion division.  For example:

---

[7] *See* 2010 Form 10-K at 1.

[8] *See* SEC Form 10-Q filed on June 3, 2011, at 1.

[9] *See* SEC Form 10-Q filed on Sept. 7, 2011, at 1.

- In the Company's Form 10-Q filed with the SEC on December 8, 2010, Aeropostale stated that Women's fashion represented 68% and 70% of net sales for the 13 weeks ended October 30, 2010 and October 31, 2009, respectively, as well as 69% and 70% of net sales for the 39 weeks ended October 30, 2010, and October 31, 2009, respectively.

- In the Company's Form 10-Q filed during the Class Period on June 3, 2011 the Company noted that the percentage of net sales attributable to Women's fashion for the 13 weeks ended April 30, 2011, and May 1, 2010, was 68% and 71%, respectively.

41.     Analysts also cited the importance of Aeropostale's Women's fashion division. For example, analyst Evren Kopelman of Wells Fargo Securities repeatedly noted that a majority of the Company's sales were derived from the Women's fashion division. *See* Evren Kopelman, Equity Research, Aeropostale, Inc., Jan. 7, 2011, at 1 (noting that Women's fashion represented "70% of sales"); Evren Kopelman, Equity Research, Aeropostale, Inc., Mar. 11, 2011, at 1 (same); Evren Kopelman, Equity Research, Aeropostale, Inc., May 9, 2011, at 1 (same); Evren Kopelman, Equity Research, Aeropostale, Inc., May 20, 2011, at 1 (same); Evren Kopelman, Equity Research, Aeropostale, Inc., Aug. 19, 2011, at 1 (same).

42.     Aeropostale's statements made prior to and during the Class Period, the statements of former employees, and contemporaneous analyst reports leave no question that (1) the Women's department was the core of the Company's operations, (2) the Defendants were fully aware of the issues concerning the Company's excessive women's inventory issues (as described more fully herein), and (3) Defendants accessed reports on a daily, weekly, and monthly basis that showed the Company's Women's department was in a massive decline both leading into and continuing through the Class Period.

**C.     Aeropostale's Comprehensive Information Management System**

43.     As set forth in the Company's Form 10-K for the year ended January 29, 2011, and as confirmed by CW8, the Company uses a sophisticated management information system

called "Island Pacific" which provides a full range of retail financial and merchandising applications. Island Pacific performs various functions relating to point-of-sale, inventory management, supply chain, planning and replenishment as well as financial reporting. Island Pacific is the leading supplier of merchandising, store operations and retail point of sale solutions for multi-store specialty retail chains.[10]

44.     Since 2008, the Company has also been implementing, in phases, new planning and allocation systems. During 2010, the Company completed implementation of a data warehouse system to enhance its business intelligence reporting capabilities.[11] This enabled the Company further real-time insight into its inventory position at the store level. The system also allows the Company to monitor sales of each style and color. Aeropostale's corporate headquarters direct the merchandise assortments, merchandise pricing, store layout, inventory management, and in-store visuals for all of the Company's stores.

45.     Collectively, the various information systems in place at Aeropostale during the Class Period allowed management to track, *inter alia,* inventory levels, sales data, pricing, and margins, all in real time. Access to this data allowed Defendants to see which merchandise lines were moving, which lines required added inducements, where and to what extent inventory was backing up, and the profitability of the various merchandise lines.

**D.     Weekly Executive Committee Meetings, Daily Reports, and Unit-Q Meetings**

**1.     Weekly Executive Committee Meetings**

46.     According to CW1 and CW2, as a matter of course and throughout the Class Period, the Company held weekly Executive Committee meetings every Monday in its boardroom at Aeropostale's corporate headquarters in New York. According to CW1 and CW9,

---

[10] *See* www.islandpacific.com.
[11] 2010 Form 10-K at 8.

the boardroom was a conference room located directly outside of Defendant Johnson's office. CW1 attended these meeting throughout the Class Period and stated that the Individual Defendants regularly attended.  CW1 recalled a specific meeting in or about February 2011 during which the "very large" inventory "carryover" problem was discussed.  CW1 also recalled a meeting in or about April 2011 attended by Defendants Johnson and Miller where they acknowledged that the heavily discounted merchandise was still not selling.

### 2. Daily Flash Reports and the "Bible"

47.     According to CW5 and CW8, the Company updated its "flash" report every day. CW5 confirmed that the "flash" was a spreadsheet broken down by daily units sold, sales, comps, dollars made, inventory and other important sales data figures.

48.     According to CW8, each transaction from a cash register or point of sale ("POS") was recorded by the Island Pacific software.  The system would take a "polling" from "every single store" each night.  The polling would then produce an inventory and sales report.  CW8 confirmed that that the polling occurred "every day."  The daily polling information, including an inventory and sales report, would appear on "internal flash reports."

49.     CW 8 stated that the "flash" was accessible on the Island Pacific system, and that the Individual Defendants had access to and utilized the Island Pacific system, including the "flash" reports.  CW5 confirmed that more senior level personnel as well as the executive team had access to Company-wide data on the daily Flash reporting system.  According to CW2, the flash report listed "Aero Comp Sales and Gross Margin" by department and compared sales and margins year over year.  CW2 also explained that the flash report was broken down by product category (women's, men's, *etc.*) and within each product category was broken down by type of product (*i.e.*, graphic tees, sweaters, dresses, pants).  Thus, by looking at a flash report,

Defendants could see on a daily basis how each kind of unit was currently performing as to sales and margins and compare that to the year before.

50.     CW8 stated that Island Pacific also had an inventory application.   CW8 explained that the inventory in this snapshot was divided by "styles" and "sku's." CW8 recalled that the executive team had access to certain files that no others at the Company would be able to view.

51.     In addition, CW8 stated that the Individual Defendants received a daily report known as the "Bible."  CW8 described the "Bible" as providing the Individual Defendants with a "snapshot" of the Company's entire business, including inventory.  CW8 confirmed that the Bible was also accessible on the Island Pacific System.

### 3.     Weekly Unit-Q Reports and Monthly Unit-Q Meetings

52.     In addition, according to CW2, the Company held monthly "Unit Q" meetings including the Company's senior executives, department heads and product line directors. Defendants Johnson and Miller attended the monthly Unit Q meetings before and during the Class Period.  Inventory, production issues, and sales were discussed at these meetings.  CW2 prepared reports on storage, performance and sell-throughs using the Company's Microstrategy Reporting tool for the meetings.

53.     CW2 explained that the executive team, including the Individual Defendants, would look at these "Unit-Q" reports.  CW2 described the Unit-Q report as an excel-based spreadsheet prepared on legal sized paper that compared the 52 weeks of the year, listing them top to bottom.  The comparative metrics "that went across the top" included weekly sell throughs, average unit retail ("AUR"), weekly units being sold, dollars and projections prepared by department directors.  CW2 would print out the Unit Q report weekly to give to his supervisors, Reis and Pindar.  During his time at the "Aero" line, CW2 would give his Unit Q reports to Reis who was "religious" about going through them.  Reis reported to Pindar who

reported to Cunningham.  CW2 recalled that beginning in late 2010 and throughout the Class

Period, the AUR—or amount that each unit sold for—was down for every type product,

including the women's department.  This was reflected in the Unit Q reports.

54.     According to CW2, the monthly Unit-Q reports were discussed internally at

Monthly Unit-Q meetings which were held by product line at the department level.  CW2

attended for his product lines and confirmed that the Women's division had its own Unit-Q

meeting.  These meetings were held during the second or third week of every month and they

occurred monthly throughout the Class Period.  CW2 advised that inventory, production issues,

sales, and other Company metrics were discussed at these meetings.  CW2 recalled that Johnson,

Cunningham and Pindar regularly attended his Unit-Q meetings during the Class Period, and

would have been at the Women's department meetings as well.  In addition to these executives,

the planner, the Senior Vice President, and Executive Vice President, among others, attended the

Unit-Q meetings.

55.     CW2 explained that during the Unit-Q meetings, the department discussed

forecasting and how the month was going to perform with the executives.  The attendees looked

a quarter out and if it was close to the end of the year, they would begin forecasting for the

following year.  CW2 also met seasonally with Defendant Johnson and Cunningham, when he

presented products to them and finalized orders for the upcoming seasons.

**E.      Aeropostale Moves Away from It's Core Offering in the Back Half of 2010**

56.     Under the direction of former Co-CEO and Chief Merchandising Officer Mindy

Meads, the Company adopted new styles in its Women's line for the back-to-school and holiday

2010 seasons.  Meads ordered clothing with a muted color palate and mature designs.  This

clothing was a marked departure from the more "wholesome" styles and bright colors that the

Company had typically sold to its core female client base.  This change was received poorly by Aeropostale's customers and the Company had trouble selling the new style of merchandise.

57.     CW1 stated that poor sales in the Company's Women's fashion line in 4Q2010, leading to a huge inventory glut, resulted from Meads having gone "too far into fashion" with the "preppy products and the fleece products."  These products did not appeal to the Company's teen girl constituent.

58.     Half way into 4Q2010, on December 1, 2010, the Company announced that Meads was resigning.  In truth, according to CW1, Meads was actually *fired* from the Company because her decision to change from the Company's traditional "core offering" designs to a more mature style was a failure.  CW2 confirmed that the poorly received line of products that Meads ordered for the second half of 2010 resulted in a tremendous excess women's inventory leading into 2011.  According to CW2 the "internal dialogue" at the Company was that Meads was being blamed for the "bad product" that had not been selling.  CW5 agreed, stating that Meads had left the Company because her leadership role was "not working out."  According to CW5, Meads envisioned taking the brand in a different direction and met a lot of opposition among the executive board—Meads wanted Aeropostale to "push the fashion envelope." In shaking up the administration, the Company promoted Defendant Johnson to CEO and Defendant Miller to CFO.

59.     CW2 explained that on the heels of Meads' departure, Julian Geiger, who was Chairman of the Board at the time, was forced to step back in because Defendant Johnson had no experience in the product side of the business--he was more of a real estate person.  This comports with CW7's recollection that after Mindy Meads left the Company, the Merchandising Department was under a lot of scrutiny.  Each product line had to present its products to the

Board and Julian Geiger. According to CW7, this had not been the typical procedure at the Company. This product line review occurred some time between December 2010 and January 2011. Apparently, the Board wanted to make sure that the products for the fall 2011 line were "sell-worthy" after Meads' departure. As explained below, it was already too late to reverse course for the already ordered spring and summer 2011 lines—a fact known internally by Defendants.

### F.   Defendants Know That the Company Has Already Over-Ordered Inventory Under Meads' New Designs for Spring and Summer 2011

60.   CW3 was responsible for ordering merchandise for the Company. CW3 said that in 2010 he made ordering recommendations that were overridden by the executive team and he was forced to order inventory well beyond what he calculated as necessary. He further explained that the ultimate "open to buy," or amount of inventory that should be ordered, was dictated by the executive team including Pindar, Christine Munnelly (former Vice President of Merchandising ), Todd Blumenthal (Chief Marketing Officer at Aeropostale-who took over for Meads after she was fired), Meads and Defendant Johnson.

61.   According to CW1 and CW2, the inventory ordered in 2010 consisted of the new designs approved by Meads. According to CW2, he personally was "very tight" in ordering his inventory for the P.S. brand, but that the Women's division was not conservative at all. Defendants were aware of this over-ordering of the Women's line because the heads of planning and merchandising reported directly to Defendant Johnson. In addition, Defendants tracked ordering and inventory. According to CW1, CW2, CW4, and CW5 and CW8, the content and make-up of the inventory (including style type) was reviewed by Defendants through various reporting methods including, among other things, the Flash reports, Unit-Q reports, the Bible, and sales reports.

### G. Sales of the New Styles Continue to Sell Poorly Through 4Q2010 Leading to Increased Inventory Backlog

62.     CW2 explained that the build up of inventory which started in 3Q2010 and worsened in 4Q2010, led to excess inventory going into 2011.  CW2 advised the Women's department especially had "tremendous amounts of inventory."  He explained that the Women's line would leave "a million units on the shelf"—which was a large amount of inventory.

63.     According to CW2, it was clear in December 2010, that the Women's line was "really, really struggling" and that the comps[12] for the Women's line were down 20-30%.  CW2 explained that while the downward trend began at the "end of back to school," the Company was able to "eek out" respectable 2010 yearly results mostly because of the Company's successes in 1Q2010 and 2Q2010 rather than the last two quarters.  Meanwhile, the inventory back-up from the poorly selling Women's line in the fourth quarter continued to increase.  Despite the Company's efforts to discount its slowly moving merchandise in 4Q2010, the more mature styles just were not selling.  This led to an increasing inventory back-up.  CW1 confirmed this stating that the inventory was very high at the end of 4Q2010.  CW9 also confirmed that the inventory carryover problem was apparent in January towards the end of 4Q2010.

### H. Defendants Condition the Market to Believe 2010 Inventory Overhang Would Not Linger into 2011

64.     On February 3, 2011, the Company reported its January 2011 sales results.  At a time when Defendants knew that its inventory levels were increasing and that its promotional efforts were ineffective to halt that rise in inventory, the Company suggested in this

---

[12] "Comps" or "Same Store Sales" is one of the most important metrics in retail sales analysis.  Comps compare sales at stores that have been open for a year or more.  This statistic allows investors to determine what portion of new sales has come from sales growth and what portion from the opening of new stores.  This analysis is important because, although new stores are good, a saturation point – where future sales growth is determined by same store sales increases – eventually occurs.  Same-store-sales data reveals how a store, or a number of stores, fares on a period-to-period basis.

announcement and in a conference call that same day that Aeropostale was making "progress" selling through its fourth quarter holiday product.

65. Analysts accepted the Company's statements. For example, on February 4, 2011, analyst Dorothy Lakner of Caris & Company stated: "ARO shares have traded up both on December and now January sales results as *fears that promotional activity would crush its results did not prove true.*" (emphasis added).

I. **The Inventory Problems Worsened Throughout the First Half of 2011 and Defendants Knew the Severity of the Developing Crisis**

66. According to CW1, in or about February 2011, he was present at an Executive Committee meeting where the severely increasing inventory problem was discussed. CW1 attended the weekly Executive Committee meetings until his departure in July 2011. According to CW1, the inventory problem was quantified and grouped on reports by "category," such as denim, knit, sleepwear for women, fleece (sweat suits, hoodies, *etc.*) and also in terms of dollar amounts.

67. CW1 stated that initially, in order to deal with the 2010 inventory carryover, the unsold merchandise was moved to the back of the stores. However, as the inventory problem grew the stores ran out of space and the Company was forced to rent storage space in the malls to house the large amounts of unsold inventory. Therefore, to the public, there did not appear to be that much aging inventory on the sales floor.

68. According to CW2, throughout February 2011 the Company's sales continued to decline and its inventory continued to increase. CW2 advised that February 2011 sales were poor and there was a "downward trend" throughout the end of 2010 into 2011--February was no different. CW4 said that it was well known internally that sales were down throughout the first quarter of 2011, which included February.

21

69.     CW2 went on to say that the planners at Aeropostale knew that they needed to burn through the inventory glut at whatever price they could sell it, despite the effects this would have on the Company's margins. He confirmed that he and other planners were making decisions about promotions without regard to margins. The Company became more concerned about selling the excess inventory. CW2 said that other planners would "chase product" to "sell-through units." CW2 defined a "chase" as a continuous markdown to deal with the Company's excess inventory. He confirmed that this was happening throughout the Company and it was an epidemic during the Class Period.

70.     CW2 also confirmed that before and during the Class Period, "business was not good," and had been "falling off" which led to "a ton of inventory" sitting around that the Company would have "to get disposition of" somehow. CW2 recalled that in the middle of the 1Q2011, the Women's department began testing a never before used promotion called the "Big 2." With this promotion, a customer could "buy one get two free," instead of the previously used "buy one get one free" promotion. Towards the end of 1Q2011 and by early 2Q2011, the Company "really started pushing" the Big 2 promotion in its Women's department. According to CW2 this had a drastic effect on AUR and margins because the Company was selling three shirts for the price of one.

71.     CW1 confirmed CW2's account and stated that the Company tried to deal with the excess inventory problem by reducing the prices on many of their products. However, even at these new reduced pricing levels, the products still were not selling. CW9 also confirmed that even after the merchandise price reductions in the beginning of the 2011 year, merchandise was still not selling and that inventory levels were still a problem when he left the Company in April 2011. CW1 stated that during an April 2011 meeting, which included CW1 and Defendants

Johnson and Miller, there was an acknowledgement that the excess inventory was not being purchased, even at the heavily discounted prices.

72.     CW2 also stated that during the Class Period, "level 2" graphics t-shirts were being priced the same as "level 1" t-shirts in order to promote sales.  According to CW2, level 1 is a basic t-shirt whereas level 2 has a lot of "bells and whistles" (embroidery, embellishment, etc.).  Starting in May 2011, the Company began to charge the same price for both t-shirt levels, driving margins on the level 2 t-shirts down.  CW2 confirmed that the reason margins were affected was because level 2 products cost more to produce and were being sold at the same price point as level 1 t-shirts.

73.     CW3 explained that inventory was a problem that kept getting worse. Aeropostale kept "lowering their prices but not lowering inventory."  This culminated in an inventory glut leading into 2011.  CW3 was baffled by the decision to continue stocking up on inventory while lowering prices, given the poor selling environment.

74.     CW3 advised that he and the other merchants attended a weekly meeting led by Tom Carberry (former Director of Merchandising) and Caroline Pettinger (Senior Merchant). Inventory, sales and projections were discussed at these weekly meetings.  Pettinger and Carberry would then report to the executive team.  CW3 said the "inventory crisis" was discussed at "every" weekly meeting.

75.     CW3 also mentioned that a spreadsheet was distributed at the end of every month that detailed inventory levels.  This spreadsheet would break inventory into "carry-over," "leftover" and "overall" inventory.  CW3 said that the inventory problems were not a secret internally at the Company and "everyone knew they were in an inventory crisis."

76.     CW5 was very familiar with Aeropostale's disappointing sales in 2011.  CW5, who worked in women's sweaters and dresses, knew about the problems because he would access the Company's daily reporting spreadsheets known as the "flash."  CW5 had access to his department and women's overall Flash reports.  According to CW5, these flash reports showed that all of 2011 sales figures were dismal.

77.     CW4, who worked in the Women's wovens department, also reviewed weekly sales reports which made it clear that Aeropostale was not reaching its sales goals during the Class Period.  The sales reports were provided to all the managers and executives, including Defendant Johnson.

78.     CW6 was familiar with the issues related to excess inventory and the forced markdowns that occurred during the Class Period.  CW6 confirmed the statements of other former employees of the Company who said that Aeropostale was challenged to move its inventory.  CW6 explained that inventory at Aeropostale was ordered six to nine months prior to the clothing being on the shelves in their stores.  Due to this lead time, it was impossible to rectify an excess inventory problem in one or two quarters.

J.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD**

1.    **March 10, 2011 Press Release**

79.     On March 10, 2011, Aeropostale issued a press release announcing the results of the Company's 2010 fourth quarter which ended on January 29, 2011 ("4Q2010 Press Release").  Defendant Miller signed the press release.  Defendant Johnson, commenting on the results, stated as follows:

> In 2010 the Aeropostale brand continued to build momentum and popularity, we opened our flagship Times Square store, and we continued the roll-out of our children's concept 'P.S. from Aeropostale.'  While we are proud of our many accomplishments,

> our performance in the back-half was below our expectations.  The
> teen retail environment was highly promotional and we believe
> that we did not execute to our full potential.  Moving into 2011, we
> recognize our opportunities and are more determined than ever to
> show the power of the Aeropostale brand.

The Company's 4Q2010 Press Release also provided guidance for Aeropostale's 1Q2011:

> For the first quarter of fiscal 2011, the Company **expects earnings
> in the range of $0.35 to $0.38 per share**, compared to earnings of
> $0.48 per share last year.

> \* \* \*

> Mr. Johnson, continued, "**Our outlook for the first quarter reflects
> the impact from clearing through holiday inventories**, and our
> outlook for the full year reflects industry wide inflationary
> pressures.  As we look forward into 2011, we recognize that the
> entire sector faces near term challenges.  We are, however, focused
> on leveraging our flexible promotional business model to navigate
> through the current environment and delivering on our initiatives
> to position ourselves for future growth."

(emphasis added).

80.     In providing investors with this guidance, Defendants intentionally understated

the sales and inventory problems that the Company was experiencing while advising investors

that they anticipated 1Q2011 to be only slightly weaker than the very strong quarter the

Company experienced in 1Q2010.  More significantly, Defendants led the market to believe that

by March 10, 2010, six weeks into the first quarter, they had sufficiently cleared through the

4Q2010 holiday inventory overhang.

81.     The statements made in the March 10, 2011 press release were materially false

and misleading at the time made because Defendants had no reasonable basis for the guidance

provided and were aware of undisclosed facts which seriously undermined the validity of the

statements made.  Defendants knew the outlook for the first quarter **did not reflect the reality** of

the severe excess inventory carryover.

82.     Specifically, by March 10, 2011, Defendants knew but failed to disclose to investors the following facts:

(a)     Aeropostale was having trouble selling the 2010 holiday and 2011 spring merchandise ordered by Meads such that the unappealing merchandise could not be sold, even at marked down prices, and ended up sitting in storage rooms at the malls where Aeropostale's stores were located;

(b)     Defendants would have to lower prices even further in order to sell the excess inventory, which would adversely affect the Company's margins and earnings *more substantially than they advised and the guidance indicated*;

(c)     The inventory problems at the Company were so severe that they would not be able to clear through excess inventory until at least the second half of 2011; and

(d)     Meads had already made purchases for the spring and summer 2011 lines that Defendants knew did not appeal to its customers.

### 2.     March 10, 2011 Earnings Conference Call

83.     Following issuance of the press release on March 10, 2011, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations ("4Q2010 Conference Call"). The Individual Defendants participated in the call.

84.     During the call, Defendant Miller reiterated the Company's 1Q2011 guidance:

> I will now discuss our guidance outlook. *For the first quarter we expect earnings per share in the range of $0.35 to $0.38 per diluted share, which reflects the impact of the aforementioned markdown liquidation.* This compares to record earnings per share of $0.48 last year.

(emphasis added).

85.     This statement was false and misleading for the same reasons articulated in ¶¶81-82.

86.     With regard to the Company's outlook for 2011, Defendant Johnson stated, in pertinent part, as follows:

> ***Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give the customers what they want.***  At the same time, Aeropostale, along with the rest of the industry, is facing inflationary pressures.  We are working diligently to mitigate the cost increases by leveraging our vendor relationships, raising ticket prices strategically, offering our customers creative promotions and being more conservative with our initial buys.

(emphasis added).

87.     This statement was false and misleading because it gave the market the false sense that despite the problems the Company was facing, the Company had already "taken" the steps necessary to (1) give the customers designs that they wanted in the first quarter of 2011 and (2) rectify the inventory overhang problems. This was untrue.  The Company had already ordered its spring and summer 2011 lines utilizing Meads' unpopular design style—a style Defendants knew customers did not like or buy.  Additionally, (1) the Company's massive inventory problem was only going to get worse as the spring and summer 2011 lines purchased by Meads arrived in the Company's stores, (2) the backed up holiday inventory was not selling despite promotions, (3) Defendants had moved the excess holiday inventory into storage spaces at malls, (4) the lack of sell through would require the Company to be substantially more promotional in 1Q2011 and 2Q2011, and (5) this excessive promotion would massively affect the Company's margins and earnings.

88.     With regard to the Company's inventory, Defendant Miller stated, in pertinent part, as follows:

> *So we feel like we are appropriately attacking the inventory problem.* Our goal, as always, is to end the quarter as cleanly as possible from an inventory standpoint.

(emphasis added).

89.    This statement was false and misleading because it led the market to believe that the inventory problem was under control and would be resolved by the end of 1Q2011.  In reality, the Defendants knew but failed to disclose that the inventory problem was much worse and would not be resolved until at the earliest the end of 2Q2011. *See also supra* ¶87.

90.    With regard to the spring assortment Defendant Johnson said:

> **We feel very good about the product going forward**...So far for spring we have had some categories doing exceptionally well.... But we have also been **very excited about some of the fashion components of what we're delivering for spring**.  And the pricing that we have been able to get [out] of some of our fashion.

(emphasis added).

91.    This statement was false and misleading because Defendants gave the market the false sense that the spring assortment was somehow different from the fall and winter offerings and would do well.  Six weeks into the quarter, Defendants *already knew,* based on the daily sales data they had access to and reviewed, that the spring assortment was not selling well.  In addition, Defendants knew that the Women's spring line had been designed by Meads in the same styles as the failed 2010 back-to-school and holiday lines.

92.    During the Conference Call, Defendants were asked a *direct question* about the state of the inventory at the end of 1Q2011.  Anna Andreeva, an analyst at JPMorgan asked: "And it sounds like your inventories are in good shape now; where should we expect inventories at the end of 1Q?" Cunningham and Defendant Miller responded.  Neither dispelled the analyst's impression that "inventories are in good shape now," nor did they disclose the reality that inventory levels would not be in good shape at the end of the first quarter.  Instead,

Defendant Miller gave an evasive answer about margin pressure in 1Q2011, but never disclosed the known inventory crisis or the fact that the inventory overhang would continue through 1Q2011.

93.    Defendants' statements and omissions were false and misleading because Defendants had an obligation to respond truthfully to the analyst and the market. Defendants already knew that inventories were not in good shape. In fact, inventories, which consisted of the unpopular styles were backing up and would continue to do so.

94.    In response to the guidance and the accompanying false and misleading statements and omissions from the 4Q2010 Conference Call, analysts understood Defendants' statements to mean that the inventory overhang problem was all but over. On March 11, 2011, Linda Tsai of MKM Partners, stated in an analyst report: "First, 1Q11 guidance includes the impact from having to sell through excess holiday inventory as inventory ended up 9% per square foot at the end of 4Q. The inventory has largely been sold through now (up 4% currently) *and so this issue is behind the company"* (emphasis added).

95.    On March 10, 2011 Robin Murchison of SunTrust Robinson Humphreys stated in an analyst report, "[W]e were surprised by the higher level of inventory carry-over to 1Q but at this point *it appears to be worked through* at some cost to 1Q earnings (emphasis added)."

96.    Defendants' decision to provide guidance of $0.35-$0.38 for 1Q2011 was considered credible by analysts in large part because the Company had a proven track record of providing accurate guidance. In each of the three quarters leading up to the first quarter of 2011, the Company provided analysts with guidance a few weeks into the quarter and in each instance, the actual results for the quarter were within the range provided. For example, four weeks into the fourth quarter of 2010, the Company provided earnings per share guidance of $0.94-$0.96,

and subsequently reported actual earnings per share of $0.95.  In 3Q2010, the Company provided guidance three weeks into the quarter of $0.61-$0.63, and reported actual third quarter earnings of $0.63.  Defendants offered second quarter 2010 guidance of $0.45-$0.48 per share a few weeks into the quarter, and reported actual earnings per share of $0.46.  Defendants demonstrated to analysts that Aeropostale had the wherewithal and technology to know what to expect in the balance of the quarter, *absent any unexpected and unknown change in circumstances*. The market came to expect these predictable results.

### 3.    May 5, 2011 Business Update

97.    Prior to the market open, on May 5, 2011, in a partial revelation of the truth about the severe and continuing inventory problem and the problems with the spring 2011 line, Aeropostale issued a press release announcing its preliminary first quarter financial results. Defendant Miller signed the Press Release.  For the quarter, the Company reported that same store sales had decreased 7% compared to a same store sales increase of 8% the year before.  The release also stated "[B]ased on lower than expected sales and margins for the quarter," the Company expected earnings of approximately $0.20 per diluted share – well below the Company's previously issued guidance of $0.35-$0.38 per share and $0.28 cents lower than EPS for 1Q2010.  Defendant Johnson, commenting on the results, stated, in pertinent part, as follows:

> Clearly we are not satisfied with our sales and margin performance for the first quarter.  **We were more promotional than anticipated on our spring assortment and clearance merchandise.**  Additionally, our core customers continue to be pressured by challenging macroeconomic conditions while, at the same time, the teen retail sector remains intensely promotional.  As we move forward through the year, our entire management team is keenly focused on our key initiatives: regaining the balance and clarity of our merchandise assortment, managing our cost structure, and leveraging our strong financial position.  We remain very confident in our business model, in the ability and determination of our organization, and in the strength and positioning of our brand.

(emphasis added).

98.     While this release partially revealed the scope of the inventory overhang on the ongoing disappointing spring 2011 sales, and its effect on margins and earnings, this statement still was false and misleading because Defendants gave the false impression that they did not anticipate and were surprised by how promotional the Company would have to be to clear through their product.  Defendants already knew, and discussed internally, the massive inventory problem and had visibility into the poor sales of carryover inventory at normal discount prices. Significantly, when Defendants made these statements on May 5, 2011, they already knew that even bigger, unprecedented promotions, such as "buy one get two free" had already hit the shelves, to address the still staggering problem the Company had with stale inventory.  Indeed, Defendants would have to continue lowering prices even further in order to sell the excess inventory, which would continue to adversely affect their margins *more substantially than they advised*.

99.     Indeed, CW2 recalled being "really shocked" by the lowered 1Q2011 EPS number announced in early May given the Company's visibility back in March when they provided guidance. CW2 said "I don't know how you can go to the street" with the guidance given the internal knowledge of the sales environment at Aeropostale.  CW2 explained that the 1Q2011 guidance was unrealistic and unattainable given the way AURs were down. According to CW2, during the Class Period, "there was not a single week where AUR was higher than 2010."  CW2 explained that the Women's business was "really, really soft" and that would have a material impact on the Company because "missy drives the bus" at Aeropostale.

100.     In reaction to this announcement, the price of Aeropostale stock fell $4.20 per share, or 16.5%, to close at $21.29 per share, on heavy trading volume (approximately 14 million

shares when average daily volume during the Class Period averaged approximately 2.8 million shares).

### 4.    May 19, 2011 Press Release

101.    After the market closed on May 19, 2011, Aeropostale issued a press release announcing its actual first quarter financial results and second quarter financial guidance ("1Q2011 Press Release"). Defendant Miller signed the Press Release. The Company confirmed the preliminary 1Q2011 financial performance it had provided in its May 5, 2011 business update of diluted net earnings per share of $0.20 per share, and a same store sales decrease of 7% compared to a same store sale increase of 8% the year before. With regard to the Company's outlook for the second quarter, Defendants stated, as follows:

> **For the second quarter of fiscal 2011, the Company expects earnings in the range of $0.11 to $0.16 per share.**
>
> \*\*\*
>
> Thomas P. Johnson, Chief Executive Officer, commented, "**Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories** to position ourselves appropriately for the important back to school selling season. While we are disappointed with our current performance, we are confident that our entire organization is focused on the right initiatives to regain market share. Our goals for the remainder of the year remain very clear - regain balance and clarity in our merchandise assortments, mitigate industry wide cost increases, and manage our cost structure conservatively and carefully."

(emphasis added).

102.    While the 1Q2011 Press Release partially revealed the true nature of the Company's inventory problem and poor 2011 spring line sales and its impact on the Company's financial performance, it was materially false and misleading at the time made because Defendants had no reasonable basis for the 2Q2011 guidance of earnings of $0.11 - $0.16 and

were aware of undisclosed facts tending to seriously undermine the validity of that guidance. Specifically:

    (a)    The spring and summer 2011 line purchased by Meads, which had been selling poorly up until that point, would continue to sell poorly, and would add to the inventory backlog;

    (b)    The unappealing merchandise could not be sold, even at marked down prices, and ended up sitting in storage rooms at the malls where Aeropostale's store were located;

    (c)    Because the merchandise had not been selling well, Defendants had made the decision in mid-April to begin drastically marking down their merchandise in May with promotions such as "buy one get two free";

    (d)    These promotions would adversely affect the Company's margins and earnings *more substantially than they advised*.

103.    In addition, the outlook for the second quarter did not reflect the reality of the impact of clearing through spring inventories. Defendants would not be able to clear though all of the inventory overhang from 1Q2011 and the first six weeks of 2Q2011 in the weeks that remained in 2Q2011. Defendants also failed to disclose that the same poorly selected merchandise would add to the problem with the summer 2011 line on the Company's shelves.

104.    CW2 was surprised at the 2Q2011 guidance as well, especially considering that AURs were down even more in the second quarter.

    **5.**    **May 19, 2011 Earnings Conference Call**

105.    Following the Company's first quarter press release, after the market closed on May 19, 2011, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations ("1Q2011 Conference Call"). Both of the

Individual Defendants were present on the call.  Defendant Johnson, commenting on the

Company's "disappointing" first quarter performance, stated, in pertinent part, as follows:

> The first quarter was clearly very disappointing.  ***While our February started off well***, we experienced a significant deceleration in the business as we moved through March and April.  Sales were affected more severely than we originally anticipated during the Easter shift, and we did not experience the recovery that we had expected during the month of April.

(emphasis added).

106.    This statement was false and misleading because February did not "start off well."

In fact, according to CWs 2 and 4, February sales were just as low as March and April sales.

Moreover, Defendants made this false and misleading statement about February sales and the

subsequent deceleration to create the (false) impression that the Company missed its guidance

because of an unexpected downward turn in events that was unknown at the time the guidance

was given.  Defendants knew that the excuse they gave for the poor performance was not true.

107.    In closing, Defendant Johnson stated:

> Thank you again, everyone, for your support.  We know that coming off of a tough quarter like this it's never a great position to be in.  **I think that the positive outlook that we have is grounded in the fact that we know that the mistakes that we made and that we have taken steps to rectify those and to get this brand back on course.**  And we have the team to do that.  So I'm confident in our ability to be back on track.

(emphasis added).

108.    This statement is false and misleading because it gives the market the false sense

that the Company's previously announced promotional campaign would be sufficient to rectify

the inventory overhang and that there is a positive outlook for 2Q2011, when in reality,

Defendants knew that the Company (1) was still facing a massive inventory problem of

unpopular spring and summer 2011 product and an inventory overhang from 1Q2011, (2) the

34

inventory was not selling despite promotions and markdowns, (3) the lack of sell throughs would require the Company to substantially increase its promotions, and (4) this excessive promotion would massively affect the Company's margins and earnings in 2Q2011.

109.    In reaction to the 1Q2011 Press Release and Earnings Conference Call, on May 20, 2011, the price of Aeropostale stock fell $3.04 per share, or 14.25%, to close at $18.30 per share, on extremely heavy trading volume (approximately 16.5 million shares where Class Period volume averaged approximately 2.8 million shares).

110.    In response to the guidance and the accompanying false and misleading statements, analysts understood Defendants' statements to mean that while there was an inventory overhang, it was not unmanageable.  Analysts believed Defendants when they said they expected to clear out inventory by the end of the 2Q2011.  Eric Beder of Brean, Murray, Carret & Co issued an analyst report on May 20, 2011 where he stated: "management will aggressively clear out goods to enter the back-to-school period clean and ready for the season." On May 20, 2011, Pamela Quintiliano from Oppenheimer stated "we believe aggressive markdowns will result in clean BTS [back-to-school] inventories."  This couldn't be farther from the truth.

### K.    THE TRUTH IS FULLY REVEALED

#### 1.    August 4, 2011 Business Update

111.    Before the market opened on August 4, 2011, Defendants shocked investors when Aeropostale issued a press release, signed by Defendant Miller, providing a business update for the second quarter of 2011.  For the quarter, the Company preliminarily reported a same stores sales decrease of 14% compared to a same store sales increase of 4% the year prior, and expected net earnings to be in the range of **$0.02 to $0.03 per share**.  This included a one-time pre-tax benefit of $0.06 per share, resulting from the favorable resolution of a dispute with a vendor.

Therefore, the non-adjusted EPS based on net sales, without considering this pre-tax benefit, was *negative*, in **the range of -$0.04 to -$0.03 – a difference of $0.15 to $0.19 per share** from what the Company had guided several weeks into the quarter and a huge drop from the Company's $0.46 EPS in the second quarter of 2010.

112.   Defendant Johnson, commenting on the second quarter results, stated, in pertinent part, as follows:

> **We are very disappointed with our second quarter financial results that were clearly unacceptable.** As a result of a lack of balance in our merchandise assortments, as well as continued promotional and macroeconomic challenges, **we <u>significantly</u> increased the depth and breadth of our promotions and markdowns.** Our top priority is to deliver a merchandise assortment that resonates with the teen customer and captures market share from our competitors. Additionally, based on current business conditions that are likely to continue for the remainder of the year, we are planning our inventories conservatively and focusing aggressively on cost controls. As we look to 2012 and beyond, we have great confidence in the strength of the Aeropostale and PS brands, in our ability to develop balanced merchandise assortments for our customer, and in our capability to deliver improved financial performance and growth.

(emphasis added).

113.   Thus investors began to learn the truth—that the Company's inventory overhang led to significantly increased promotions and mark downs well above normal levels, such that the Company's 2Q2011 results would be significantly below what investors had been led to believe by Defendants on May 19, 2011.

114.   In reaction to the Company's announcement, on August 4, 2011, the price of Aeropostale stock fell $3.99 per share, or 24%, to close at $12.53 per share, on extremely heavy trading volume (approximately 14 million shares where Class Period volume averaged 2.4 million shares).

115.     Investors and analysts were shocked by the news.  For example, Brian S. Sozzi

from Wall Street Strategies issued an analyst report on August 4, 2011 stating: "Eek, gadzooks,

and golly gee the July sales announcement from Aeropostale (ARO) was an utter disaster.  The

company's poorly positioned assortments required stronger markdowns to clear than expected."

Evren Kopelman, of Wells Fargo issued an analyst report that same day stating: "[W]e think

there was not too much progress made on lowering inventory levels to get them more in-line

with sales trends."

### 2.     August 18, 2011 Press Release

116.     After the market closed on August 18, 2011, Aeropostale issued a press release

announcing its actual second quarter financial results ("2Q2011 Press Release").  Defendant

Miller signed the Press Release.  The Company announced the actual 2Q2011 earnings per share

of $0.04, which included a non-recurring pre-tax benefit of $0.06 per diluted share—so that the

actual adjusted diluted net earnings per share for the second quarter was -$0.02 per diluted share-

-*down $0.48 per share* compared to the same period the year before.  The Company also

reported a same stores sales decrease of 14% compared to a same store sales increase of 4% the

year prior.  With regard to the Company's outlook for the third quarter, Defendants stated, as

follows:

> Our outlook for the third quarter reflects challenging sales and
> margin trends, as well as an uncertain macroeconomic
> environment. While we are very disappointed with our current
> performance, **we are working diligently to integrate the right
> balance of fashion into our assortment.** Additionally, we will
> find new ways to connect with our customer, and amplify our
> fashion message. I am very confident that the strategies we have in
> place and the tenacity of our organization will position us for
> future growth and success.

(emphasis added).

117.    Defendant Johnson admitted that, contrary to what Defendants led the market believe, the Company was still recovering from the merchandising gaffes committed the year prior beginning in 3Q2010.  Even at the end of 2Q2011, the Company was *still* trying to "integrate the right balance of fashion" into its clothing assortment.

### 3.    August 18, 2011 Earnings Conference Call

118.    On August 18, 2011, the Company held a conference call with analysts and investors to discuss Aeropostale's actual second quarter 2011 financial results ("2Q2011 Conference Call").  The Individual Defendants participated on the call.

119.    Defendant Johnson echoed the business update issued on August 4, 2011, and admitted that larger than disclosed markdowns had occurred on both the spring and summer merchandise:

> [W]e increased both the **depth and the breadth of our promotions and our markdowns in order to move through our spring and summer merchandise.**  This action resulted in significantly lower than expected sales and gross margins for the second quarter.

(emphasis added).

120.    In addition, Defendants admitted that their inventory levels were still very high. The Company still had to clear through the excess inventory from spring and summer. Cunningham stated:

> Clearly we are not satisfied with our level of inventory at the end of the second quarter. It is clearly well above our sales trend.

121.    Defendants also admitted that for the back-to-school season, they were finally returning to the color palate customers were used to, admitting that the styles offered for the back-to-school and holiday 2010 seasons and spring and summer 2011 seasons had consisted of the muted, mature styles— an unsuccessful departure from their "core offering":

> Since that call [on May 19, 2011], **we have returned** our color palate to represent the fun, bright and optimistic spirit that our customer wants…
>
> [W]e do feel that **we have returned to that color palette that our customers are accustomed to and expect from us**. And, from a fashion perspective, we feel very good about the progress we have made because the fashion this **back-to-school 2 in particular set and going forward is more relevant to our teen customer**….
>
> And the change we have made I think that you guys see, and it is really in the overall project of the brand today, and it is **back to… our core**.

(emphasis added).

122.   Moreover, Defendant Johnson admitted that the Executive Team must have known about the problems with the inventory because they tracked pricing, product and sales on a daily basis:

> We keep a close eye on mostly that reaction to is not so much the actual price of the competitor, but it is really based upon how our product categories are turning. So if we see a particular product category or item that is not turning fast enough, we will change the price. And some of that is due to the competitive pressures, and some of that is due to obviously the product itself. **So we do that on a daily basis, and we react to pricing accordingly.**

(emphasis added).

123.   This admission was reinforced by Cunningham:

> We have invested heavily in the data warehouse internally to be able to capture, **analyze and report in real time, as well as as often as we need the data to understand the business in every possible way**.

(emphasis added).

124.   Thus investors finally learn the full truth: (1) that the Company had strayed from its core offering, (2) that the Company had ordered these unpopular styles through summer 2011 and just now was able to return to its core offering, (3) that its core female customers did like the

styles offered leading to excess inventory, (4) that the inventory overhang led to significantly increased promotions and mark downs well above normal levels, and (5) that as a result the Company's margins suffered severely.

125.    Analysts finally understood the complete picture.  Dorothy Lakner from Caris & Company issued an analyst report stating: **"ARO failed to deliver a strong womens assortment in 1H11 [first half 2011], leading to heavy clearance and increased promotional activity that took a big toll on margins.** ARO got some traction from better colors in its early BTS [back-to-school] assortments…. Inventory ended…clearly way higher than the rate of gain on sales. So again this quarter, ARO will have to heavily promote current inventory again in order to make room for the more fashion correct product planned for BTS… (emphasis added).

126.    In reaction to the Company's announcement, on August 19, 2011, the price of Aeropostale stock fell $1.78 per share, or 14% on heavy trading volume (approximately 8.5 million shares where Class Period volume averaged 1-3 million shares).

## VI.    PLAINTIFF'S INDUSTRY EXPERT ALLAN ZWERNER

127.    Lead Plaintiff consulted with Allan Zwerner, an expert in the retail and wholesale industry.  Mr. Zwerner has over 40 years of experience working in the retail industry.  He has served as an executive at public retail and wholesale companies including serving as the President of Tommy Hilfiger's wholesale division and as a Senior Vice President at Macy's.  Mr. Zwerner also served as an adjunct professor at Columbia University, where he taught a class on the retail apparel industry.

128.    Mr. Zwerner reviewed publicly available news articles, confidential witness reports, and SEC filings, and relied on his many years of experience in forming his opinion.

129.    In Mr. Zwerner's opinion: (1) the Defendants had no reasonable basis on March 10, 2011 to believe that the Company could meet the guidance they issued for 1Q2011, and (2)

the Defendants had no reasonable basis on May 19, 2011 to believe that the Company could meet the guidance they issued for 2Q2011.

130.    Specifically, the Individual Defendants had access to daily sell through data in the flash report and the "Bible," monthly Unit Q reports, and discussed sell throughs at the monthly Unit Q meetings before and throughout the Class Period.  An increase in inventory is indicative of a lack of sell-through.  Sell through data, therefore, gave the Defendants a clear indication of whether inventory was being liquidated in a timely manner.  According to CWs 1, 2, 3, 4, 6 and 9 sell throughs did not get better during the Class Period (and going back to 3Q2010 and 4Q2010).  This would have been reflected in all the reports that Defendants reviewed.

131.    When Defendants saw slow sell throughs on inventory that had already been marked down (*i.e.*, holiday inventory in 1Q2011, spring inventory in 2Q2011), they knew further, drastic markdowns to inventory were needed and inevitable.  This would have a severe affect on and impact EPS negatively. In addition, the extra storage space the Company rented at the malls to store the excess inventory was another cost factor that would drive margin and EPS lower.

132.    Compounding the problem in Mr. Zwerner's opinion was that the spring and summer lines ordered by Meads could also be expected to sell poorly, adding more inventory to the backlog.

133.    According to Mr. Zwerner, going into 1Q2011 (and when they issued guidance *six weeks into 1Q211 on March 10, 2011*) the guidance numbers were unreasonable and unattainable.  In Mr. Zwerner's opinion, the CW testimony that sales were down throughout the first quarter of 2011 combined with the guidance miss of $0.15 to $0.18 per share was too large for the Defendants not to have known about 6 weeks into the quarter.

134.    According to Mr. Zwerner, going into 2Q2011 (and when they issued guidance *several weeks into 2Q2011 on May 19, 2011*) the guidance numbers were unreasonable and unattainable.  In Mr. Zwerner's opinion, the CW testimony that sales continued to be down throughout 1Q2011 and into 2Q2011—through the spring line and early sales of the summer 2011 line, combined with the guidance miss of $0.15-$0.20 per share was too large for the Defendants not to have known about when they issued guidance.

135.    The massive markdowns ("buy 1 get 2 free") began towards the end of 1Q2010.  According to Mr. Zwerner, these types of markdowns take time to plan because retailers need to order signage and get the sales floor ready.  Management would have known about these promotions at least two weeks beforehand--by mid-April.  Because Defendants must have known about the hit that margins would take by mid-April, Mr. Zwerner believes for this additional reason, Defendants' 2Q2011 guidance issued on May 19, 2011 lacked a reasonable basis when made.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

136.    As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aeropostale, their control over, and/or receipt and/or modification of Aeropostale's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to non-public information concerning Aeropostale, participated in the wrongful scheme alleged herein.

137.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme and illegal course of conduct: (i) deceived the investing public regarding Aeropostale's business, operations, and management and the intrinsic value of Aeropostale common stock; (ii) enabled Defendants to artificially inflate the price of Aeropostale common stock; and (iii) caused Plaintiff and other members of the Class to purchase Aeropostale common stock at artificially inflated prices.

138.    The Individual Defendants received contemporaneous daily reports showing the severity of the Company's inventory overhang problems and that normal promotions would not rectify the problems. Defendants had access to the daily "flash report" detailing the sales made and aged inventory and the "Bible" which was a daily "snapshot" of the Company's entire business, including a snapshot of the Company's inventory divided by "styles" & "sku's," as part of their responsibilities for, inter alia, making projections and budgeting.

139.    The Executive Committee, including both Individual Defendants and heads of the Company's business lines, had weekly Executive Committee meetings.  The meetings were held on Mondays in the Boardroom at the Company's headquarters in New York.  Based on CW statements, during the Class Period, these meetings included discussions of sales trends and how bad the inventory situation had become.  In or about February 2011, the severity of the inventory crisis was discussed at the Executive Committee meetings.  By the end of the 1Q2011 Defendants had begun to test their "buy one get two free" promotion.  In April 2011, Defendants discussed that the excess inventory was not being purchased, even at the reduced promotion prices.  By the end of 1Q2011 and early 2Q2011, Big 2 "buy one get two free" promotion was in full swing.  Indeed, Defendants knew before they issued 2Q2011 guidance that they were already severely marking down product for the Big 2 promotions.

140.     *Defendants admit that they looked at inventory and pricing on a daily basis* and

that they had systems in place to access and analyze information "in real time…to understand the

business in every possible way."  With this analysis in hand Defendants internally discussed the

Company's poor sales, dire inventory situation in 1Q2011, and the difficulty they faced in

offloading their stale product *at least a month* before issuing guidance for 1Q2011.  In addition,

before issuing guidance for 2Q2011, Defendants had already started "substantial" markdowns,

including an unprecedented "buy one get two free" promotion that would lead to margins

shrinking and a negative EPS for 2Q2011. Yet Defendants continued to make contradictory

public statements on March 10, 2011, May 5, 2011 and May 19, 2011.

141.     Defendant Johnson also participated in Unit-Q meetings with Department Heads

and Department Directors.  At the Unit-Q meetings, Johnson discussed with others weekly sell

through, weekly units, dollars and projections by product line.

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

142.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

damages to Plaintiff and the Class.

143.     During the Class Period, as detailed herein, Defendants engaged in a scheme to

deceive the market and a course of conduct which artificially inflated the price of Aeropostale's

common stock by misrepresenting, or failing to disclose, among other things, the true and

ongoing impact of the Company's massive inventory glut; and that various internal indicia

indicated to Defendants that the Company would not—and could not—meet Defendants'

publicly issued guidance for 1Q2011 and 2Q2011.

144.     Partial disclosures issued on May 5, 2011 and May 19, 2011 informed the market

that while the Company had problems with overhang inventory from holiday 2010 sales (that had

not been previously disclosed), (1) these issues were under control and mostly behind the

44

Company, and (2) the Company's prospective guidance adequately took this into consideration. Thus, Defendants continued to deceive the market.

145.    Defendants' additional corrective disclosures, issued on August 4, 2011 and August 18, 2011, informed investors, belatedly, what Defendants knew all along: that its earnings guidance was too high and that the problems it experienced during the Class Period with excess inventory made it impossible for the Company to come close to the projected results. As a direct result of these disclosures, the price of Aeropostale common stock dropped precipitously. These disclosures also revealed the truth regarding the other false and misleading statements complained of herein.

146.    The dramatic decline in Aeropostale's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and to the market. The timing and magnitude of Aeropostale's stock price decline negates any inference that the losses suffered by Plaintiff and the other Class members was caused by changed market conditions and/or Company-specific facts unrelated to Defendants' wrongful conduct. Indeed, at the end of the Class Period, while Aeropostale's share price fell over 45% as a result of Defendants' scheme and conduct, the Standard & Poor's 500 securities index was relatively stable.

147.    During the Class Period, as a result of Defendants' material misrepresentations and omissions in the form of inflated guidance among other misstatements of present fact, Aeropostale's stock traded at a high of $26.30 per share. However, after Aeropostale revealed the truth of its financial condition, the stock dropped precipitously to *approximately 60%* of its Class Period high.

## IX.   CLASS ACTION ALLEGATIONS

148.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Aeropostale common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the Company's officers, directors, employees, successors, and assigns, and any person, entity, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Individual Defendants.

149.    This action is properly maintainable as a class action.

150.    The Class is so numerous that joinder of all members is impracticable. Throughout the Class Period, Aeropostale stock traded on NYSE, a national securities exchange. During the Class Period, there were approximately 81 million shares of issued and outstanding Aeropostale common stock.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that the proposed Class consists of at least hundreds or thousands of members scattered throughout the United States.  Record owners and other members of the Class may be identified from records maintained by Aeropostale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

151.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

152.    Plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests

antagonistic to or in conflict with those of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

153.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including, among others:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, financial condition, inventory, operations, internal controls, prospects and management of Aeropostale;

(c)    whether the Individual Defendants caused Aeropostale to issue materially false and misleading statements during the Class Period and/or omitted material facts necessary to make statements made not misleading;

(d)    whether Defendants acted knowingly or recklessly in issuing materially false and misleading statements and/or omitting material facts necessary to make statements made not misleading;

(e)    whether the price of Aeropostale's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

154.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications

with respect to individual members of the Class which would, as a practical matter, be

dispositive of the interests of the other members not parties to the adjudications or substantially

impair or impede their ability to protect their interests.

155.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

156.    Additionally, Plaintiff will rely, in part, upon the presumption of reliance

established by the fraud-on-the-market doctrine in that: Defendants made public

misrepresentations or failed to disclose material facts in order to make the statements made not

misleading during the Class Period; the omissions and misrepresentations were material;

Aeropostale common stock is traded in an efficient market as the Company traded on the NYSE,

and was covered by analysts.

157.    Based on the foregoing, this action is properly maintainable as a class action.

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE
      UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE
      ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

158.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United

States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are

primarily predicated upon omissions of material fact which there was a duty to disclose in order

to make statements previously made not misleading.

159.    Plaintiff is alternatively entitled to a presumption of reliance because, as more

fully alleged above, the Defendants made material misstatements and failed to disclose material

information regarding Aeropostale's revenue guidance and known problems, *not just risks*, regarding the impact of the inventory problem on margins and earnings.

160.    Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for Aeropostale's common stock was an efficient market for the following reasons, among others:

(a)    Aeropostale's stock met the requirements for listing on, and was listed and actively traded on, the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Aeropostale filed periodic public reports with the SEC and the NYSE;

(c)    Aeropostale regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Aeropostale was followed by securities analysts employed by major brokerage firms (and others) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.  Some of these analysts include:

(i)    Adrienne Tennant, Simeon Siegel, Janney Montgomery Scott;

(ii)    Betty Chen, Connie Wong, Wedbush Securities;

(iii)    Brian S. Sozzi, Wall Street Strategies;

(iv)    Brian J. Tunick, Anna A. Andreeva, Simeon A. Siegel, Lindsey Bell, J.P. Morgan Securities LLC;

(v)   Christine Chen, Needham & Company;

(vi)   Dana Telsey, Telsey Advisory Group;

(vii)   Datamonitor;

(viii)   David J. Glick, Jonathan Hart, The Buckingham Research Group;

(ix)   Disclosure Insight;

(x)   Dorothy Lakner, Caris & Company;

(xi)   Edward Yruma, Charu Sharm, KeyBanc Capital Markets Inc.;

(xii)   Eric Beder, Jennifer Sung, Brean Murray, Carret & Co.;

(xiii)   Evren Kopelman, Maren Kasper, Wells Fargo Securities;

(xiv)   Globaldata Howard Tubin, Jayson Schmitt, RBC Capital Markets, LLC;

(xv)   ICD Research;

(xvi)   Janet Kloppenburg, JJK Research;

(xvii)   Jeff Black, Kimberly C. Greenberger, Citigroup;

(xviii)   Jeffrey P. Klinefelter, Sean P. Naughton, Jennifer Yung, Piper Jaffray & Co.;

(xix)   Jim Chartier, Monness, Crespi, Hardt; and

(xx)   John Kernan, Laura Champine, Rob Simone, Tom Nikic, Cowen and Co.

161.   As a result of the foregoing, the market for Aeropostale common stock promptly digested current information regarding Aeropostale from all publicly available sources and reflected such information in Aeropostale common stock prices.  Under these circumstances, all purchasers of Aeropostale common stock during the Class Period suffered similar injury through their purchase of Aeropostale common stock at artificially inflated prices and a presumption of reliance applies.

## XI.    NO STATUTORY SAFE HARBOR

162.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. First, many of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and/or historic fact regarding Aeropostale's sales and inventory and state of its operations as a result of the inventory overhang.  For example:

(a)    Defendant Johnson's statement made in the 4Q2010 Press Release: "Our outlook for the first quarter reflects the impact from clearing through holiday inventories." ¶¶79-80.

(b)    Defendant Johnson's statement made during the 4Q2010 Conference Call: "Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give customers what they want." ¶¶86-87.

(c)    Defendant Johnson's statement made during the 4Q2010 Conference Call: "So we feel like we are appropriately attacking the inventory problem." ¶¶88-89.

(d)    Defendant Johnson's statement made during the 4Q2010 Conference Call: "We feel really good about the product going forward…we have also been very excited about some of the fashion components of what we're delivering for spring." ¶90-91.

(e)    Defendant Johnson's statement made during the 1Q2011 Earnings Conference call: "While our February started off well, we experienced a significant deceleration in the business as we moved through March and April." ¶¶10-106.

(f)    Defendant Johnson's statement made during the 1Q2011 Conference Call: "I think the positive outlook we have is grounded in the fact that we know that the mistakes that we made and that we have taken steps to rectify those and get this brand on course." ¶¶107-108.

51

163.    To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

164.    To the extent there were any forward-looking statements that were identified as such at the time made, such statements were knowingly false when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  For example, all of Defendants' Class Period statements providing guidance were not accompanied by meaningful cautionary language because the Defendants knew that the "risk" factors they warned of had already come to pass at the time they made these statements.

## XII.   CONTROL PERSON ALLEGATIONS

165.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Aeropostale's business.

166.    The Individual Defendants because of their positions of control and authority as executives and senior officers and/or directors of the Company, had access to the adverse, undisclosed information about Aeropostale's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

52

167.    Both of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, and was directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Sales of the Company's core products, Women's apparel, and the Company's ability to manage its inventory, were fundamental, core aspects of Aeropostale's business and subjects that these Individual Defendants followed, tracked, and were aware of at all times.

168.    The Individual Defendants, as senior officers, executives and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, investor presentations and other public statements pertaining to the Company during the Class Period.  As senior officers, executives and/or directors of the Company, the Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

169.    As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act, and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and

business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

170.    The Individual Defendants are each liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Aeropostale's common stock during the Class Period, which included the dissemination of materially false and misleading statements regarding the state of its operations and its financial guidance and concealment or omission of material adverse facts.  The scheme: (i) deceived the investing public regarding Aeropostale's operations and business, and the true value of Aeropostale's common stock; and (ii) caused Plaintiff and other members of the Class to purchase Aeropostale's common stock at artificially inflated prices, which fell as the truth concerning Aeropostale ultimately became known.

171.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Aeropostale, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## COUNT I

### Claim for Violations of Section 10(b) Of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

172.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Aeropostale and the Individual Defendants.

173.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public regarding Aeropostale's business, operations, management and the intrinsic value of

Aeropostale's common stock; and (ii) cause Plaintiff and other members of the Class to purchase

Aeropostale's common stock at artificially inflated prices.  In furtherance of this unlawful

scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth

herein.

174.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

to maintain artificially high market prices for Aeropostale's securities in violation of Section

10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the

wrongful and illegal conduct charged herein.

175.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to misrepresent and conceal adverse material information about

Aeropostale's earning potential, as specified herein.

176.    Defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information, and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Aeropostale's  value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about Aeropostale and its business

operations in the light of the circumstances under which they were made, not misleading, as set

55

forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Aeropostale's common stock during the Class Period.

177.    Each Defendants' primary liability arises from the following facts, among others set forth above: (i) they were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each Defendant enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

178.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Aeropostale's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements and omissions of the Company's business and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and

omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

179.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aeropostale's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Aeropostale's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by them during the Class Period, Plaintiff and the other members of the Class acquired Aeropostale's common stock during the Class Period at artificially high prices and were damaged when the value of their common stock declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

180.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Aeropostale's business and operations, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Aeropostale common stock or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

181.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Claim for Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

182.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.  This claim is asserted against the Individual Defendants.

183.   During the Class Period, the Individual Defendants participated in the operation and management of Aeropostale, and conducted and participated, directly and indirectly, in the conduct of Aeropostale's business affairs.  Because of their senior positions, they knew the adverse non-public information about Aeropostale's misstatements of financial guidance and the Company's operations.

184.   As officers and/or directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Aeropostale's financial condition and results of operations, and to promptly correct any public statements issued by Aeropostale that had become materially false or misleading.

185.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings, as well as presentations to securities analysts, money and portfolio managers, and institutional investors, which Aeropostale disseminated in the marketplace during the Class Period.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aeropostale to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were

"controlling persons" of Aeropostale within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aeropostale common stock.

186.   Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

187.   Each of the Individual Defendants, therefore, acted as a controlling person of Aeropostale.  By reason of their senior management positions and/or being directors of Aeropostale, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Aeropostale to engage in the unlawful acts and conduct complained of herein.  Each Individual Defendant exercised control over the general operations of Aeropostale and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

188.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aeropostale.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Certifying this case as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as class representative and its counsel as class counsel;

B.   Declaring that the Defendants violated §10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder;

C.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

D.      Awarding Plaintiff and the Class appropriate compensatory damages;

E.      Awarding Plaintiff and the other members of the Class the costs, expenses, and disbursements of this action, including attorneys' and experts' fees and, if applicable, prejudgment and post judgment interest; and

F.      Awarding Plaintiff and the Class such other relief as this Court deems just, equitable, and proper.

## XIV.   <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: New York, New York
       February 10, 2012

LABATON SUCHAROW LLP

Jonathan Gardner
Mark S. Goldman
Carol C. Villegas
140 Broadway
New York, NY 10005
Telephone:  212-907-0700
Facsimile:   212-818-0477
jgardner@labaton.com
mgoldmand@labaton.com
cvillegas@labaton.com

*Attorneys for Lead Plaintiff The City of Providence*

Daniel E. Bacine
Lisa M. Lamb
**BARRACK, RODOS & BACINE**
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, Pennsylvania  19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
dbacine@barrack.com
llamb@barrack.com

*Additional Counsel*

# EXHIBIT A

## CERTIFICATION

I, Jeffrey Padwa, City Solicitor for the City of Providence, Rhode Island, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of City of Providence and/or the Board of Investment Commissioners ("Providence"). I have reviewed a complaint filed against Aeropostale, Inc. ("Aeropostale") alleging violations of the federal securities laws;

2.     Providence did not purchase securities of Aeropostale at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Providence is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.     Providence's transactions in Aeropostale during the Class Period are reflected in Exhibit A, attached hereto;

5.     Providence has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years;

6.     Beyond its pro rata share of any recovery, Providence will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 1st day of December , 2011.

_____
Jeffrey Padwa
*City Solicitor, City of Providence, R.I.*

## EXHIBIT A

## TRANSACTIONS IN
## AEROPOSTALE, INC.

| Trans Type | Trade Date | Settle Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|---|
| Purchase | 06/07/11 | 06/10/11 | 2,490.00 | $17.47 | ($43,498.31) |
| Purchase | 06/07/11 | 06/10/11 | 4,065.00 | $17.47 | ($71,034.25) |
| Purchase | 06/08/11 | 06/13/11 | 4,980.00 | $17.34 | ($86,354.20) |
| Purchase | 06/08/11 | 06/13/11 | 6,330.00 | $17.38 | ($109,983.75) |
| Sale | 07/08/11 | 07/13/11 | -5,120.00 | $18.12 | $92,776.96 |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(THK) |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) ) | |

## CERTIFICATE OF SERVICE

I, Carol C. Villegas, hereby certify that on February 10, 2012, I caused a copy of the

Amended Class Action Complaint For Violation of the Federal Securities Laws to be served

upon the following counsel for defendants by U.S Mail:

Joseph S. Allerhand
Stephen Alan Radin
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, NY 10153
Tel. (212) 310-8000
Fax: (212) 833-3148
Email: joseph.allerhand@weil.com
Email: stephen.radin@weil.com

*Attorneys for Defendants Aeropostale, Inc., Thomas P. Johnson, and Marc D. Miller*

Carol C. Villegas