UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

THE CITY OF PROVIDENCE, Individually and
on Behalf of All Others Similarly Situated,

                            Plaintiff,                    No. 11 Civ. 7132 (CM) (THK)

               -against-

AEROPOSTALE, INC., THOMAS P. JOHNSON
and MARC D. MILLER,

                            Defendants.
————————————————————————x

## DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS

McMahon, District Judge:

        This is a securities fraud class action.  Lead Plaintiff, The City of Providence

("Providence" or "Plaintiff"), asserts a single claim under section 10(b) of the Securities

Exchange Act (the "Exchange Act") against Aeropostale, Inc. ("Aeropostale") and two of its

officers (collectively, "Defendants").  It also asserts a related "controlling person" claim under

section 20(a) of the Exchange Act against the individual defendants.  Plaintiff brings these

claims on behalf of all persons who purchased the common stock of Aeropostale between March

11, 2011, and August 18, 2011, inclusive (the "putative class period"), and were damaged

thereby.

        Defendants move to dismiss the Amended Complaint pursuant to the safe harbor

provisions and heightened pleading standards of the Private Securities Litigation Reform Act of

1995 (the "PSLRA").  The motion is DENIED.

## BACKGROUND

### I. The Parties

Providence purchased Aeropostale common stock during the putative class period and alleges that it was damaged thereby.

Defendant Aeropostale is a Delaware corporation with its principal executive offices located in New York, New York.

Defendant Thomas P. Johnson ("Johnson") has served as Aeropostale's Chief Executive Officer ("CEO") since December 2010. Prior to that, from February 2010 to December 2010, he served as the company's "co-CEO" along with Mindy Meads. From March 2004 through February 2010, he served as Executive Vice President and Chief Operating Officer. He has also been a member of the company's Board of Directors since August 2008.

Defendant Marc D. Miller ("Miller") has served as Aeropostale's Chief Financial Officer ("CFO") since December 2010. Prior to that, from April 2007 to December 2010, he served as the Senior Vice President of Strategic Planning, Business Development and E-Commerce.

### II. Jurisdiction

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

### III. Allegations in the Amended Complaint

Plaintiff alleges that Defendants made materially false and misleading statements in March and May of 2011, painting a much rosier picture of Aeropostale's expected performance for the first and second fiscal quarters of 2011 than they had reason to believe. When the "truth" about the company's actual performance was finally revealed at the close of each quarter, the value of the company's stock dropped significantly.

The company's problems began in the second half of 2010, when Mindy Meads, the co-CEO (alongside Defendant Johnson) and Chief Merchandising Officer for Aeropostale, decided to change the design of the women's fashion line to one that (she hoped) would appeal to an older customer. The new styles featured a muted color palate and "mature" designs – in contrast to the bright colors and more "wholesome" styles that had previously formed the "core offering" for the teen women's line.

The "mature" designs first appeared in Aeropostale's 2010 back-to-school and holiday merchandise. As it turned out, the new approach did not appeal to Aeropostale's target audience. The new styles sold poorly, leading to a large amount of excess inventory.

On December 1, 2010, about halfway through the fourth quarter of 2010 ("4Q2010"), Aeropostale announced Meads' resignation; according to the accounts of several employees, she was fired because her design change was a failure.

But Aeropostale's problems with the new designs were not over. Because the company orders most of its merchandise nine months in advance, the spring and summer lines for 2011 had already been ordered. At least 90% of the merchandise ordered through the summer of 2011 was based on Meads' unpopular design choices.

The new styles continued to sell poorly through the beginning of the first quarter of 2011 ("1Q2011"). Aeropostale uses a particular metric, known as "comps" or "same store sales," to track the sales of a particular store or a number of stores on a period-to-period basis. The purpose of the statistic is to allow investors to determine which portion of new sales has come from actual sales growth, as opposed to the opening of new stores. As early as December 2010, same store sales were down 20-30 % over the prior year. According to an employee from the merchandise planning department, sales in February of 2011 were "poor."

Inventory had started to build up in the last two quarters of 2010.  Initially, the excess merchandise was moved to the backs of the stores; eventually, Aeropostale had to rent storage space in malls to house all the excess inventory.

Aeropostale began discounting slow-moving merchandise and offering various promotions.  According to an employee in the merchandise planning department, the planners at Aeropostale knew that they needed to "burn through the inventory glut" at whatever price they could sell it, despite the effect this would have on the company's margins.  This employee confirmed that he and other planners were making decisions about promotions without regard to margins.

In the beginning of 2011, the company began "chasing product" – continuously marking down the prices in order to move the merchandise – across all product lines.  At the beginning of the first quarter of 2011, the women's department started testing a new "buy one, get two free" promotion in the women's department.  In May, the "Big 2" promotion, as it was called, was implemented widely at Aeropostale stores.  Also in May, the company offered steep discounts on some of its t-shirts, selling more expensive t-shirts for the same price as a cheaper t-shirt.  According to a former employee, the discounts and extreme promotions had a significant impact on the margins for those products.

Plaintiff argues that Defendants were aware of how poorly the women's line was doing on a near real-time basis because of a "sophisticated management information system" that Aeropostale used to track inventory levels, sales data, pricing, and margins (all in real time).  Plaintiff alleges that the information system, "Island Pacific," allowed Defendants to see which merchandise lines were moving, which lines required added inducements, where and to what extent inventory was backing up, and how profitable the various merchandise lines were.

Former Aeropostale employees (who are identified as "confidential witnesses" or "CWs") provided Plaintiff with information regarding the content of the various analytical reports, covering sales and inventory data, that Defendants would have reviewed, and also with accounts of regular meetings that Defendants attended where the severity of the sales and inventory problems was discussed. According to these CWs, the company held weekly "Executive Committee" meetings, which the individual defendants regularly attended. One CW recalled a specific meeting in February 2011 during which the "very large" inventory "carryover" problem was discussed. At that meeting, the inventory problem was quantified and grouped on reports by "category," such as denim, knit, sleepwear for women, fleece (sweat suits, hoodies, etc.) as well as in terms of dollar amounts. At another meeting in April 2011, Defendants Johnson and Miller acknowledged that the heavily discounted merchandise was still not selling.

Defendants also had access to daily "flash" reports, which consisted of a spreadsheet reporting inventory and sales on a daily basis. Flash reports included a breakdown by product category (*e.g.*, women's, men's), tracking comp sales and gross margin by department and comparing sales and margins year over year. The individual defendants also received a daily report known as the "Bible," a snapshot of the company's entire business, including inventory.

The individual defendants attended monthly "Unit Q" meetings, which were held for each department separately, and where inventory, production issues, and sales were discussed. According to an employee in merchandise planning who focused on the men's department, the individual defendants would review "Unit Q" reports, which included weekly "sell throughs," average unit retail (the amount that each unit sold for, or "AUR"), weekly units being sold, and dollars and projections prepared by department directors. At the Unit Q meetings, the members

of the particular division at Aeropostale would meet with the executives to discuss forecasting and how the month was going to perform. The attendees "looked a quarter out," and if it was close to the end of the year, they would begin forecasting for the following year. This employee recalled that the AUR was down for every type of product, including the women's department, throughout the putative class period. Although this employee did not attend the women's division Unit Q meeting, he stated that Defendant Johnson regularly attended his Unit Q meeting and would have the women's department meetings as well.

The individual defendants were allegedly aware that the merchandise in the women's line had been ordered in the "mature" designs for the following two quarters because they tracked ordering and inventory. According to various former Aeropostale employees, the content and make-up of the inventory (including style type) was reviewed by them through various reporting methods, including, among other things, the flash reports, Unit Q reports, the Bible, and sales reports. Defendant Johnson in particular would have been aware of any significant merchandising decisions because the heads of planning and merchandise reported directly to him.

## A.  *March 10, 2011 Press Release*

Aeropostale issued a press release on March 10, 2011, which announced the results of the fourth quarter of 2010 (ending on January 29, 2011) and gave guidance for the first quarter of 2011 (ending on April 30, 2011) ("4Q2010 Press Release"). Defendant Miller signed the press release. The individual defendants also gave public comments on the press release, including in an earnings conference call with analysts and investors held on the same day.

The Amended Complaint identifies the statements below made in association with the press release as false and misleading.

(1)     For the first quarter of fiscal 2011, the Company *expects earnings in the range of $0.35 to $0.38 per share*, compared to earnings of $0.48 per share last year.  (4Q2010 Press Release.)

(2)     *Our outlook for the first quarter reflects the impact from clearing through holiday inventories*, and our outlook for the full year reflects industry wide inflationary pressures.  As we look forward into 2011, we recognize that the entire sector faces near term challenges.  We are, however, focused on leveraging our flexible promotional business model to navigate through the current environment and delivering on our initiatives to position ourselves for future growth.  (Defendant Johnson's comments on the 4Q2010 Press Release.)

(3)     I will now discuss our guidance outlook.  *For the first quarter we expect earnings per share in the range of $0.35 to $0.38 per diluted share, which reflects the impact of the aforementioned markdown liquidation.*  This compares to record earnings per share of $0.48 last year.  (Defendant Miller on the earnings conference call.)

(4)     *Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give the customers what they want.*  At the same time, Aeropostale, along with the rest of the industry, is facing inflationary pressures.  We are working diligently to mitigate the cost increases by leveraging our vendor relationships, raising ticket prices strategically, offering our customers creative promotions and being more conservative with our initial buys.  (Defendant Johnson on the earnings conference call.)

(5)     *So we feel like we are appropriately attacking the inventory problem.*  Our goal, as always, is to end the quarter as cleanly as possible from an inventory standpoint.  (Defendant Miller on the earnings conference call.)

(6)     *We feel very good about the product going forward* . . . So far for spring we have had some categories doing exceptionally well . . . But we have also been *very excited about some of the fashion components of what we're delivering for spring.*  And the pricing that we have been able to get [out] of some of our fashion.  (Defendant Johnson on the earnings conference call.)

Additionally, Providence alleges that the individual defendants made a material omission in their response to a direct question from an analyst.  The analyst asked, "And it sounds like your inventories are in good shape now; where should we expect inventories at the end of 1Q?"  According to the Amended Complaint, the company's President, Michael Cunningham

("Cunningham"), and Defendant Miller responded.  Defendant Miller gave an "evasive" answer about margin pressure in 1Q2011, but neither Cunningham nor Defendant Miller disclosed the "known inventory crisis" or the fact that the inventory overhang would continue through the end of the first quarter and beyond.

Providence alleges that all these statements were false and misleading at the time they were made for a number of reasons.

First, the earnings guidance understated the sales and inventory problems, providing guidance that suggested only a slight diminution in performance year to year.

Second, the statements led the market to believe that Aeropostale had "sufficiently" cleared through the holiday inventory when it had not – as evidenced by the fact that excess inventory had to be moved into storage spaces at malls and that the holiday inventory was not selling despite promotions.

Third, the statements failed to disclose that the sales and inventory problems would only get worse through the first and second quarters of 2011 because the poorly-selling "mature" styles had already been ordered through the spring and summer of 2011, and to sell that merchandise, Aeropostale would have to offer more substantial promotions – which would "massively" affect the company's margins and earnings.

## B. May 5, 2011 Business Update

Aeropostale issued a press release announcing its "preliminary" first quarter financial results on May 5, 2011 (the quarter ended on April 30, 2011).  Defendant Miller signed the press release, and Defendant Johnson commented on the results.

In the press release, the company reported that "same store sales" had decreased 7% – in contrast to a same store sales increase of 8% the year before.  The release also revised the

company's expected earnings for the first quarter of 2011 to approximately $0.20 per diluted share (down from $0.35-$0.38 in the 4Q2010 Press Release), "based on lower than expected sales and margins for the quarter."

Plaintiff identifies the following statements as false and misleading:

(7)     Clearly we are not satisfied with our sales and margin performance for the first quarter. *We were more promotional than anticipated on our spring assortment and clearance merchandise.* Additionally, our core customers continue to be pressured by challenging macroeconomic conditions while, at the same time, the teen retail sector remains intensely promotional. As we move forward through the year, our entire management team is keenly focused on our key initiatives: regaining the balance and clarity of our merchandise assortment, managing our cost structure, and leveraging our strong financial position. We remain very confident in our business model, in the ability and determination of our organization, and in the strength and positioning of our brand. (Defendant Johnson's comments on the press release.)

Plaintiff alleges that these statements were false and misleading at the time they were made because they gave the false impression that Defendants did not anticipate having low sales and poor margins during the first quarter and were surprised by how promotional Aeropostale would have to be to clear through its product – when in fact they had long known that they had poorly-selling merchandise on hand. Defendants already knew, and discussed internally, the massive inventory problem and had visibility into the poor sales of carryover inventory at normal discount prices. Additionally, at the time the statements were made, large, unprecedented promotions such as "buy one, get two free" had already "hit the shelves."

After this announcement, the price of Aeropostale stock fell $4.20 per share, or 16.5%, to close at $21.29 per share, on heavy trading volume (approximately 14 million shares when average daily volume during the putative class period was approximately 2.8 million).

### C. May 19, 2011 Press Release

Aeropostale issued a third press release on May 19, 2011, which included its actual first quarter financial results and gave second quarter ("2Q2011") financial guidance ("1Q2011 Press Release"). Defendant Miller signed the press release. The individual defendants commented on the release, including on an earnings conference call with analysts and investors held on the same day.

The company confirmed the preliminary 1Q2011 financial performance it had provided in the May 5, 2011 business update.

Plaintiff identifies the following statements made in association with the press release as false and misleading:

(8)   *For the second quarter of fiscal 2011, the Company expects earnings in the range of $0.11 to $0.16 per share.*  (1Q2011 Press Release.)

(9)   *Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories* to position ourselves appropriately for the important back to school selling season. While we are disappointed with our current performance, we are confident that our entire organization is focused on the right initiatives to regain market share. Our goals for the remainder of the year remain very clear -- regain balance and clarity in our merchandise assortments, mitigate industry wide cost increases, and manage our cost structure conservatively and carefully. (Defendant Johnson's comments on 1Q2011 Press Release.)

(10)  The first quarter was clearly very disappointing. *While our February started off well*, we experienced a significant deceleration in the business as we moved through March and April. Sales were affected more severely than we originally anticipated during the Easter shift, and we did not experience the recovery that we had expected during the month of April. (Defendant Johnson on the earnings conference call.)

(11)  Thank you again, everyone, for your support. We know that coming off of a tough quarter like this it's never a great position to be in. *I think that the positive outlook that we have is grounded in the fact that we know that the mistakes that we made and that we have taken steps to rectify those and to get this brand back on course.*

And we have the team to do that. So I'm confident in our ability to be back on track. (Defendant Johnson on the earnings conference call.)

Plaintiff alleges that these statements were materially false and misleading for many of the same reasons outlined above, including that the earnings guidance understated the sales and inventory problems; that the spring and summer lines were selling poorly and would continue to sell poorly; that markdowns and promotions were not helping to sell the merchandise; that Aeropostale would therefore not be able to clear through all of the inventory by the end of the second quarter; and that the markdowns and promotions would adversely affect the company's margins and earnings more substantially than Defendants advised. Also as noted above, promotions like the "buy one, get two free" promotion were already being implemented.

Additionally, according to two former employees, sales in February were just as low as sales in March and April. It was well known internally that sales were down throughout the entire first quarter.

### D. *August 4, 2011 Business Update*

Defendants issued a press release on August 4, 2011, which provided a business update for the second quarter (the quarter ended on July 31, 2011). The press release was signed by Defendant Miller.

For the quarter, Aeropostale preliminarily reported a same store sales decrease of 14% in contrast to a same store sales increase of 4% the year prior. It also reported preliminary earnings per share for the second quarter in the range of $0.02 to $0.03 per share (down from the guidance of $0.11-$0.16 given in the 1Q2011 Press Release.) However, this included a one-time pre-tax benefit of $0.06 per share, resulting from the favorable resolution of a dispute with a vendor. According to the Amended Complaint, the non-adjusted earnings per share based on net sales, without taking into consideration the pre-tax benefit, was negative, in the range of -$0.04 to -

$0.03, and the actual adjusted diluted net earnings per share for the second quarter was -$0.02 per diluted share.

After the announcement, on August 4, 2011, the price of Aeropostale stock fell $3.99 per share, or 24%, to close at $12.53 per share, on extremely heavy trading volume (approximately 14 million shares where the putative class period volume averaged 2.4 million shares).

### E.  August 18, 2011 Press Release

Aeropostale issued a press release on August 18, 2011 announcing its actual second quarter financial results ("2Q2011 Press Release").  Defendant Miller signed the press release.

The company announced the actual 2Q2011 earnings per share of $0.04.  Due to the aforementioned pre-tax benefit, according to the Amended Complaint, the actual adjusted diluted net earnings per share for the second quarter was -$0.02 per diluted share.  The company also confirmed the earlier guidance in the August 4, 2011 business update regarding the same store sales decrease of 14%.

At that time, Defendants finally told the public that the "muted" color styles had been ordered up until the fall of 2011; that Aeropostale had been forced to engage in excessive markdowns and promotions in order to sell the spring and summer merchandise; and that the company was now returning to the "color palette" of its "core offering."  Defendant Johnson also commented that Aeropostale tracks pricing closely, "on a daily basis," so that the company can react quickly to change the price of products when they are not selling fast enough.  Cunningham confirmed this, stating, "We have invested heavily in the data warehouse internally to be able to capture, analyze and report in real time, as well as as [sic] often as we need the data to understand the business in every possible way."

On August 19, 2011, the price of Aeropostale stock fell another $1.78 per share, or 14%
on heavy trading volume (approximately 8.5 million shares where the putative class period
volume averaged 1-3 million shares).

### F.  Plaintiff's Industry Expert

The Amended Complaint also contains opinion evidence from an expert in the retail and
wholesale industry, Allan Zwerner.  Zwerner reviewed publicly available news articles,
confidential witness reports, and SEC filings to form his opinion.  In Zwerner's view,
Defendants had no reasonable basis to believe that Aeropostale could meet the guidance they
issued on March 10, 2011 and May 19, 2011, for the first and second quarters of 2011,
respectively.  The confidential witness testimony that sales continued to be down throughout the
first and second quarters of 2011, combined with the guidance "miss" of $0.15 - $0.18 per share
for the first quarter and $0.15 - $0.20 per share for the second quarter, demonstrated that the
"miss" was too large for Defendants not to have known about when they issued the guidance.

Zwerner also concluded that all of the various reporting available to Defendants, which
included daily sell-through data, would have given Defendants a clear indication of whether
inventory was being liquidated in a timely manner.  Because large markdowns like the "buy one,
get two free" promotion take time to plan, Zwerner found that management would have known
about such promotions at least two weeks before they were implemented.  In the case of the "buy
one, get two free" promotion that was implemented in the end of the first and beginning of the
second quarter of 2011 (around April or May), Defendants would have known about the
promotion by mid-April.  In Zwerner's opinion, this provided an additional reason to conclude
that the second quarter guidance issued on May 19, 2011 lacked a reasonable basis when made.

# DISCUSSION

## I. Standard for Determining the Motion

Even under the PSLRA, which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted).

The gloss imposed by the PSLRA involves what allegations can be deemed "well-pleaded." In addition to the long-standing requirements of Fed. R. Civ. P. 9(b), which requires the plaintiffs to state "the circumstances constituting fraud . . . with particularity," the PSLRA requires them to "state with particularity all facts on which [information and belief that defendants have violated Rule 10(b)(5)] is formed." 15 U.S.C. § 78u-4(b)(1). The Second Circuit has ruled that the word "all" as used in the PSLRA means that plaintiffs must plead "sufficient" facts to support a reasonable belief as to the misleading nature of defendants' statements or omissions. *Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000). The PSLRA also requires the plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

14

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996). In this case, because the Amended Complaint quotes and relies upon statements made in the press releases and the two investor calls, the Court may properly consider the complete referenced press releases, the full transcripts of those calls, and the Aeropostale Form 10-Ks referenced and incorporated in those calls in connection with the Rule 12(b)(6) motion, without converting it to one for summary judgment. *See Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232 n.3 (S.D.N.Y. 2009).

## II. Section 10(b) and Section 20(a) of the Securities and Exchange Act

Plaintiff brings claims under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78a *et seq.* To state a claim under section 10(b), and the accompanying regulation Rule 10b-5, the plaintiff must allege that Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005). Section 20(a) of the Exchange Act establishes joint and several liability (subject to a good faith exception) for every person who, directly or indirectly, controls any person liable under any provision of the Act. 15 U.S.C. § 78t(a).

The PSLRA establishes a statutory safe harbor for forward-looking statements. Under the safe harbor, a defendant will not be liable for a forward-looking statement if (1) the statement

is "identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," (2) the statement is immaterial, or (3) if "the plaintiff fails to prove that the forward-looking statement . . . was . . . made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c).

"The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original).

Defendants argue that the statements identified in the Amended Complaint as materially misleading were in fact not misleading; that these statements are all forward-looking and fall within the PSLRA safe harbor; and that even if these arguments fail, the Amended Complaint does not allege scienter.

## III. The Amended Complaint Alleges Material Misstatements and Omissions With Sufficient Particularity

The Amended Complaint specifies each statement alleged to have been misleading, outlines separately the reasons why each statement is misleading, and where applicable, states with particularity all facts on which "information or belief" is formed. *See* 15 U.S.C. 78u-4(b)(1); (Compl. ¶¶ 79-110.) This is not a complaint that can be dismissed for failure to plead fraud with particularity; Defendants do not contend otherwise.

Defendants, however, argue that Providence has failed to allege *material* misstatements or omissions because, in light of the "total mix" of information available to the investing public –

including public disclosures made at the same time as the alleged misstatements and publicly available information regarding sales and promotions at Aeropostale stores – the alleged misstatements or omissions (i) were not misleading and (ii) were forward-looking statements accompanied by meaningful cautionary language.  To the extent the Court might find that some of the statements were not forward-looking, Defendants claim they are a combination of non-actionable statements, such as expressions of puffery or corporate optimism, or of belief or opinion, which are non-actionable unless the speaker does not genuinely or reasonably believe the statement at the time it was made.

In every respect, Defendants are wrong.

Section 10(b) requires a plaintiff claiming securities fraud to allege, *inter alia*, a material misstatement or omission in a public disclosure.  *See* 15 U.S.C. § 78(j).  The meaning of materiality in the context of securities litigation is long settled – the key to the inquiry is whether there is a "substantial likelihood" that the alleged misstatement or omission would be deemed significant by a reasonable investor in light of the "total mix" of information available at such time about the investment.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

As a general matter, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988) and *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).  "A corporation is not required to disclose a material fact merely because a reasonable investor would very much like to know that fact."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *Time Warner*, 9 F.3d at 267) (internal alteration marks omitted).  Nevertheless, a duty to disclose

"arises when disclosure is necessary to make prior statements not misleading." *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009) (quoting *Time Warner*, 9 F.3d at 268). A plaintiff in that instance need only demonstrate the materiality of the omitted facts and need not separately address the misleading nature of the statements that were actually made. *See Time Warner*, 9 F.3d at 267-68. "If a reasonable investor would so regard the omitted fact as material, it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011) (quoting *Time Warner*, 9 F.3d at 267-68) (internal alteration marks omitted).

Plaintiff here has alleged that Defendants omitted to disclose material facts without which the statements that were made were materially misleading. On several occasions, for example, Defendants disclosed that they were taking steps to get their problems behind them by being "promotional" with 4Q2010 and 1Q2011 inventory (*e.g.*, "Our outlook for the first quarter reflects the impact from clearing through holiday inventories" (statement 2), "So we feel like we are appropriately attacking the inventory problem" (statement 5), "Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories" (statement 9), "we have taken steps to rectify [our mistakes] and to get this brand back on course" (statement 11)). They made such statements as late as May 19, 2011, when Defendants announced that the problem was "primarily impacted by missteps . . . in the back half of last year."

But facts are alleged in the Amended Complaint – facts that I must presume are true – that, if proved, demonstrate that Defendants knew that this was not a problem limited to inventory overhang for 4Q2010, or even 1Q2011, at the time those statements were made. Even assuming that Defendants could not be certain early in 2011 that the merchandise ordered for the

spring and summer of 2011 would not sell just because holiday sales (or lack of sales) were weak (although they were certain enough about the failure of Meads' strategy to fire her and reverse course on teen apparel), they had the ability to track sales on a daily basis, and so could undoubtedly surmise relatively early in the spring selling season (February through April) that the spring line was going to be no more successful than the winter line had been. And from those results, it is not at all illogical to infer that the summer was highly likely to be problematic as well. The supposedly "forward-looking" statements, fairly read, imply that the company's lower earnings are the product of a temporary inventory problem (in the case of some statements, a 4Q2010 inventory problem) that would be resolved imminently – without disclosing that the company anticipated that the problem might well extend into succeeding quarters (as it did) because the merchandise that had proved unpopular had been pre-ordered and would continue to be stocked until fall of 2011, when a different "look" arrived at stores.

The May 19 statement quoted above, fairly read, does not suggest to a rational investor that the "problems . . . in the back half of last year" included merchandise orders for merchandise that would not even hit the stores until the second quarter of *this* year. A rational investor would want to know that the merchandising misstep that led to the firing of a merchandise director and a sudden and precipitous downturn in same store sales – all of which did indeed occur "in the back half of last year" – was going to have considerable impact on the profitability during the first two quarters of this year. For that reason alone, Plaintiff has exceeded the materiality threshold, and by a considerable margin.

The safe harbor also offers Defendants no protection. Under the first prong of the safe harbor, a defendant will not be liable for a forward-looking statement if the statement is "identified as a forward-looking statement, and accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). Defendants assert that all of the alleged misstatements are "forward-looking" and accompanied by "meaningful cautionary statements."

But the safe harbor does not apply to material omissions. *See, e.g.*, *In re Complete Mgmt. Inc. Sec. Litig*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y.1999). Nor does it apply to statements of current or historical fact. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[S]tatements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements falling within the PSLRA's safe harbor."). Defendants' failure to disclose that the unpopular designs – the source of the poor sales and inventory problems in the "back half of last year" – had been ordered through summer of 2011 is unprotected by the safe harbor, regardless of whether the statements thereby rendered misleading were forward-looking. *See Complete Mgmt.*, 153 F. Supp. at 340.

The forward-looking statements are also not protected by the first prong of the safe harbor because they are not accompanied by "meaningful cautionary statements" that are sufficiently specific to address the material omission. *See Slayton*, 604 F.3d 758, 769-72 (2d Cir. 2010). Vague or boilerplate disclaimers do not suffice as cautionary statements. *See id.*; *Schottenfeld Qualified Associates, L.P. v. Workstream, Inc.*, No. 05 Civ. 7092 (CLB), 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006). To be meaningful, cautionary statements must be "substantive and tailored to the specific future projections, estimates or opinions which the plaintiffs challenge." *Slayton*, 604 F.3d at 772 (quoting *Inst. Investors Group v. Avaya, Inc.*, 564

F.3d 242, 256 (3d Cir. 2009)); *see also In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ.
3111 (RWS), 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005).

In this case, there is no question that the forward-looking statements made on the
conference calls and in the press releases were specifically identified as "forward-looking" and
were accompanied by cautionary language,[1] so the only issue is whether those statements were
sufficient to warrant protection under the PSLRA.

Defendants point to cautionary language concerning "consumer spending patterns,"
"fashion preferences and trends," and "the effectiveness of our inventory management" as
effectively cautioning investors of the risks identified by Plaintiff – the merchandising missteps,
inventory build-up, and increased promotional activities (*i.e.*, sales and markdowns to reduce
inventory). However, Plaintiff argues that these factors were not "meaningful" or "sufficiently
specific" because Aeropostale did not disclose that the risk factors were not merely hypothetical
(*i.e.*, they "could" happen), but were in fact happening – indeed, had already happened – that is,
Aeropostale did not reveal that, at that time, Meads' designs were ordered through the summer of
2011 and that the poor performance would necessarily continue through then.

Nor can many of the alleged misstatements be fairly characterized simply as "forward-
looking." The PSLRA gives several definitions of a forward-looking statement, including "a
statement containing a projection of . . . income (including income loss), earnings (including
earnings loss) per share, . . . or other financial items"; "statement of the plans and objections of
management for future operations, including plans or objectives relating to the products or

---

[1] Plaintiff contends that the oral statements, made on conference calls with investors, were not sufficiently identified
by Defendants' statement at the beginning of the calls that "certain statements and responses to questions may
contain forward-looking statements such as forecasts of financial performance" and directing the participants to the
risks as described in Aeropostale's Form 10-K. Under the PSLRA, oral forward-looking statements require an
accompanying statement "that the particular oral statement is a forward-looking statement." 15 U.S.C. § 78u-
5(c)(2)(A)(i). But courts have held that a statement like Defendants' at the beginning of a conference call is
sufficient to identify the oral forward-looking statements, and I find that to be the case here. *See, e.g., Biovail*, 615
F. Supp. 2d at 232-33.

21

services of the issuer"; and "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(C).

But statements that the company had "taken the necessary steps to give the customers what they want" (statement 4), was "appropriately attacking the inventory problem" (statement 5), and that Defendants "know the mistakes that we made and . . . have taken steps to rectify those" (statement 11) are not "forward-looking." They are statements about present or historical fact, whose "accuracy can be determined at the time they were made." *Vivendi Universal*, 765 F. Supp. 2d at 569. Statements that Aeropostale had taken the "necessary steps" to rectify the problems are another excellent example of a statement that, while technically true, is materially misleading (or could well be) without disclosing that the "necessary steps" did not involve undoing already-planned orders for spring and summer merchandise, and so would not lead to better results until 3Q of 2011.

Moreover, "mixed" statements that have both a forward-looking aspect and a representation of present or historical fact are not protected with respect to the latter. *See, e.g.*, *Schottenfeld*, No. 05 Civ. 7092 (CLB), 2006 WL 4472318, at *3; *Regeneron Pharms.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *13. Viewed in isolation, Aeropostale's earnings projections fall within the definition of a forward-looking statement under the PSLRA as "statements containing a projection of . . . earnings [] per share." 15 U.S.C. § 78u-5(i)(1)(A)-(C). But these statements are accompanied by statements that the projections and "outlook" incorporate the effect of clearing through the inventory, sometimes even within the same sentence (*see* statements 1, 2, 3, 8, and 9). Such statements imply that the earnings projections accurately reflect the sales and inventory problems that Defendants were aware of at the time the statements were made, demonstrating that the statements are not solely forward-looking, but

instead incorporate a present fact "whose accuracy could be determined at the time the statements were made." *Vivendi Universal*, 765 F. Supp. 2d at 569.

Appreciating that these statements are not properly characterized as mere forward-looking projections makes their misleading nature, and the materiality of the omissions regarding Meads' designs in the company's earnings guidance, all the more apparent.  Plaintiff does not need to rely on the falsity of Aeropostale's financial projections in order to show that they fail to disclose facts that impacted the reliability of those statements. *See, e.g., Oxford*, 187 F.R.D. at 141.  Plaintiff's position is analogous to that of the plaintiffs in *Oxford*, where the court explained, "[P]laintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements." *Id.*  As in *Oxford*, "The safe harbor and bespeaks caution doctrines do not apply to these omissions." *Id.*  Moreover the same-day sales data – assuming (as I must) that it showed nothing was getting better – meant that any pretense that these statements were "predictions" that might or might not work lost all force at some point (what that point is we need not decide now).  Aeropostale knew what the problem was.  By the summer, well after the holiday "inventory glut" had passed, sales were so poor that they were a negative number, and only an accounting gambit could get the earnings onto the positive side of the ledger.

Finally, it speaks volumes that the ultimate corrective statement – the one that was finally made on August 18, 2011 – was the only one to disclose the true scope of a problem that had been identified months earlier.  As it became more and more certain that Aeropostale customers were not going to accept Meads' design concept, there undoubtedly came a point at which

23

investors were entitled to know that the merchandising misstep committed in the fall of 2010 would ripple through Aeropostale's earnings for virtually an entire year. They certainly could not be told that the misstep had occurred last year and nothing more; only by knowing for how long Aeropostale's inventory would be "infected" with unpopular "mature" designs and colors could investors make rational decisions about purchasing and/or selling the company's stock.

I agree with Plaintiff that these allegations, if proven, would take the forward-looking disclosures out of the PSLRA's safe harbor. "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (quoting *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001)). Even assuming that Defendants sufficiently identified the correct risk factors for the public, the disclosures failed to warn investors that the risks were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences. That is what makes the forward-looking disclosures misleading (if they are misleading – an issue that must abide discovery). As Judge Pollack presciently noted some years ago, in the context of the judicially-created "bespeaks caution" doctrine (analogous to and a predecessor of the PSLRA's safe harbor provision): "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." *In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 930 F.Supp. 68, 72 (S.D.N.Y.1996); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Of course, if the evidence reveals that Plaintiff's allegations about the existence of unfavorable events are unfounded, the safe harbor provision may yet absolve Defendants of

liability for any forward-looking statement, identified as such, that was accompanied by meaningful cautionary language. *Asher v. Baxter International Inc.*, 377 F.3d 727, 735 (7th Cir. 2004). This will, however, depend on facts that remain to be developed.

The alleged misstatements are also misleading to the extent that they led the market to believe Aeropostale had sufficiently cleared through its holiday inventory as of March 10, 2011; "February started off well" in terms of performance; or Aeropostale was "more promotional" in the first and second quarters of 2011 "than anticipated." Defendands argue that many of the statements amount to "puffery" or "expressions of corporate optimism," or belief or opinion, and are not actionable misrepresentations on those grounds (*e.g.*, "We feel very good about the product going forward" and "we have also been very excited about some of the fashion components . . . for spring").

A plaintiff may not rely on statements that constitute puffery or ordinary expressions of corporate optimism which are "too general to cause a reasonable investor to rely upon them." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Rombach*, 355 F.3d at 174. Statements of belief or opinion are also not actionable unless they are both objectively false and disbelieved by the speaker at the time the statements were made. *Sanofi-Aventis*, 774 F. Supp. 2d at 567; *see also Time Warner*, 9 F.3d at 267.

But the rosy predictions that might otherwise be puffery are rendered problematic for the very same material omissions outlined above. *See Time Warner*, 9 F.3d at 267. Moreover, statements of belief or opinion are actionable upon a showing of knowing falsity and the fair implication of the holding discussed in the preceding page is that Aeropostale's executives,

including the individual defendants, well knew that their half-true expressions of optimism were both overly rosy and highly unlikely.

## IV. The Amended Complaint Raises a Strong Inference of Scienter

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court interpreted this provision of the PSLRA to require a court to consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. Under this rubric, a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id* at 324. The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324 (citation and internal quotation marks omitted). In determining whether a strong inference exists, the court must consider "whether *all* of the facts alleged, taken collectively, . . . [and] not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 551 U.S. at 322-23 (emphasis in original).

The requisite state of mind in a Rule 10b-5 action is "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Second Circuit, a strong inference of scienter can be established in two ways: by alleging particularized facts that show that defendants had both motive and opportunity to commit the fraud, or by alleging particularized facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI Commc'ns, Inc. v. Wolfson*, 493 F.3d 87, 99 (2d Cir. 2007). In either case, the court must be convinced that the inference of scienter is "at least as compelling" as any

competing inferences. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

As indicated above, Defendants urge the Court to adopt a finding that the alleged misstatements are all forward-looking, and so would be subject to the higher standard of "actual knowledge" for scienter under the second prong of the PSLRA. *See* 15 U.S.C. § 78u-5(c); *Slayton*, 604 F.3d at 773 ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.") (quoting *Avaya, Inc.*, 564 F.3d at 274). I have declined to find that the misleading nature of the statements rests on the forward-looking aspects of the statements; instead, it is the omissions that make the alleged misstatements materially misleading. The standard that applies to material omissions is "conscious misbehavior or recklessness." *See, e.g.*, *ATSI*, 493 F.3d at 99.

A generalized desire to maintain a company's stock price or to sustain "the appearance of corporate profitability" does not constitute sufficient evidence of motive to support a securities fraud claim. *Chill v. Gen Elec. Co.*, 101 F.3d 263, 268 & n.5 (2d Cir. 1996). Plaintiff does not plead or argue that Defendants personally profited by selling Aeropostale stock while the price was artificially inflated – though, ironically, Defendants admitted in their responsive papers that they had previously made elections to sell stock during the putative class period to satisfy their tax liability, thereby giving them a personal motive to keep the stock price inflated that would satisfy the "motive" prong of scienter analysis. *See ECA*, 553 F.3d at 198 ("[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.") (citations and internal quotation marks omitted).

27

But Plaintiff definitely pleads particularized facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. "[W]here the plaintiffs cannot make a motive showing, . . . their circumstantial evidence of fraud must be correspondingly greater." *Slayton*, 604 F.3d at 776; *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). The inquiry regarding scienter is necessarily case-specific, and the conclusion rests on a practical judgment about whether, taking all of the allegations collectively, it is at least as likely that Defendants acted with scienter. *See Tellabs*, 551 U.S. at 322-23; *Avaya Inc.*, 564 F.3d at 269.

In order to demonstrate "conscious misbehavior or recklessness," Plaintiff alleges that Defendants knew or had access to information suggesting that their public statements were not accurate. Defendants argue that Plaintiff has failed to both plead its facts with sufficient particularity and to raise a strong inference of scienter.

It is well settled that plaintiffs can plead conscious misbehavior or recklessness by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311; *see also In re AIG*, 741 F. Supp. 2d at 532-33; *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309 (2d Cir. 2000). With respect to sales data and reports, pleadings are sufficiently specific where the plaintiffs have alleged who prepared the reports, how frequently they were prepared, who reviewed them, and the issues discussed in the reports. *See New Orleans Emps. Ret. Sys. V. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. Dec. 29, 2011); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73 (2d Cir. 2001) (allegations with respect to company-generated

28

statistics held sufficient where plaintiffs specified "who prepared internal company reports, how frequently the reports were prepared and who reviewed them").

In this case, Plaintiff has pleaded such facts with sufficient particularity. Plaintiff has pleaded facts tending to show that Defendants knew they had made a huge merchandising mistake – indeed, they fired the merchandising director whose fashion sense was so disastrously wrong and set about correcting it. It pleads facts tending to show that Defendants knew that her poor decisions were not limited to Aeropostale holiday results, but would have longer term consequences. Defendants could see that sales, not just of the holiday inventory, but of spring inventory, were poor and getting poorer. They could see it on a daily basis. Consumer distate for Meads' lines was not hypothetical and it was not confined to the holiday season – it was real and demonstrable and ongoing. These issues were discussed at meetings as early as February 2011, as well as at monthly Unit Q meetings.

Plaintiff, moreover, has pleaded facts tending to show Defendants knew the kind of impact these failures would have on the company's overall performance – the women's fashion division was recognized as the "core" of Aeropostale's business and constituted approximately 70% of the company's annual net sales.

I decline to accept Defendants' invitation to overlook the law in this circuit regarding confidential sources, as articulated in *Novak*, in favor of the Seventh Circuit's decision in *Higginbotham v. Baxter Int'l*, 495 F.3d 753 (7th Cir. 2007). *See Higginbotham*, 495 F.3d at 756-57.; *see Novak*, 216 F.3d at 313-14. If the confidential employees turn out to have given Plaintiff's counsel false information, or have axes to grind that renders implausible their testimony about what Defendants knew and when they knew it, so be it – but that is an issue for

*trial*, not on a motion to dismiss. Here, sufficient facts are disclosed to allow, at the pleading stage, an inference of scienter.

The CWs included the director of visual merchandising, who was responsible for inventory issues and routinely discussed the inventory overhang with Defendants (CW1); a director of planning and allocation primarily focused on the P.S. from Aeropostale brand, responsible for preparing financials for his group and presenting products to the Executive Committee (CW2); an associate merchant in the merchandising department, responsible for ordering clothing in the long-sleeve women's knit line (CW3); an assistant designer, responsible for fashion line development in women's woven outerwear (CW4); an associate merchant, responsible for women's sweaters and dresses (CW5); a senior planner for e-commerce primarily focused on the P.S. from Aeropostale brand, responsible for managing the P.S. line on the company's website (CW6); a freelance merchandise assistant in the merchandising department, who worked in women's accessories (CW7); a senior programmer/analyst, responsible for the upgrade and coding of Aeropostale's internal systems (CW8); and a merchandiser at the company (CW9).

Their evidence gives rise to the following findings.

- The women's line changed direction during the second half of 2010, with the introduction of Meads' new "mature" designs and muted color palette. Defendants knew about the change, and Meads was fired in December 2010 as a result of the designs' failure.

- As of December 2010, the women's department had ordered almost all of the merchandise in Meads' unpopular styles through spring and summer of 2011. Since inventory at Aeropostale is ordered six to nine months before the clothing hits the shelves, it is impossible to rectify an excess inventory problem in one or two quarters.

- The "inventory crisis" began in the second half of 2010 and intensified in early 2011 and throughout the putative class period. Aggressive markdowns and promotions were not proving successful at clearing the inventory, and Aeropostale had to rent additional storage space to house the excess inventory.

- Aeropostale employed aggressive and unprecedented discounts and promotions during the putative class period, which severely affected Aeropostale's margins throughout the putative class period.

- Defendants had access to, reviewed, and discussed flash reports, Unit Q reports, the Bible, and sales reports, which contained detailed information regarding sales, inventory, and other performance metrics on a "real time basis." Daily flash reports showed that all of the 2011 sales figures were "dismal," and weekly sales reports made it clear that Aeropostale was not reaching its sales goals during the putative class period.

- The inventory crisis was discussed at weekly Executive Committee meetings, as early as February 2011. At a meeting in April 2011, Defendants acknowledged that the "heavily discounted merchandise was still not selling."

From this, one can infer that Defendants, having access to all this information and watching the downward trend, omitted to disclose all the information necessary to make their statements true and did so either recklessly or consciously – more likely the latter.

And those inferences are "at least as" compelling as any non-fraudulent inference. This is a case where, assuming the pleaded facts to be true, it is hard to come up with a non-fraudulent inference. In view of the daily sales data available to Defendants, and the ongoing nature of the problem as the weeks and months passed with no visible improvement (indeed, with a deterioration) in the company's prospects for consumer acceptance of Meads' styles and colors – in a business segment that accounted for 70% of the company's revenue – it is difficult to infer that Defendants really and reasonably thought that the company's problem would not persist until all of Meads' influence on Aeropostale's teen fashions had dissipated. The inference that Defendants failed to apprise the market that "last year's problem" could not be fully corrected

until halfway through "this year," even though they knew otherwise, is highly compelling on this record.

The opposing inference of non-fraudulent intent is that Defendants were aware that the "mature" designs were not selling, and that they had problems with excess inventory as a result. But they reasonably believed that the problems would not persist throughout the first and second quarters, and that the effect on financial performance would not be "as bad" as it proved to be. This inference is supported by Defendants "early" disclosures – several weeks before their financial reporting on the quarter at issue was due under SEC regulations – that the actual earnings per share results would be much lower than the projected earnings given at the beginning of the quarter. It is also supported by the fact that Defendants significantly lowered the expected earnings per share for the second quarter (from $0.35-$0.38 in the first quarter, to $0.11-$0.16 in the second quarter, and compared to $0.46 earnings per share in the second quarter of the previous year), presumably after they saw how poorly the designs ended up selling through the spring.

"Later disclosures that timely raise questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith." _Slayton_, 604 F.3d at 777 (quoting _Matrix Capital Management Fund, LP v. Bearing Point, Inc._, 576 F.3d 172, 187 (4th Cir. 2009)). But in this case, the facts as alleged by Plaintiff do not indicate that these disclosures made by Defendant were "timely;" in fact, they suggest the opposite. And the lowered "earnings per share" guidance for the second quarter also supports an inference that Defendants, recognizing that actual earnings would eventually be disclosed, merely understated the severity of the problems as a way to avoid revealing the full extent of the problem – the poor designs purchased through the summer of 2011 – until the fall. At that time,

Aeropostale could comfortably report that the problems arising from the "merchandising missteps" were over.

Defendants argue vigorously that the "real time" data available to Defendants was not a "magic black box" that could perfectly predict performance for the quarter. But that need not be the case in order for Plaintiff to raise a strong inference of scienter. In assessing whether Plaintiff has met its burden to raise such an inference – one that is *at least as* compelling as any opposing inference – I must consider whether all of the facts, taken collectively, meet that standard, and not scrutinize any one fact in isolation. *See Tellabs*, 551 U.S. at 322-23. I am, of course, not privy to what the actual data revealed, aside from the reports of the confidential witnesses that appear in the Amended Complaint. But I find that here, the *access* to real time data, at a minimum, bolsters Plaintiff's allegation that Defendants were aware of the severity of the "inventory crisis," as recounted by the confidential witnesses (in addition to and separate from the witnesses' reports that Defendants attended various meetings and were aware of the inventory problems). And the bevy of information provided by those witnesses suggests that the crisis was severe and that it would not abate for the next two quarters, because of the material fact, omitted from Defendants' statements, that the poorly-received "mature" designs had been purchased through the summer of 2011.

We are only at the pleading stage, and discovery may well undermine the seeming strength of Plaintiff's position. But precisely because we are at the pleading stage, where – even under the PSLRA – we have to assume the truth of well-pleaded facts, it would be inappropriate to grant the motion to dismiss.[2]

---

[2] The Court did not consider any of the "expert testimony" that was included – inappropriately, in the Court's view – in the pleading.

## V. The Amended Complaint Sufficiently Alleges Section 20(a) Liability

Because Plaintiff has sufficiently pled a primary violation that the individual defendants controlled Aeropostale and acted with conscious misbehavior or recklessness, Plaintiff's control person claims against Defendants Johnson and Miller are actionable. *See* 15 U.S.C. § 78(t); *In re AIG*, 741 F. Supp. 2d at 534-36.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint is denied. The Clerk of the Court is directed to remove the motion at Docket No. 23 from the Court's list of pending motions.

Plaintiff has 30 days to move for class certification. Meanwhile, merits discovery will commence; it will not be stayed, since whether a class is certified or not we will be litigating the merits. *All* merits discovery, including expert discovery, must be complete by September 30, 2013. Plaintiff's expert report is due June 7, 2013; if Defendants retain an expert the report is due August 23, 2013. These dates *will not be extended.* Class discovery must proceed simultaneously.

March 25, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL