UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

THE CITY OF PROVIDENCE, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

-against-

AÉROPOSTALE, INC., THOMAS P. JOHNSON
and MARC D. MILLER,

Defendants.

——————————————————————— x

11 Civ. 7132 (CM) (GWG)

## MEMORANDUM OPINION AND ORDER GRANTING LEAD PLAINTIFF'S MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND ATTORNEYS' FEES AND EXPENSES

McMahon, J.:

This Action was commenced on October 11, 2011 by the filing of an initial complaint

alleging that Defendants violated the federal securities laws. ECF No. 1. On January 29, 2014,

after more than two years of litigation, the Parties signed a settlement Stipulation resolving Lead

Plaintiff's and the Class' claims for fifteen million dollars ($15,000,000). Under the terms of the

proposed Settlement, these funds will be allocated to all eligible Class Members[1] allegedly

impacted by Defendants' alleged violations of the federal securities laws.

The Court concludes that the Settlement should be approved. As set forth in detail in the

Declaration of Jonathan Gardner in Support of (A) Lead Plaintiff's Motion for Final Approval of

---

[1] On July 17, 2013, the Court entered an order that certified a class consisting of "all persons and entities that purchased or otherwise acquired the publicly traded common stock of Aeropostale from March 11, 2011 through August 18, 2011, inclusive, and who were damaged thereby." ECF No. 40.

Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for Attorneys' Fees and Payment of Litigation Expenses, dated April 4, 2014 (the "Gardner Declaration" or "Gardner Decl."), when viewed in light of the risks that Lead Plaintiff would not prevail on Defendants' likely summary judgment motion or at trial, the Settlement is a very favorable result for the Class. In addition, the Settlement also saves the Class the delay posed by continued litigation through summary judgment, trial, and any subsequent appeals.

The Parties reached the Settlement only after aggressively, extensively, and thoroughly litigating this Action. Lead Plaintiff's efforts are detailed in the Gardner Declaration and include, *inter alia*: (i) a detailed pre-filing investigation that included the review and analysis of documents filed publicly by Aéropostale with the SEC as well as other publicly available information about Aéropostale and the retail industry and interviewing 40 former Aéropostale employees—a number of whose accounts were included in the Complaint as confidential witness ("CW") accounts; (ii) responding to and defeating Defendants' motion to dismiss; (iii) fact discovery that involved, among other things, numerous meet and confer sessions to ensure the efficient production of relevant material, the collection and review of over 1.3 million pages of documents from Defendants and third parties, and five weeks of depositions, including a 30(b)(6) deposition and those of 12 current or former employees of Aéropostale; (iv) negotiation of a stipulation with Defendants regarding class certification after Lead Plaintiff had filed its motion for class certification, Providence and its investment advisors produced over 20,000 pages of documents, and after Defendants took the deposition of Providence as well as two representatives of its investment manager; and (v) a protracted mediation session before Judge Weinstein preceded by the exchange of detailed mediation statements and verbal presentations

by counsel that culminated in an arm's-length agreement in principle to settle the claims against Defendants. *See* Gardner Decl. ¶¶6-7, 19-75, 93-95.

In short, this case presents a near-ideal set of circumstances that give the court confidence that the Settlement as proposed is fair and reasonable. It is approved.

## I.   NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS

On January 30, 2014, the Court entered its Preliminary Approval Order (ECF No. 55), which directed that a hearing be held on May 9, 2014 to determine the fairness, reasonableness, and adequacy of the Settlement (the "Settlement Hearing"). The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice must be provided in a "reasonable manner"—*i.e.*, it must "'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 114 (2d Cir. 2005) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)).

Pursuant to the Preliminary Approval Order, the Notice was mailed to all known potential Class Members on February 20, 2014 and Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire* on March 6, 2014. *See* Declaration of Adam D. Walter on Behalf of A.B. Data, Ltd. Regarding Mailing of Notice to Potential Class Members and Publication of Summary Notice ("Mailing Declaration" or "Mailing Decl."), Ex. 3 ¶¶ 2-11.[2] The

---

[2] All exhibits referenced herein are annexed to the Gardner Declaration. For clarity, citations to exhibits that themselves have attached exhibits are referenced as "Ex. __-__," which is how Lead

3

Notice contains a detailed description of the nature and procedural history of the Action, as well as the material terms of the Settlement, including, *inter alia*: (i) the total recovery under the Settlement; (ii) the manner in which the Net Settlement Fund will be allocated among eligible Class Members; (iii) a description of the claims that will be released in the Settlement; (iv) the right and mechanism for Class Members to opt out or exclude themselves from the Class; and (v) the right and mechanism for Class Members to object to the Settlement, the Plan of Allocation, or the request for attorneys' fees and expenses.

One objection was received to the sufficiency of notice. It came from an attorney, Forrest S. Turkish, who has apparently filed similar objections in at least 12 other recent class actions. He is, as we say in the trade, a "professional objector." When his objections are overruled, he files a notice of appeal. As far as this court is aware, every one of those appeals has either been dismissed for failure to perfect or voluntarily dismissed. This pattern of litigiousness from a single attorney-objector without more seriously undermines the credibility of the objection in the eyes of this court. I have little time for "professional objectors," who, as one of my colleagues has noted, "undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients." *In re Initial Public Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010). They are a throwback to the days when this court was practicing law, and when the filing of securities fraud class actions by certain attorneys was chalked up as a "cost of doing business" by corporations – leading to the passage of the Private Securities Litigation Reform Act.

---

Counsel refers to them in the moving brief. The first numerical references refers to the designation of the entire exhibit itself attached to the Gardner Declaration and the second reference refers to the exhibit designation with the exhibit itself.

Furthermore, the objection is patently without merit. Indeed, it is patently frivolous. Responding to it has wasted the time of Lead Plaintiff's counsel, and dealing with it has wasted the time of this Court.

Mr. Turkish is hereby ordered to show cause why he should not be sanctioned by this court, in the amount of the costs incurred by Lead Plaintiff in responding to his objection, for filing a patently frivolous objection. An affidavit explaining why that sanction ought not be imposed must be filed with this court by Friday, May 16, 2014.

## II. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.    The Standard for Evaluating Class Action Settlements

Rule 23(e) requires review and approval by the Court for any class action settlement to be effective.  A settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Sony Corp SXRD*, 448 Fed. App'x. 85, 86 (2d Cir. 2011).  This evaluation requires the court to consider "both the settlement's terms and the negotiating process leading to settlement."  *Wal-Mart Stores*, 396 F.3d at 116; *Wright v. Stern*, 553 F. Supp. 2d 337, 343 (S.D.N.Y. 2008); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 165 (S.D.N.Y. 2007).

While the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, a general policy favoring settlement exists, especially with respect to class actions.  *Wal-Mart,* 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *see also In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816 (DLC), 2004 WL 2338151, at *5 (S.D.N.Y. Oct. 18, 2004).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp

5

approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation

that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d

448, 462 (2d Cir. 1974); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM),

2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.).

In addition to a presumption of fairness that attaches to a settlement reached as a result of

arm's-length negotiations, the Second Circuit has identified nine factors that courts should

consider in deciding whether to approve a proposed settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; [and] (9) the range of reasonableness of the settlement fund to a
> possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted). "[N]ot every factor must weigh in favor of

settlement, rather the court should consider the totality of these factors in light of the particular

circumstances." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y.

2004); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK),

2007 WL 4526593, at *13 (S.D.N.Y. Dec. 20, 2007).

Here, the Settlement satisfies the criteria for approval articulated by the Second Circuit.

**B.     The Settlement Is Procedurally Fair**

A strong initial presumption of fairness attaches to a proposed settlement if it is reached

by experienced counsel after arm's-length negotiations. *See Shapiro v. JPMorgan Chase & Co.*,

Nos. 11 Civ. 8831(CM)(MHD), 11 Civ. 7961(CM), 2014 WL 1224666, at *7 (S.D.N.Y. Mar. 24,

2014) (McMahon, J.); *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 315 (E.D.N.Y.

2006). A court may find the negotiating process is fair where, as here, "the settlement resulted

from 'arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability . . . necessary to effective representation of the class's interests.'" *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (quoting *Weinberger,* 698 F.2d at 74)*; In re PaineWebber P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (citation omitted).

This initial presumption of fairness and adequacy applies here because the Settlement was reached by experienced, fully-informed counsel after arm's-length negotiations and, ultimately, with the assistance of Judge Daniel Weinstein, one of the nation's premier mediators in complex, multi-party, high stakes litigation, and one in whom this court reposes considerable confidence as a result of past experience. *See In re Flag Telecom Holdings*, *Ltd. Sec. Litig* No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010) (McMahon, J.) (noting that the "presumption in favor of the negotiated settlement in this case is strengthened by the fact that settlement was reached in an extended mediation supervised by Judge Weinstein"); *In re Wachovia Equity Sec. Litig.,* No. 08 Civ. 617 (RJS), 2012 WL 2774969, at *3 (S.D.N.Y. June 12, 2012) (noting the procedural fairness of settlement mediated by Judge Weinstein); *see also Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *3 (N.D. Ill. May 7, 2012), *aff'd sub nom. Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) (approving settlement and describing Judge Weinstein as "a nationally-recognized and highly-respected mediator"); Gardner Decl. ¶5.

Moreover, the recommendation of Lead Plaintiff, a sophisticated institutional investor, also supports the fairness of the Settlement. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is entitled to an even greater

7

presumption of reasonableness." *Veeco*, 2007 WL 4115809, at *5 (internal citation omitted). "'Absent fraud or collusion, the court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement.'" *Id.* at *5 (citation omitted). Lead Plaintiff Providence is a sophisticated institutional investor managing approximately $300.8 million in retirement fund assets. *See* Declaration of Jeffrey Padwa, Ex. 2 ¶1. Lead Plaintiff took an active role in all aspects of this Action, as envisioned by the PSLRA, including extensive efforts in discovery and participation in settlement negotiations. *Id.* ¶¶3-4. Lead Plaintiff approves of the Settlement without reservation. *Id.* ¶5.

Lead Counsel, who has extensive experience prosecuting complex securities class actions and is intimately familiar with the facts of this case, believes that the Settlement is not just fair, reasonable, and adequate, but is an excellent result for Lead Plaintiff and the Class. See Gardner Decl. ¶8. This opinion is entitled to "great weight." *PaineWebber*, 171 F.R.D. at 125 (citation omitted); *see also Veeco*, 2007 WL 4115809, at *12.

All of these considerations confirm the reasonableness of the Settlement and that the Settlement is entitled to the presumption of procedural fairness.

### C.  Application of the *Grinnell* Factors Supports Approval of the Settlement

#### 1.  The Complexity, Expense and Likely Duration of the Litigation Support Final Approval of the Settlement

"This factor captures the probable costs, in both time and money, of continued litigation." *Shapiro,* 2014 WL 1224666, at *8. Here, the litigation was complex and likely would have lasted for quite some time in the absence of settlement. Indeed, securities class actions are by their very nature complicated and district courts in this Circuit have "long recognized" that securities class actions are "notably difficult and notoriously uncertain" to litigate. *In re Bear*

*Stearns Cos. Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999).

Lead Plaintiff's claims raise numerous complex legal and factual issues concerning the retail industry, inventory account, and loss causation. *See generally* Gardner Decl. ¶¶76-92. It would be costly and time-consuming to pursue this litigation all the way through to trial, with no guarantee of success. Even if the Class could recover a judgment at trial, the additional delay through trial, post-trial motions, and the appellate process could prevent the Class from obtaining any recovery for years. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation ... the passage of time would introduce yet more risks ... and would in light of the time value of money, make future recoveries less valuable than this current recovery."). Furthermore, even winning at a trial does not guarantee a recovery to the Class, because there is always a risk that the verdict could be reversed on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action). Thus, this factor weighs strongly in favor of approval of the Settlement.

### 2. The Reaction of the Class to the Settlement Supports Final Approval of the Settlement

The reaction of the Class to the Settlement is a significant factor in assessing its fairness and adequacy, and "'the absence of objections may itself be taken as evidencing the fairness of a settlement.'" *PaineWebber*, 171 F.R.D. at 126 (citation omitted); *see also Luxottica Grp.*, 233 F.R.D. at 311-12. This Court has previously noted that the reaction of the class to a settlement "is considered perhaps 'the most significant factor to be weighed in considering its adequacy.'" *Veeco*, 2007 WL 4115809, at *7 (citation omitted).

Here, pursuant to the Preliminary Approval Order, a total of 39,429 copies of the Notice have been mailed to potential Class Members and the Summary Notice was published in *Investor's Business Daily* and issued over the *PR Newswire*. *See* Ex. 3 ¶¶10-1. Only two requests for exclusion were received, representing 40.43 shares of Aeropostale's common stock. (*see id.* ¶16).

The only objection to the Settlement itself was filed by a Mr. Opp, who takes issue with the start date of the Class Period and the fact that only purchasers of stock during the Class Period are member of the class. (Mr. Opp also objected to the request for attorneys' fees; that will be taken up separately at the end of this opinion). For the reasons set forth at pages 9-10 of the Reply Brief filed by Lead Plaintiff, neither of those objections has the slightest merit, and I reject them.

That almost no Class Member objected to the Settlement or chose to exclude himself from it is indeed the strongest indication that the Settlement is fair and reasonable.

### 3.  The Stage of the Proceedings and Discovery Completed Support Final Approval of the Settlement

In considering this factor, "the question is whether the parties had adequate information about their claims,' such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *Bear Stearns,* 909 F. Supp. 2d at 266 (citing *In re IMAX Sec. Litig.,* 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (internal citations, quotation marks and alterations omitted)).  To satisfy this factor, parties need not have even engaged in formal or extensive discovery. *See Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 363 (S.D.N.Y. 2002).

Here, Lead Counsel conducted its own initial investigation without the benefit of any government investigation to formulate its theory of the case and develop sufficient detail to

defeat Defendants' motion to dismiss.  As set forth in the Gardner Declaration, the investigation

included, *inter alia*, reviewing and analyzing publicly available information and data concerning

Aéropostale; interviewing numerous former Aéropostale employees and other persons with

relevant knowledge after locating over a hundred potential witnesses; and consulting with

experts about the retail industry, accounting, valuation, and causation issues.  Gardner Decl. ¶¶6,

19-20.

     In addition, Lead Plaintiff and Lead Counsel have conducted extensive formal discovery,

including the review and analysis of over 1.3 million pages of documents from Defendants and

various third parties as well as substantially completing fact depositions.  *See* Gardner Decl.

¶¶36-55, 59-60, 61-64.  Lead Counsel has worked extensively with Lead Plaintiff's damages and

liability experts, including a retail industry expert and an accounting expert, in order to analyze

the strengths and weaknesses of Lead Plaintiff's claims.  *Id.* ¶74.  Indeed, this Action settled

only three days before the close of fact discovery and only three weeks before Lead Plaintiff was

set to serve its expert reports.  *Id.*

     Lead Plaintiff also filed its motion for class certification, arguing that the Action was

particularly well-suited for class action treatment and that all the requirements of Federal Rule of

Civil Procedure 23 were satisfied.  *See* ECF No. 31.  Accompanying Lead Plaintiff's class

certification motion were numerous exhibits supporting that the market for Aéropostale common

stock was efficient during the Class Period.  Lead Plaintiff also submitted a declaration from

Providence demonstrating Lead Plaintiff's adequacy to represent the proposed class in

connection with its class certification motion.  *See* ECF No. 34.  Class discovery was conducted,

including the deposition of Lead Plaintiff, after which Defendants ultimately stipulated to class

certification.  *See* ECF No. 40.

Accordingly, Lead Plaintiff and Lead Counsel have developed a comprehensive understanding of the key legal and factual issues in the litigation and, at the time the Settlement was reached, had "a clear view of the strengths and weaknesses of their case" and of the range of possible outcomes at trial. *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) (quotation omitted). Accordingly, this factor supports approval of the Settlement.

### 4. The Reasonableness of the Settlement in Relation to the Risk of Establishing Liability Supports Approval of the Settlement

In assessing the Settlement, the Court should balance the benefits afforded to the Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation. *See Grinnell*, 495 F.2d at 463; *Veeco*, 2007 WL 4115809, at **8-9. Although Lead Plaintiff and Lead Counsel believe that they had a reasonable likelihood of prevailing on the claims at summary judgment and at trial, they also recognize that there were considerable risks involved in pursuing the litigation against Defendants that could have led to a substantially smaller recovery or no recovery at all.

As set forth in detail in the Gardner Declaration (¶¶76-92), Lead Plaintiff faced numerous hurdles to establishing liability. In particular, Defendants have raised a number of arguments and defenses (which they would likely raise at summary judgment and trial) involving, *inter alia*: whether there were actionable misstatements and omissions; the ability of Lead Plaintiff to establish that Defendants acted with scienter; whether the market was fully aware during the Class Period of the issues the Company was having with its inventory, before the alleged corrective disclosures; and whether the market reacted to general negative earnings disclosures, not revelations of any allegedly fraudulent statements or omissions. *See id.*

For example, with respect to the falsity of statements, Defendants would have likely argued that, in a March 2011 investor call, well in advance of the first alleged corrective disclosure, Defendants explained to investors that the Company was aggressively clearing through an "overhang" in inventory caused by "women's assortment" issues that would not be recalibrated until its "fall and holiday product." As a result of such warnings, and others, Defendants would likely contend that the market knew, and Defendants did not conceal, the facts and risks that Lead Plaintiff claims were allegedly not disclosed. *Id.* ¶¶78-82.

Additionally, Defendants would have continued to challenge Lead Plaintiff's ability to prove that Defendants acted with scienter. In particular, Defendants would likely contend that they lacked any fraudulent motive, illustrated by the lack of insider trading during the Class Period. Additionally, Defendants would argue that Aéropostale repurchased $100 million worth of stock at the beginning of the Class Period, thereby showing that the Company believed that the stock was undervalued. *Id.* ¶¶84-86.

Defendants undoubtedly would have also continued to argue that any potential investment losses suffered by Lead Plaintiff and the Class were actually caused by external, independent factors, and not caused by Defendants' alleged conduct. In particular, Defendants would undoubtedly argue that Aéropostale's guidance misses were attributable to market forces and other macroeconomic considerations, including, among others, that during the Class Period (i) Aéropostale's competitors in the teen retail market adopted Aéropostale's "highly promotional" strategy which historically gave it a competitive edge, and (ii) its core customer base had not responded to a slow and bifurcated economic recovery. *Id.* ¶¶87-88.

Defendants would also have argued that Lead Plaintiff could not establish liability with respect to Aéropostale's 2Q2011 earnings miss. If successful, this defense would have

eliminated two of the four alleged corrective disclosure dates in the case, and would have reduced the Class's maximum damages by $91 million.  Among the facts that did not favor Lead Plaintiff in this regard, the Company issued conservative guidance for 2Q2011,[3] highlighted the increasingly promotional nature of the Company's competition in public statements to the market, and warned that the Company continued to face margin pressure resulting from a buildup of unsold inventory.  *Id.* ¶¶8, 81.

The risks of the case being lost or its value diminished on a pre-trial motion or at trial, when weighed against the immediate benefits of settlement, reinforce Lead Plaintiff's judgment that the Settlement is in the best interest of the Class.

### 5. The Reasonableness of the Settlement in Relation to the Risk of Establishing Damages Supports Final Approval of the Settlement

Even if Lead Plaintiff successfully established liability, it also faced substantial risk in proving damages.  Once causation is established, damages remain "a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and [share]s true value absent the alleged fraud." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (internal quotation omitted).  Should Lead Plaintiff have succeeded in proving liability, considerable risk remained with proving damages at trial. The elimination of even one alleged corrective disclosure would have material consequences.  As noted above, if, for example, a jury were to find no loss causation or artificial inflation with respect to Aéropostale's 2Q2011 earnings miss, this would have eliminated two of the four

---

[3] Indeed, the Company issued EPS guidance in 2Q2011 of $0.11 to $0.16, dramatically lower than 2Q2010 results of $0.46, citing margin pressure from the inventory overhang and assortment issues. The Company ultimately reported 2Q2011 EPS of $0.04.  *Id.* ¶81.

alleged corrective disclosure dates and would have drastically reduced the Class's damages. A jury might also have credited Defendants' argument that macroeconomic conditions led to the Company's earnings miss at the end of the Class Period – significantly reducing or eliminating the Class' damages.

Undoubtedly, the Parties' competing expert testimony on damages would inevitably reduce the trial of these issues to a risky "battle of the experts" and the "jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable." *Flag Telecom*, 2010 WL 4537550, at *18. The complex issues surrounding damages, therefore, support final approval of the Settlement.

### 6. The Risks of Maintaining the Class Action Through Trial Supports Final Approval of the Settlement

Had the Settlement not been reached, there is no assurance that Class status would be maintained. This is not a significant factor favoring settlement, since it appears to this court unlikely that decertification would have occurred. But the law of class actions is developing at a rapid clip, and it is always possible that some new Supreme Court decision would counsel in favor of decertification.

### 7. The Ability of Defendant to Withstand a Greater Judgment

Lead Counsel does not dispute the viability of Aéropostale and has no reason to believe that Defendants could not withstand a greater judgment. Courts, however, generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement.

The Amount of the Settlement Supports Final Approval

The last two substantive factors courts consider are the range of reasonableness of a settlement in light of (i) the best possible recovery and (ii) litigation risks. *Grinnell*, 495 F.2d at

463. In analyzing these last two factors, the issue for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. The court "'consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable.'" *Id.* at 462 (citation omitted). Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *PaineWebber*, 171 F.R.D. at 130 (citation and internal quotation marks omitted). Instead, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The Settlement here provides a recovery well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation. According to analyses prepared by Lead Plaintiff's consulting damages expert, using certain assumptions and modeling, the maximum damages recoverable by the Class would be approximately $163 million (assuming 100% recovery for all four alleged corrective disclosure dates), but the most realistic maximum provable damages would likely be as low as $72 million. Gardner Decl. ¶8. The $15 million Settlement therefore represents a recovery in the range of approximately 9.2% to 21% of estimated damages. This recovery, particularly in view of the risks and uncertainties discussed above, falls well within the range of possible approval and courts have generally approved other settlements in PSLRA cases that recover a comparable or smaller percentage of estimated damages. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million settlement with a recovery of approximately 6.25% of estimated damages and noting that this is at the "higher end of the range of reasonableness of recovery in class actions securities litigations"); *In re Gilat*

16

*Satellite Networks, Ltd.*, No. CV 02-1510 (CPS), 2007 WL 2743675, at *12 (E.D.N.Y. Sept. 18, 2007) (approving $20 million settlement representing 10% of maximum damages); *see also In re Omnivision Techs., Inc. Sec. Litig.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages after deducting fees and costs was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements").

Moreover, the $15 million Settlement is well above the $9.1 million median settlement amount of reported securities class action settlements in 2013, and greater than the median reported settlement amounts since the passage of the PSLRA, which have ranged from $3.7 million in 1996 to $9.1 million in 2013 (with a peak of $12.3 million in 2012). *See* Gardner Decl. ¶8; Ex. 1 at 28.

Accordingly, the court concludes that the *Grinnell* factors favor approval of the Settlement.

## III.   THE PLAN OF ALLOCATION IS FAIR AND ADEQUATE

The standard for approval of a plan of allocation is the same as the standard for approving the settlement as a whole: "'namely, it must be fair and adequate.'" *Maley*, 186 F. Supp. 2d at 367 (citation omitted); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005). "As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable' under the particular circumstances of the case." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 518 (E.D.N.Y. 2003) (citation omitted), *aff'd sub nom. Wal- Mart Stores, Inc.*, 396 F.3d 96 (2d Cir. 2005). A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *In re Am. Bank Note Holographics Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001); *see also WorldCom*, 388 F. Supp. 2d at 344 (same).

The Plan of Allocation, which was fully described in the Notice, was prepared with the assistance of Lead Plaintiff's consulting damages expert.  It provides for the distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata basis* based upon each Class Member's "Recognized Loss," as calculated by the formulas described in the Notice.  These formulas are tied to the amount of alleged artificial inflation in the share prices, as quantified by Lead Plaintiff's expert.  Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Class.  *See* Gardner Decl. ¶¶103-07.

Notably, no Class Member has objected to this straightforward Plan of Allocation.

## IV. THE MOTION FOR ATTORNEYS' FEES IS GRANTED

For its efforts in achieving this result, Lead Counsel seeks a percentage fee of 33% of the Settlement Fund (or $4,950,000), and payment of $455,506.85 in expenses incurred in prosecuting this Action.

Attorneys who achieve a benefit for class members in the form of a "common fund" are entitled to be compensated for their services from that settlement fund.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  *See also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *In re Beacon Assocs. Litig.*, No. 09 Civ. 777(CM), 2013 WL 2450960, at *4 (S.D.N.Y. May 9, 2013 ) (McMahon, J.).  The purpose of the common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to ensure that all class members contribute equally towards the costs associated with litigation pursued on their behalf.  *See Goldberger*, 209 F.3d at 47; *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 0165 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007) (McMahon, J).

18

Courts have recognized that, in addition to providing just compensation, awards of fair attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature. *See, e.g., Hicks v. Morgan Stanley*, No. 01-cv-10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding."); *Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (McMahon, J.) ("courts recognize that such awards serve the dual purposes of encouraging representatives to seek redress for injuries caused to public investors and discouraging future misconduct of a similar nature") (citation omitted). Courts in this Circuit have consistently adhered to these teachings. *See, e.g., In re Top Tankers, Inc. Sec. Litig.,* No. 06 Civ. 13761 (CM), 2008 WL 2944620, at *12 (S.D.N.Y. July 31, 2008) (McMahon, J.) ("It is well established that where an attorney creates a common fund from which members of a class are compensated for a common injury, the attorneys who created the fund are entitled to 'a reasonable fee - set by the court - to be taken from the fund.'") (citations omitted).

The Second Circuit has authorized district courts to employ the percentage-of-the-fund method when awarding fees in common fund cases. *See Goldberger,* 209 F.3d at 47 (holding that the percentage-of-the-fund method may be used to determine appropriate attorneys' fees, although the lodestar method may also be used); *Veeco,* 2007 WL 4115808, at *2. In expressly approving the percentage method, the Second Circuit recognized that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger,* 209 F.3d at 48, 49; *Savoie v. Merchs. Bank,* 166 F.3d 456, 460 (2d Cir. 1999) (stating that

"percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases").

The trend among district courts in the Second Circuit is to award fees using the percentage method. *See, e.g., Beacon*, 2013 WL 2450960, at *5 ("the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases, reserving the traditional 'lodestar' calculation as a method of testing the fairness of a proposed settlement"); *In re IMAX Sec. Litig.,* No. 06 Civ. 6128 (NRB), 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012) ("'the percentage method continues to be the trend of district courts in th[e Second] Circuit'") (citation omitted); *see also Veeco,* 2007 WL 4115808, at *3; *Hicks*, 2005 WL 2757792, at *22.

The issue in this case is whether 33% — which is at the high end of the range of other percentage fee awards within the Second Circuit in comparable settlements — is reasonable. Given the advanced stage of the litigation at the time that the settlement was achieved, I hold that it is.

This Court has held, in another case, that "[i]n this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund." *Beacon*, 2013 WL 2450960, at *5. I also recognize that other courts in this District have approved attorneys' fees in the amount requested here. *See Fogarazzo v. Lehman Bros. Inc.*, No. 03 Civ. 5194(SAS), 2011 WL 671745, at *4 (S.D.N.Y. Feb. 23, 2011) (awarding 33.3% of $6.75 million settlement); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2001) (awarding 33% of $13 million settlement); *In re Van Der Moolen Holding N.V. Sec. Litig.*, No. 1:03-CV-8284 (RWS), slip op. at 2 (S.D.N.Y. Dec. 6, 2006) (awarding 33 1/3% of $8 million settlement) (Ex. 9); *Maley*, 186 F. Supp. 2d at 368 (awarding 33 1/3% of $11.5 million

settlement and citing two cases which awarded 33 1/3% of the settlement amount: *In re Apac Teleservs., Inc. Sec. Litig.*, No. 97 Civ. 9145, at 2 (S.D.N.Y. June 29, 2001), awarding 33 1/3% of $21 million settlement, and *Newman v. Caribiner Int'l Inc.*, No. 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001), awarding 33 1/3% of $15 million settlement); *see also Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06 Civ. 4270 (PAC), 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Khait v. Whirlpool Corp.*, No. 06-6381, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement). The same is true in other districts. *See, e.g., In re Heritage Bond Litig.*, No. No. 02–ML–1475 DT(RCx), 2005 WL 1594403, at *23 (C.D. Cal. June 10, 2005) (awarding 33 1/3% of $27.78 million settlement); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 498 (E.D. Pa. 2003) (awarding 33 1/3% of $7 million settlement); *In re E.W. Blanch Holdings, Inc. Sec. Litig.*, No. 01-258, 2003 WL 23335319, at *3 (D. Minn. June 16, 2003) (awarding 33 1/3% of $20 million settlement); *In re Green Tree Fin. Corp. Stock Litig./Options Litig.*, Nos. 97-2666 and 97-2679, slip op. at 9 (D. Minn. Dec. 18, 2003) (awarding 33 1/3% of $12.45 million settlement) (Ex. 9).

Nonetheless, in cases where the settlement amount – while reasonable – is not a large fraction of the total amount sought by the class (and this is such a case), this court believes it incumbent to scrutinize the fee request with great care, lest it authorize a fee award that is out of proportion to the amount of work performed by class counsel.

I handily conclude that Lead Counsel have earned the fee they request.

The Second Circuit in *Goldberger* explained that a court should consider the traditional criteria that reflect a reasonable fee in common fund cases, including:  (i) the time and labor

21

expended by counsel; (ii) the risks of the litigation; (iii) the magnitude and complexity of the litigation; (iv) the requested fee in relation to the settlement; (v) the quality of representation; and (vi) public policy considerations. *Goldberger*, 209 F.3d at 50. As explained fully above, all the factors are satisfied. Plaintiffs' Counsel have expended substantial time and effort pursuing the Action on behalf of the Class — since its inception, Plaintiffs' Counsel have devoted more than 14,000 hours to this Action with a lodestar value of $7,047,145. *See also* Ex. 7. The Settlement follows two years of litigation, the scope of which was described above. This is not a class action that was settled early on, with only minimal or preliminary discovery. The case involved substantial expenditure of time and effort by Lead Counsel. The case was complicated. And the risks of continuing litigation were substantial.

To ensure the reasonableness of a fee awarded under the percentage method, "the Second Circuit encourages a crosscheck against counsel's lodestar." *Beacon*, 2013 WL 2450960, at *15. "Where the lodestar is 'used as a mere cross-check, the hours document by counsel need not be exhaustively scrutinized by the district court.'" *Veeco,* 2007 WL 4115808, at *8 (quoting *Goldberger*, 209 F.3d at 50).

Under the lodestar method, the court must engage in a two-step analysis: first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work. *See, e.g., Flag Telecom*, 2010 WL 4537550, at *25-26. Performing the lodestar cross-check here confirms that the fee requested by Lead Counsel is reasonable and should be approved.

Plaintiffs' Counsel have spent, in the aggregate, 14,119 hours in the prosecution of this case. *See* Gardner Decl. ¶¶112, 122; Exs. 4 - B, 5 - B, 6 - B, and 7 (summary table of lodestars and expenses). This represents time spent on the Action by partners, of counsel, associates, staff attorneys, paralegals, investigators, and professional analysts. *Id.* The resulting lodestar at Plaintiffs' Counsel's billing rates is $7,047,145. Applying 2013 or 2014 rates to the work done (which has the approval of both the Second Circuit and the Supreme Court), the hourly billing rates of Plaintiffs' Counsel here range from $640 to $875 for partners, $550 to $725 for of counsels, and $335 to $665 for other attorneys. *See* Gardner Decl. ¶121. "In determining the propriety of the hourly rates charged by plaintiffs' counsel in class actions, courts have continually held that the standard is the rate charged in the community where the services were performed for the type of services performed by counsel," *Telik,* 576 F. Supp. 2d at 589, and the rates charges by Lead Counsel are in line with rates charged by New York firms that *defend* class actions on a regular basis." *Id. , See* Gardner Decl. ¶121. The fee request is a negative multiplier of 0.70 of Plaintiffs' Counsel's lodestar. Such a multiplier is well below the parameters used throughout district courts in the Second Circuit, which affords additional evidence that the requested fee is reasonable. *See, e.g., In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.,* 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (approving requested fee with a negative multiplier and noting that the negative multiplier was a "strong indication of the reasonableness of the [requested] fee") (citation omitted of reasonableness and noting that lodestar multiples of over 4 are awarded by this Court).

Furthermore, while the fee is set, the legal work on this Action will not end with the Court's approval of the proposed Settlement. Additional hours and resources necessarily will be expended assisting members of the Class with their Proof of Claim and Release forms,

shepherding the claims process, responding to Class Member inquiries, and moving for a distribution order. The time and effort devoted to this case by Plaintiffs' Counsel to obtain this $15 million Settlement confirm that the 33% fee request is reasonable.

### A. The Risks of the Litigation

#### 1. The Contingent Nature of Lead Counsel's Representation

The Second Circuit has recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974); *In re Am. Bank Note Holographics, Inc. Sec. Litig*, 127 F. Supp. 2d 418, 433(S.D.N.Y. 2001) (concluding it is "appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award") (citation omitted); *In re Prudential Sec. Ltd P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

Lead Counsel undertook this Action on a wholly contingent-fee basis, investing a substantial amount of time and money to prosecute the Action without a guarantee of compensation or even the recovery of expenses. Unlike counsel for Defendants, who is paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses since this case began, and would have received no compensation or expenses had this case not been successful. From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no

guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to pay for the considerable costs which a case such as this entails.  Because of the nature of a contingent practice where cases are predominantly complex lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.  Under these circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  *See* Gardner Decl. ¶¶112-13.

### 2. Risks Concerning Liability

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004).  Indeed, the "Second Circuit has identified 'the risk of success as perhaps the foremost factor to be considered in determining [a reasonable award of attorneys' fees.]'" *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *18 (S.D.N.Y. Dec. 23, 2009) (McMahon, J.) (citing *Goldberger*, 209 F.3d at 54).  While Lead Plaintiff remains confident in its ability to prove its claims and to effectively rebut Defendants' defenses, it recognizes that proving liability was far from certain.  Although the Court sustained Lead Plaintiff's claims at the motion to dismiss stage, it faced substantial risks if the Action continued.  To succeed on its claims, Lead Plaintiff must establish that Defendants made misstatements or omissions of material fact with scienter in connection with the purchase of Aéropostale common stock and that the Class suffered losses as a result of the revelation of truth regarding Defendants' misstatements and omissions.

As set forth in the Gardner Declaration and in the Settlement Brief, Defendants countered the existence of scienter, falsity, materiality, and loss causation, and presented arguments and defenses that required considerable legal skill to rebut. *See* Gardner Decl. ¶¶76-92; Settlement Brief §I.C.4. For example, since the beginning of the Action, Defendants have argued that Lead Plaintiff has not satisfied its scienter burden and they would continue to argue that Lead Plaintiff would not be able to prove scienter. Specifically, a central theme to the defense was that no one benefited from the alleged fraud; rather, because the Individual Defendants' bonus compensation was tied to achieving the announced projections, they stood to lose hundreds of thousands of dollars by knowingly setting the projections at unattainably high levels. In further support of its position, Defendants argued that Aéropostale had repurchased $100 million of Company stock at the beginning of the Class Period because it believed that the stock was undervalued. *See* Gardner Decl. ¶¶84-86.

Defendants would also continue to argue that their Class Period statements were not false and misleading because the market was already aware of the factors that caused the Company's earnings miss, including, *inter alia*: (i) a slow, bifurcated economic recovery had helped more well-off customers but had not yet reached the Company's customer base, therefore, its core customer base was spending less at Aéropostale; (ii) aggressive promotional activity by its competitors harmed Aéropostale's position in the teen retail sector; and (iii) merchandising decisions, including failing to predict what fashion would appeal to a fickle teen customer had negatively affected sales and margins. *Id.* ¶¶79-82.

Additionally, Defendants would have also continued to argue that Lead Plaintiff would not be able to prove loss causation, arguing that the stock price drops following announcements of the Company's first and second quarter 2011 results were attributable to market forces and

other macroeconomic considerations, not the correction of an alleged misstatement or omission. *Id.* ¶87.

Lead Counsel was able to rebut these arguments, and others, in connection with the Defendants' motion to dismiss, however Defendants would never concede their liability and would likely continue to press these defenses and others at summary judgment and trial.

### 3. Risks Concerning Damages

Whether Lead Plaintiff could prove damages was also unsettled and would continue to require a significant amount of effort on the part of Lead Counsel. "Proof of damages in complex class actions is always complex and difficult and often subject to expert testimony." *Shapiro v. JPMorgan Chase & Co.*, Nos. 11 Civ. 8831(CM)(MHD), 11 Civ. 7961(CM), 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (McMahon, J.). Lead Plaintiff's expert estimated that, depending on consideration of different alleged corrective disclosures, aggregate damages ranged between $72 million (if 100% of the two alleged corrective disclosures pertaining only to 1Q2011 are considered) and $163 million (if 100% of the four alleged corrective disclosures pertaining to both 1Q2011 and 2Q2011 are considered). *See* Gardner Decl. ¶8. In order for the Class to recover damages at the maximum level estimated by Lead Plaintiff's damages expert, they would need to prevail on each and every one of the claims alleged and establish loss causation related to the four alleged disclosures. The damage assessments of the Parties' trial experts would be sure to vary substantially, and expert discovery and trial would become a "battle of experts" requiring significant work on the part of Lead Counsel. *See, e.g., In re Flag Telecom Holdings Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *28 (S.D.N.Y. Nov. 8, 2010) (McMahon, J.) (burden in proving the extent of the class's damages weighed in favor of approving fee request).

### B.    The Magnitude and Complexity of the Litigation

The complexity of the litigation is another factor examined by courts evaluating the

reasonableness of attorneys' fees requested by class counsel. *See Chatelain v. Prudential-Bache*

*Sec. Inc.*, 805 F. Supp. 209, 216 (S.D.N.Y. 1992).  Indeed, the complex and multifaceted subject

matter involved in a securities class action such as this supports the fee request. *See Fogarazzo*,

2011 WL 671745, at *3 ("courts have recognized that, in general, securities actions are highly

complex").  As described in greater detail in the Gardner Declaration, this Action involved

difficult, complex, hotly disputed, and expert-intensive issues related to the retail industry,

inventory accounting, and loss causation.  Further, there was no road-map for Lead Counsel to

follow in this Action as no governmental agency investigated or brought action against

Defendants. *See, e.g., Flag Telecom*, 2010 WL 4537550, at *27 (noting lack of prior

governmental action against defendant on which lead counsel could "piggy back" in considering

fee request); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *8

(E.D.N.Y. Aug. 7, 1998) (noting that "class counsel did not have the benefit of a prior

government litigation or investigation" in approving requested fee).  Thus, Lead Counsel were

left to investigate and develop sufficient facts (without formal discovery) so as to overcome

Defendants' motion to dismiss governed by the heightened pleading standards of the PSLRA.

In connection with formal discovery, Lead Counsel undertook to review and analyze over

1.3 million pages of documents, which included complex accounting work papers and intricate

and voluminous inventory and sales reports.  Counsel prepared for and took 12 fact depositions

of executives of the Company.  Lead Counsel also prepared an extensive motion for class

certification and engaged in class discovery, which resulted in the Defendants stipulating to class

certification.

28

Accordingly, the magnitude and complexity of the Action and the difficulty of the legal and factual issues involved support the requested fee.

The quality of the representation and the standing of Lead Counsel are important factors that support the reasonableness of the requested fee. *See Flag Telecom,* 2010 WL 4537550, at *28.

Lead Counsel is nationally known as a leader in the fields of class actions and complex litigation, and has had substantial experience litigating securities class actions in courts throughout the country with success. *See* Gardner Decl. ¶124; Ex. 4 - A. As a firm with experienced securities class action litigators, Lead Counsel has not only had to use its knowledge, skill and efficiency from past experiences, but has also developed expertise in the unique issues presented here to overcome significant obstacles in the past two years of this litigation. Gardner Decl. ¶¶117-18. This favorable Settlement is attributable to the diligence, determination, hard work, and reputation of Lead Counsel, who developed, litigated, and successfully negotiated the settlement of this Action, an immediate cash recovery in a very challenging case.

The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work. *See Flag Telecom*, 2010 WL 4537550, at *28; *Teachers Ret. Sys.*, 2004 WL 1087261, at *20. Indeed, Defendants' Counsel, Weil, Gotshal & Manges LLP, is a long-time leader among national litigation firms, with well-noted expertise in corporate litigation practices. The highly skilled attorneys at Weil Gotshal zealously fought Lead Plaintiff's claims at every turn, but notwithstanding this formidable opposition, Lead Counsel was able to develop Lead Plaintiff's case so as to resolve the litigation on terms favorably to the Class.

Finally, the federal securities laws are remedial in nature, and, to effectuate their purpose

of protecting investors, the courts must encourage private lawsuits. *See Basic Inc. v. Levinson*,

485 U.S. 224, 230-31 (1988). The Supreme Court has emphasized that private securities actions

such as this provide "'a most effective weapon in the enforcement' of the securities laws and are

'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472

U.S. 299, 310 (1985) (citation omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 319 (2007) (noting that the court has long recognized that meritorious private actions to

enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and

civil enforcement actions).

Courts in the Second Circuit have held that "public policy concerns favor the award of

reasonable attorneys' fees in class action securities litigation." *Flag Telecom*, 2010 WL

4537550, at \*29. Specifically, "[i]n order to attract well-qualified plaintiffs' counsel who are

able to take a case to trial, and who defendants understand are able and willing to do so, it is

necessary to provide appropriate financial incentives." *In re WorldCom, Inc. Sec. Litig.*, 388 F.

Supp. 2d 319, 359 (S.D.N.Y. 2005). The significant expense combined with the high degree of

uncertainty of ultimate success means that contingent fees are virtually the only means of

recovery in such cases. Indeed, this Court recently noted the importance of "private enforcement

actions and the corresponding need to incentivize attorneys to pursue such actions on a

contingency fee basis" in *Shapiro*:

> [C]lass actions serve as private enforcement tools when . . . regulatory entities fail
> to adequately protect investors . . . plaintiffs' attorneys need to be sufficiently
> incentivized to commence such actions in order to ensure that defendants who
> engage in misconduct will suffer serious financial consequences . . . awarding
> counsel a fee that is too low would therefore be detrimental to this system of
> private enforcement.

2014 WL 1224666, at *24 (citing *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467,

515-16 (S.D.N.Y. 2009)); *see also Maley*, 186 F. Supp. 2d at 373 ("In considering an award of

attorney's fees, the public policy of vigorously enforcing the federal securities laws must be

considered."); *Med. X-Ray Film Antitrust Litig.*, 1998 WL 661515, at *23 (E.D.N.Y. Aug. 7,

1998) ("an adequate award furthers the public policy of encouraging private lawsuits");

*Chatelain*, 805 F. Supp. at 216 ("an adequate award furthers the public policy of encouraging

private lawsuits in pursuance of the remedial federal securities laws"); *In re Warner Commc'ns*

*Sec. Litig.*, 618 F. Supp. 735, 750-51 (S.D.N.Y. 1985) (observing that "[f]air awards in cases

such as this encourage and support other prosecutions, and thereby forward the cause of

securities law enforcement and compliance"), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

     Lawsuits such as this one can only be maintained if competent counsel can be retained to

prosecute them. This will occur if courts award reasonable and adequate compensation for such

services where successful results are achieved. Public policy therefore supports awarding Lead

Counsel's reasonable attorneys' fee request.

     In accordance with this Court's Preliminary Approval Order, 39,429 copies of the Notice

of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and

Expenses (the "Notice") were sent to potential Members of the Class. *See* Declaration of Adam

D. Walter on Behalf of A.B. Data, Ltd. Regarding Mailing of Notice to Potential Class Members

and Publication of Summary Notice ¶10. The Notice informed Members of the Class that Lead

Counsel would make an application up to 33% of the Settlement Fund plus litigation expenses

not to exceed $650,000, plus interest on such amounts. The time to object to the fee request

expires on April 18, 2014.

Two objections have been filed to the fee request. One came from professional objector Turkish, which does not recommend it to the court. All Mr. Turkish says is that the fee request is too high – indeed, is "presumptively unjustified." Actually, neither the Second Circuit nor the Supreme Court has established any presumption at all concerning any particular level of fee award that would be unreasonable in a securities fraud class action – nor would such a "presumption" be appropriate, since a fee request must be analyzed in accordance with the particulars of the case at bar, not against some arbitrary one-size-fits-all standard. As for Mr. Turkish's contention that the settlement compensation of $0.50 per share is extremely low in comparison to "damages of as much as $12.34 per share alleged by Plaintiffs," I can only say that his apparent inability to distinguish between the gross drop in the stock price between the beginning and the end of the class period (which was originally alleged to be, and in fact was, $12.34) and the damages that could be recovered by any given plaintiff suggests that this court would be well advised not to listen to his suggestions. In fact, had this case gone to trial, Plaintiffs' expert would have testified that damages would have ranged between $2.42 and $5.48 per share, while Defendant's expert (who had not yet submitted a report) would undoubtedly have testified that the per share damages were even less. The risk that various corrective disclosures would cut off damages altogether at an early date was far from insubstantial. In short, this court concludes that Mr. Turkish does not know whereof he speaks.

The other objection comes from a Mr. Opp, who suggests that the requested attorneys' fee should be no more than 4.8% — which he calculates is the percentage of eventual recovery after trial that the Settlement provides. Lead Counsel expended over $7 million, using reasonable local billing rates, in prosecuting this hard-fought action over a two year period. 4.8% of the Settlement (assuming, contrary to fact, that 4.8% is the correct figure – Mr. Opp, like Mr.

32

Turkish, simplistically assumed that the proper calculation of damages was simply the difference between the price of the stock at the start and the end of the Class Period) is $720,000. Public policy considerations alone compel the conclusion that an award of that magnitude – representing about 10 cents on the dollar worked – would be inappropriate.

## V.  PLAINTIFFS' COUNSEL'S EXPENSES WERE REASONABLY INCURRED AND NECESSARY TO THE PROSECUTION OF THIS ACTION

Plaintiffs' Counsel also respectfully request $455,506.85 in expenses incurred in prosecuting this Action.  Plaintiffs' Counsel's individual declarations attest to the accuracy of these expenses, which are properly recovered by counsel.  *See* Gardner Decl. ¶129; Exs. 4 through 6; *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (court may compensate class counsel for reasonable expenses necessary to the representation of the class).  Much of Plaintiffs' Counsel's expenses were for professional services rendered by Lead Plaintiff's experts and consultants, and expenses relating to discovery taken in the case.  Gardner Decl. ¶¶131-33; Exs. 4 ¶8 – C, 5 ¶8, 6 ¶8.  The remaining expenses are attributable to such things as travel for depositions and for mediation, the costs of computerized research, duplicating documents, and other incidental expenses.  *Id.* ¶134.  These expenses were critical to Lead Plaintiff's success in achieving the proposed Settlement.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys . . . [and] [F]or this reason, they are properly chargeable to the Settlement fund.") (citation omitted).

Not a single objection to the expense request has been received. Lead Counsel is entitled to payment for these expenses, plus interest earned on such amounts at the same rate as that earned by the Settlement Fund.

## VI. THE COURT AWARDS COSTS AND EXPENSES TO LEAD PLAINTIFF

Finally, Lead Counsel seeks an expense award of $11,235.04 for Lead Plaintiff for its lost wages and expenses, pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4(a)(4). The Notice disseminated to the Class stated that Lead Plaintiff may seek reimbursement of up to $15,000 from the Settlement Fund as compensation for the time and expense it incurred. *See* Ex. 3 - A at 2. Lead Plaintiff claims to have expended, in wages and expenses for City employees who worked on aspects of this lawsuit, more than the amount requested.

A practice has grown up recently of awarding extra money (that is, money in addition to the fees awarded to the counsel to prosecute the case) to Lead Plaintiffs themselves. Although the PSLRA authorizes (but does not mandate) such awards, this court has always been troubled by the practice – even though I have not rocked the boat and disallowed such awards in prior cases. For the most part, I fail to see why a party who chooses to bring a lawsuit should be compensated for time expended in appearing at a deposition taken in order to insure that he is actually capable of fulfilling his statutory obligations, or responding to document requests, or performing what are essentially duplicative reviews of pleadings and motions that his lawyers are perfectly capable of reviewing for him. Meaning no disrespect to the City Solicitor of the City of Providence, he selected eminent and experienced outside counsel to prosecute this case, who needed no assistance in understanding the issues involved. There are no "lost wages" for the City to recover in this case: as counsel admitted at the final settlement hearing, all the employees of the City of Providence who worked on this case were paid their usual wages every day; they

34

were simply assigned to tasks associated with the lawsuit that they City chose to prosecute, and no concrete evidence has been offered that City operations suffered as a result.

Ironically, in this case, the Lead Plaintiff has probably been more involved in working on this lawsuit than most are – and more competently as well. I have no doubt that the City Solicitor for Providence and his staff have spent more than 150 hours providing various kinds of assistance to Lead Counsel. But what they did involves no more than (1) responding to perfectly legitimate discovery demands, including attending exactly one deposition, (2) commenting on papers prepared and filed by outside counsel, and (3) attending the mediation session. *See* Declaration of Jeffrey M. Padwa, City Solicitor for Providence, attached as Ex. 2 to Gardner Decl. These are activities for which we ordinarily do not "pay" plaintiffs – even prevailing plaintiffs. There has been no adjudication that Aeropostale violated the federal securities laws; there has been a settlement. It is entirely possible that this lawsuit is lacking in merit and that the City of Providence ought not to have bothered the court with it in the first place.

Courts may well "routinely award such costs and expenses to both reimburse named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as provide an incentive for such plaintiffs to remain involved in the litigation and incur such expenses in the first place." *Morgan Stanley*, 2005 WL 2757793, at *10; *see also Varljen v. H.J. Meyers & Co.*, No. 97 CIV 6742 (DLC), 2000 WL 1683656, at *4 (S.D.N.Y. Nov. 8, 2000) (reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel"). However, I personally believe that this sort of "tip" to the Lead Plaintiff ought not be routine. After much soul searching, and after hearing Lead Counsel extol the assistance he received from the City Solicitor's office, I have decided to authorize the payment of the requested sum to the City of Providence. But this opinion should

serve notice that this court, at least, will not routinely decide to "tip" Lead Plaintiffs simply

because their names appear in the caption, and will view with some skepticism conclusory

arguments that they actually made a meaningful substantive contribution to the lawsuit.

## CONCLUSION

For the foregoing reasons, the Court hereby (1) finds that due and adequate notice was

directed to persons and entities who are Class Members, advising them of the Plan of Allocation

and of their right to object thereto, and a full and fair opportunity was accorded to persons and

entities who are Class Members to be heard with respect to the Plan of Allocation.; (2) finds that

the formula in the Plan of Allocation for the calculation of the claims of Authorized Claimants

that is set forth in the Notice of Pendency of Class Action and Proposed Settlement and Motion

for Attorneys' Fees and Expenses (the "Notice") disseminated to Class Members, provides a fair

and reasonable basis upon which to allocate the net settlement proceeds among Class Members;

(3) finds that the Plan of Allocation set forth in the Notice is, in all respects, fair and reasonable;

(4) grants final approval of the Plan of Allocation; (4) authorizes Settlement Class Counsel to

make disbursements to Class members; and (5) awarded attorneys' fees in the amount of

$4,950,000 plus interest at the same rate earned by the Settlement Fund (or 33% of the

Settlement Fund, which includes interest earned thereon) and payment of litigation expenses in

the amount of $455,506.85, plus interest at the same rate earned by the Settlement Fund, which

sums the Court finds to be fair and reasonable; and (6) authorizes an award of $11,235.04 to

Lead Plaintiff. The Clerk of the Court is directed to remove Docket Nos. 57 and 59 from the

Court's list of pending motions and to close the file.

36

Dated: May 9, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL